**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**


William Soler Justice

v.                                          Case No. 20-cv-517-PB

Christopher T. Sununu et al.[1]


**AMENDED REPORT AND RECOMMENDATION**


Plaintiff William Soler Justice brings this action pursuant to 42 U.S.C. § 1983, alleging that the defendants have violated his federal constitutional and statutory rights, and are liable to him under state law.  Mr. Justice's complaint (Doc. No. 1) is before the court for preliminary review pursuant to 28 U.S.C. §§ 1915(e)(2) and LR 4.3(d)(2).


**Preliminary Review Standard**

The Court reviews complaints filed by individuals proceeding pro se and in forma pauperis to determine, among

---

[1] The plaintiff identifies the following defendants in his complaint: New Hampshire Governor Christopher T. Sununu; the New Hampshire Department of Corrections ("DOC"); DOC Commissioner Helen E. Hanks; DOC Medical and Forensic Services Director Paula L. Mattis; the DOC Secure Psychiatric Unit ("SPU"); SPU Medical Director Daniel P. Potenza, M.D.; SPU Psychiatrist Wendy Martin, M.D.; SPU Administrator Deborah Robinson; SPU Director of Nursing Carlene Ferrier; SPU Nurses John Lombard and Mark Gagne; SPU Corrections Officers Frank Logan, Scott J. Marshall, Joshua N. Deblois, Mark J. Kimball, Randal G. Carver, and Nathaniel P. Seabron; the Office of Public Guardian ("OPG"); and the former OPG guardian of Mr. Justice's person, Eric VanGelder.

other things, whether the complaint states a claim.  The court
determines whether, stripped of legal conclusions, and with all
reasonable inferences construed in the plaintiff's favor, the
complaint contains "sufficient factual matter, accepted as true,
to 'state a claim to relief.'"  Ashcroft v. Iqbal, 556 U.S. 662,
678 (2009) (citation omitted).  The Court may dismiss claims sua
sponte if, among other things, the court lacks jurisdiction, a
defendant is immune from the relief sought, or the complaint
fails to state a claim upon which relief may be granted.  See LR
4.3(d)(1).  The court construes pro se plaintiffs' filings
liberally.  See Erickson v. Pardus, 551 U.S. 89, 94 (2007).


## Background

### I.   Mr. Justice's Initial Placement in the SPU

Mr. Justice was charged in the New Hampshire Superior Court
("Superior Court") with attempted murder, assault, and reckless
conduct with a dangerous weapon (a car).  On February 9, 2018,
the Superior Court found that Mr. Justice, who has been
diagnosed with schizophrenia, paranoid type, was not competent
to stand trial on the charges against him, and that he was not
restorable to competence.  Thereafter, the New Hampshire Circuit
Court, Sixth Circuit, Probate Division ("Probate Court")
determined that Mr. Justice was potentially dangerous to himself
and others, and civilly committed him to the Secure Psychiatric
Unit ("SPU"), for a period of five years, with allowance for a

conditional discharge from that placement when and if such a
discharge was clinically appropriate, pursuant to N.H. Rev.
Stat. Ann. § ("RSA") 135-C.  See Feb. 9, 2018 Invol. Admis.
Order, In re Soler, No. 317-2018-IN-00027 (Probate Court) (Doc.
No. 1-13, at 1).  The SPU is a New Hampshire Department of
Corrections ("DOC") facility located in the New Hampshire State
Prison.

     Mr. Justice was placed at the SPU on February 13, 2018.
Mr. Justice asserts that he felt unsafe while housed at the SPU,
because the SPU is a prison setting, rather than a hospital
setting, and while there he was comingled with convicted
prisoners housed in that unit and subjected to punitive
corrections tactics which he alleges are not appropriate for a
nonprisoner patient committed to a mental health facility.  Mr.
Justice further alleges that the SPU is not licensed or
accredited as a mental health treatment facility, and is not
subject to oversight by any agency outside of the DOC.


II.  Use of Force Against Mr. Justice[2]

---

[2] Mr. Justice has attached a number of documents to his
complaint which were prepared by DOC employees.  See, e.g., Feb.
18, 2018 DOC Involuntary Treatment Authorization of Dr. Wendy
Martin (Doc. No. 1-16); Apr. 10, 2018 SPU SOAP Notes of Nurse
John Lombard (Doc. No. 1-20, at 1); Apr. 10, 2018 DOC Post
Pepper Spray Report of Nurse John Lombard (Doc. No. 1-21); July
13, 2017 Post Use-of-Force Report of Nurse Mark Gagne (Doc. No.
1-22); Jan. 22, 2019 SPU SOAP Note of Nurse John Lombard (Doc
No. 1-20, at 2); Jan. 22, 2019 Invol. Emerg. Treatment
Authorization of Scott Congdon (Doc. No. 1-23).  The documents

A.   <u>February 18, 2018</u>

On February 18, 2018, Mr. Justice was housed in the SPU infirmary when, because he was irritated by SPU Nurse John Lombard's refusal to answer his questions, he banged on his cell door for approximately ten minutes.  Corrections Officers ("COs") Joshua Deblois and Mark Kimball entered Mr. Justice's cell with a shield and a Taser.  CO Deblois deployed the Taser to Mr. Justice's left thigh, which caused Mr. Justice to feel "electrical throbbing and burning pain." Compl. (Doc. No. 1, at 5).  CO Deblois then forced Mr. Justice onto the concrete mattress frame in the cell.  Mr. Justice asserts he was then "involuntarily medicated and roughly transported to the restraint room" where he was evaluated, and held in four-point restraints for one to two hours.  <u>Id.</u>

B.   <u>April 10, 2018</u>

On April 10, 2018, CO Logan was firing a Taser outside of Mr. Justice's cell where Mr. Justice could hear it.  Mr. Justice, anticipating being tased, blocked the gap between his cell door and the wall with his mattress.  CO Logan ordered Mr.

---

prepared by DOC staff members at times describe the incidents underlying the claims in this action differently than Mr. Justice does in the narrative of his complaint.  For purposes of preliminary review, the Court credits Mr. Justice's version, <u>see</u> Iqbal, 566 U.S. at 678, and declines to resolve any potential factual disagreements between the parties that may arise during the litigation of this matter.

Justice to remove the mattress.  Mr. Justice followed that order, but CO Logan continued to ask him why the door was still blocked.  While Mr. Justice was trying to explain to CO Logan that he had removed the mattress, CO Logan deployed pepper spray into Mr. Justice's cell.  CO Logan left Mr. Justice in his cell for thirty to sixty minutes before returning and telling Mr. Justice to "cuff up."  Id. at 6.  Mr. Justice, agitated by what he perceived to be CO Logan's unjustified use of pepper spray, threatened to throw urine on CO Logan and refused to cooperate with him.

Nurse Lombard and CO Nathaniel Seabron then arrived at Mr. Justice's cell, at which time Mr. Justice cooperated with the SPU staff.  Nurse Lombard assessed Mr. Justice but failed to note in Mr. Justice's medical record that Mr. Justice had "breathing distress from exposure to the pepper spray."  Id.

C.  July 13, 2018[3]

On July 13, 2018, Mr. Justice placed newspaper over the window in his cell.  CO Randal Carver told him to remove the newspaper or "cuff up."  Id.  Mr. Justice climbed to the top of a concrete shelf in the cell and, anticipating being pepper-sprayed, put a pillow over his face.  CO Carver repeatedly

---

[3] Since filing his initial complaint, Mr. Justice has notified the Court that July 13, 2018 may not be the precise date of the incident described.  See Nov. 9, 2022, Pl.'s Mot. To Correct (Doc. No. 27).

deployed pepper spray into Mr. Justice's locked cell.  The exposure to pepper spray caused Mr. Justice to "double over in pain, coughing and spitting."  Id.

Thirty minutes later, CO Logan entered Mr. Justice's cell and forced him off of the high shelf and onto the concrete mattress frame, and handcuffed him, causing "painful injuries to [Mr. Justice's] wrists."  Id.  Mr. Justice asserts that prior to being handcuffed, he had not engaged in any assaultive, violent, or aggressive behavior.  Once Mr. Justice was handcuffed, CO Logan ordered him to get up and go to the shower.  When Mr. Justice told CO Logan that he couldn't breathe, SPU Nurse Mark Gagne conducted a "cursory" examination of Mr. Justice.  Id. at 7.

D.   January 22, 2019

On January 22, 2019, Mr. Justice was housed in a cell in the SPU infirmary when CO Logan accused him of attempting to spit at a female CO, and restrained Mr. Justice on the floor. CO Seabron then tased Mr. Justice while he was restrained, handcuffed, on the floor.  While Mr. Justice was handcuffed, CO Logan pulled him off the floor and to his feet, and then dragged him to the "restraint room," pulling Mr. Justice's face back "in a belittling and humiliating manner" in front of six other staff members.  Id.

In the restraint room, Mr. Justice claims CO Logan and CO
Seabron roughly placed him in four-point restraints.  CO Seabron
then tased Mr. Justice again while Mr. Justice was in four-point
restraints.  Mr. Justice was left in those restraints for three
hours, during which he was begging for help because the incident
in his cell had aggravated an old back injury and he was in
pain.  When CO Deblois released Mr. Justice from the four-point
restraints, he unnecessarily strip-searched Mr. Justice before
escorting him back to his cell.


III. <u>Request for Transfer to NHH and Eric VanGelder</u>

On May 10, 2019, Mr. Justice's SPU psychiatrist, Dr.
Garrett Graves, and SPU Administrator Deborah Robinson sent a
letter to Dr. Alexander de Nesnera, the Chief Medical Officer at
the New Hampshire Hospital ("NHH"), stating: "Currently Mr.
[Justice] has been consistently safe around staff and peers he
was advanced to the least restrictive level of care at SPU.  He
has been doing very well and is actively participating in his
treatment, including working on a WRAP plan."[4]  May 10, 2019
Letter of Deborah Robinson and Dr. Garret Graves (Doc. No. 1-
32).  On July 12, 2019 Dr. de Desnera requested that Dr. Jack
Hinck, an NHH psychiatrist, evaluate Mr. Justice and "give an

---

[4] Neither the complaint nor the attachments thereto explain
what the acronym "WRAP" stands for.

opinion as to whether Mr. [Justice] is appropriate for transfer to [NHH]."  July 12, 2019 Letter of Dr. Jack Hinck (Doc. No. 1-33, at 1).

Dr. Hinck responded to Dr. de Nesnera that he had met with Mr. Justice on July 3, 2019 and had reviewed at least some of his psychiatric records.  See id.  Dr. Hinck's letter stated that Mr. Justice, at that time, "d[id] not appear to be safe to transfer to NHH," based on his continuing "severe psychotic symptoms with persistent delusions that many people around him are part of a conspiracy against him," his "history of engaging in dangerous behaviors toward others based on these delusions," and his "poor insight into having a mental illness."  Id.  Dr. Hinck also recommended that Mr. Justice's medication be increased or changed prior to any transfer to NHH and that "a formal risk assessment be completed to assess his safety to transfer to [NHH] in the future."  Id.  On July 15, 2019, based on Dr. Hinck's assessment and recommendations, Dr. de Nesnera denied Mr. Justice a transfer to NHH.  See July 15, 2019 Letter of Dr. Alexander de Nesnera (Doc. No. 1-38).

Attached to Mr. Justice's complaint is a December 10, 2019 violence risk assessment report (Doc. No. 1-36) prepared at the request of the DOC by Kaitlyn Peretti, Psy. D.  Dr. Peretti examined Mr. Justice, reviewed his records, and conducted risk assessment testing.  See Dec. 10, 2019 Rpt. of Kaitlyn Peretti, Psy. D. (Doc. No. 1-36, at 1).  Dr. Peretti concluded that

transferring Mr. Justice from the SPU to NHH was appropriate at that time.  See id. at 10.  Based on the recommendations of Dr. Graves, Ms. Robinson, and Dr. Peretti, on December 23, 2019, Dr. de Nesnera accepted Mr. Justice for transfer to the NHH when a bed became available at that facility.  See Dec. 23, 2019 Letter of Dr. Alexander de Nesnera (Doc. No. 1-37).

At the time Mr. Justice filed this action, the Probate Court had appointed the Office of Public Guardian ("OPG") to be the guardian of his person and estate.  See July 29, 2018 Order, In re Soler, No. 317-2018-GI-00414 (Probate Court) (Doc. No. 12, at 4-13).  Eric VanGelder served as Mr. Justice's guardian on behalf of the OPG.[5]  Mr. Justice asserts that once his treating psychiatrist, Dr. Graves, recommended that Mr. Justice be transferred to the NHH, Mr. VanGelder was obligated to, but did not, assist him in obtaining a transfer out of the SPU to a less restrictive mental health treatment facility.  On August 7, 2020, Mr. Justice notified the Court that he had been transferred to NHH.  See Aug. 10, 2020, Pl.'s Notice of Change of Address (Doc. No. 9).

---

[5] After this case was filed, the Probate Court appointed Wanda J. Duryea as successor guardian of Mr. Justice's person. See Mar. 4, 2021 Order, In re Soler, No. 317-2018-GI-00414 (Probate Court) (Doc. No. 12, at 15-21).  Since then, the Probate Court has appointed Eric Hansmeier of the OPG as the guardian of Mr. Justice's person.

## Claims

The court, having construed Mr. Justice's complaint liberally, and considered all reasonable inferences in his favor, finds that Mr. Justice has asserted the following claims in this case:

1.    Defendants violated William Justice's Fourteenth Amendment right not to be subjected to an objectively unreasonable use of force, in that:

a.    On February 18, 2018, CO Joshua N. Deblois, in response to Mr. Justice banging on his cell door for ten minutes, and without sufficient provocation by Mr. Justice to make a use of force by CO Deblois objectively reasonable:

i.    deployed a Taser to Mr. Justice's thigh,

ii.   pushed Mr. Justice down on the cement mattress frame in his cell,

iii.  medicated Mr. Justice against his will,

iv.   "roughly transported" Mr. Justice to a "restraint room" in the SPU, and

v.    placed Mr. Justice in four-point restraints for one-to-two hours.

b.    On April 10, 2018, CO Frank Logan, in response to his incorrect belief that Mr. Justice had continued to block his cell door with a mattress after being instructed to remove the mattress, and without sufficient provocation by Mr. Justice to make a use of force by CO Logan objectively reasonable:

i.    pepper-sprayed Mr. Justice in his cell, and

ii.   left Mr. Justice in his cell for thirty to sixty minutes after deploying pepper spray into the cell.

10

      c.    On July 13, 2018,[6] in response to Mr. Justice's refusal to remove newspaper from his cell window, and without sufficient provocation by Mr. Justice to make a use of force against him objectively reasonable:

            i.    CO Randal G. Carver repeatedly deployed pepper spray into Mr. Justice's closed cell; and

            ii.  CO Frank Logan forced Mr. Justice off a shelf in his cell and onto a concrete mattress frame, causing "painful injury" to Mr. Justice's wrists and leg.

      d.    On January 22, 2019, believing that Mr. Justice had attempted to spit on a CO, and without sufficient provocation by Mr. Justice to make a use of force against him objectively reasonable:

            i.    CO Frank Logan forced Mr. Justice onto the floor of his cell while Mr. Justice was in restraints;

            ii.  CO Nathaniel P. Seabron tased Mr. Justice while he was restrained on the floor of his cell; and

            iii. CO Seabron tased Mr. Justice while he was in four-point restraints.

2.    Defendants violated William Justice's Fourteenth Amendment right to be protected from the objectively unreasonable use of force against him, in that:

      a.    on July 18, 2018, CO Mark J. Kimball accompanied CO Joshua N. Deblois into Mr. Justice's cell, and failed to protect Mr. Justice from being tased by CO Deblois, despite having a realistic ability and opportunity to do so; and

      b.    on January 22, 2019, CO Frank Logan failed to protect Mr. Justice, despite having a realistic ability and opportunity to do so, from:

            i.    being tased by CO Nathaniel P. Seabron while Mr. Justice was in restraints on the floor of his cell; and

---

[6] See supra note 3.

        ii.  being tased by CO Seabron while Mr. Justice
was in four-point restraints.

3.   CO Joshua Deblois violated William Justice's Fourth
and Fourteenth Amendment rights by subjecting him to an
unnecessary strip search on January 22, 2019.

4.   Defendants violated William Justice's Fourteenth
Amendment right to due process by subjecting him to
seclusion within the SPU, which amounted to objectively
unreasonable punishment.[7]

5.   Defendants violated William Justice's Fourteenth
Amendment right to equal protection by:

        a.   subjecting him to restraints, pepper-spraying,
tasing, and other abuse while he was housed in the
SPU, when other similarly situated people housed in
the SPU were not so treated; and

        b.   discriminated against him based on his
disability, serious mental illness.

6.   The DOC violated William Justice's rights under Title
II the Americans with Disabilities Act by:

        a.   discriminatorily denying him benefits and
services available in the SPU based on Mr. Justice's
disability, serious mental illness; and

        b.   violating the terms of a consent decree issued
August 12, 2014 in Amanda D. v. Hassan, No. 12-cv-53-
SM (D.N.H.).

7.   CO Frank Logan subjected William Justice to punitive
conditions of confinement on January 22, 2019, by forcing
his head up in front of six COs, while dragging Mr. Justice
from his cell to a restraint room, thus humiliating Mr.
Justice in violation of his Fourteenth Amendment rights.

8.   Defendants violated William Justice's Fourteenth
Amendment right to receive adequate medical care while
confined at the SPU, in that:

---

[7] Mr. Justice has not named any defendants to the claim
identified here as Claim 4.  Mr. Justice must move to amend his
complaint to identify those individuals by name once he obtains
their names in discovery.

a.    On April 10, 2018, SPU Nurse John Lombard examined Mr. Justice after Mr. Justice had been pepper-sprayed in his cell, and left in that cell for thirty to sixty minutes, but failed to note in Mr. Justice's medical record that Mr. Justice was experiencing "breathing distress" as a result of being exposed to pepper spray; and

b.    On July 13, 2018, Nurse Mark Gagne examined Mr. Justice after Mr. Justice had been pepper-sprayed in his cell, and left in that cell for thirty minutes, and after CO Frank Logan caused "painful injuries" to Mr. Justice's wrists and leg, but his examination was "cursory."

9.   Defendants violated William Justice's Fourteenth Amendment right to receive adequate mental health treatment at the SPU as that facility is neither licensed nor accredited as a mental health treatment facility.

10.  William Justice's personal belongings were missing after "shakedowns" of his cell in the SPU.

11.  Supervisory DOC and SPU defendants, including DOC Commissioner Helen E. Hanks, DOC Medical and Forensic Services Director Paula L. Mattis, SPU Medical Director Dr. Daniel P. Potenza, SPU Administrator Deborah Robinson, and SPU Nurse Coordinator Carlene Ferrier, violated William Justice's Fourteenth Amendment right not to be subject to a significant risk to his health and safety while he was in the SPU by failing to train SPU employees to properly interact with and protect SPU patients with serious mental illness, where the lack of and need for such training was obvious due to previous multiple injuries and deaths of mentally ill patients at the SPU.

12.  New Hampshire Governor Christopher T. Sununu, DOC supervisory officials, including DOC Commissioner Helen E. Hanks, DOC Medical and Forensic Services Director Paula L. Mattis, SPU Medical Director Dr. Daniel P. Potenza, SPU Administrator Deborah Robinson, and SPU Nurse Coordinator Carlene Ferrier, violated William Justice's Fourteenth Amendment right to due process when, after Mr. Justice sent those defendants Patient Request Slips, grievances, and/or letters concerning his complaints about the SPU COs' uses of force against him, including placing him in restraints, not using appropriate means for interacting with a nonprisoner patient in a mental health treatment facility,

13

failed to adequately investigate or resolve Mr. Justice's complaints.

13.   The Office of Public Guardian and Eric VanGelder, during the time he was William Justice's guardian:

    a.   failed to intercede on Mr. Justice's behalf to protect him from being subject to violations of his civil rights while at the SPU; and

    b.   failed to ensure that Mr. Justice was promptly transferred from the SPU to a less restrictive environment, either the NHH or another mental health treatment facility, once Mr. Justice was deemed ready for such a transfer.

14.   All of the defendants knew of and failed to report the abuses to which William Justice was subjected in the SPU to appropriate state authorities, as required by N.H. Rev. Stat. Ann. § 161-F:46.

15.   The defendants are liable to William Justice under state law as follows:

    a.   The defendants identified in Claim 1 are liable to Mr. Justice for the tort of assault for the conduct alleged to underlie that claim.

    b.   The defendants identified in Claim 1 and Claim 2 are liable to Mr. Justice for the tort of battery for the conduct alleged to underlie those claims.

    c.   The defendants identified in Claim 1 and Claim 2, are liable to Mr. Justice for negligence in that they breached their duty to Mr. Justice while engaging in the conduct alleged to underlie those claims in that the defendants:

        i.   failed to exercise reasonable care to ensure that Mr. Justice was provided with a safe place to live;

        ii.   failed to exercise reasonable care to ensure that Mr. Justice was not subjected to punishment while at the SPU; and

        iii. failed to exercise reasonable care in their use of restraints, pepper spray, and Tasers on Mr. Justice.

d.   The defendants identified in Claims 1, 2, 3, 4, and 11 are liable to Mr. Justice for the tort of intentional infliction of emotional distress for the conduct alleged to underlie those claims.

e.   The defendants identified in Claims 1, 2, 3, 4, and 11 are liable to Mr. Justice for the tort of negligent infliction of emotional distress for the conduct alleged to underlie those claims.

f.   The defendants identified in Claim 6(b) are liable to Mr. Justice for breach of contract in that they failed to meet their obligations as set forth in the Consent Decree issued in Amanda D. v. Hassan, No. 12-cv-53-SM (D.N.H.).

g.   The defendants identified in Claim 8 are liable to Mr. Justice for negligence in that they failed to provide timely medical care to Mr. Justice after he was pepper-sprayed.

h.   The defendants identified in Claim 11 are liable to Mr. Justice for negligent supervision of SPU COs Frank Logan, Mark Kimball, Nathaniel Seabron, Joshua Deblois, and Randal Carver, in that the defendants to Claim 11 breached their duty to control the conduct of COs on SPU, by:

> i.   failing to prevent COs Logan, Kimball, Seabron, Deblois, and Carver from engaging in abusive behavior toward Mr. Justice as that behavior was inappropriate for a nonprisoner patient in a mental health treatment facility; and

> ii.  failing to ensure that SPU COs Logan, Seabron, Deblois, and Carver communicated with Mr. Justice in a nonaggressive and nonconfrontational manner.

## **Discussion**

I.   Claims to Be Served

Mr. Justice has asserted sufficient facts to allow the following claims, as identified and summarized in this Report

and Recommendation ("R&R"), to proceed against the defendants identified in the claims: Claim 1 (with subparts); Claim 2(with subparts); Claim 3; Claim 4; Claim 11, Claims 15(a)-(e), and Claim 15(h).  In an Order issued simultaneously with this R&R, the Court directs service of the above-listed claims on the defendants identified therein.

II.   <u>Claims the District Judge Should Dismiss</u>

    A.   <u>Equal Protection</u>

        1.   <u>Differential Treatment – Claim 5(a)</u>

In the claim identified in this R&R as Claim 5(a), Mr. Justice alleges that the defendants mistreated him by restraining, pepper-spraying, tasing, and otherwise abusing him while he was in the SPU, but did not so abuse other similarly situated SPU residents.

> [T]he Equal Protection Clause demands that "all persons similarly situated should be treated alike." To establish an equal protection claim, a plaintiff must show that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

<u>Shurtleff v. City of Bos.</u>, 986 F.3d 78, 97 (1st Cir.) (citations omitted), <u>rev'd on other grounds</u>, 142 S. Ct. 1583, 1593 (2022).

Here, Mr. Justice's allegation of differential treatment is not supported by any facts showing that any other SPU resident

was, in fact, similarly situated to him in all relevant respects but was not subjected to the same abuse as Mr. Justice. Stripped of conclusory allegations, therefore, Mr. Justice has failed to state a claim upon which relief may be granted for unequal treatment in violation of the Equal Protection Clause, and the District Judge should dismiss Claim 5(a) for failure to state a claim.

### 2.   Class-Based Discrimination (Claim 5(b))

In the claim identified in this R&R as Claim 5(b), Mr. Justice alleges that the DOC discriminatorily denied him benefits and services generally available in the SPU based on his having a disability, specifically, a mental illness, in violation of the Equal Protection Clause of the Fourteenth Amendment.  As noted above, Mr. Justice does not assert any facts to demonstrate that any defendant to this action discriminated against him because he has a mental illness. Further, he has not named any defendants to this claim, described the conduct he alleges was discriminatory, or how such conduct violated his rights.  Accordingly, Mr. Justice has failed to assert facts sufficient to state an equal protection claim based on mental illness discrimination.  The District Judge, therefore, should dismiss Claim 5(b) from this action for failure to state a claim.

B.   Americans with Disabilities Act

1.   Title II of the ADA - Claim 6(a)

In the claim identified in this R&R as Claim 6(a), Mr. Justice alleges that while he was in the SPU, the DOC discriminatorily denied him benefits and services in violation of Title II of the Americans with Disabilities Act ("ADA"), based on his having a disability, mental illness.  Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in, or denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  To establish a violation of Title II, a plaintiff must establish that:

> (1) [the plaintiff] is a qualified individual with a disability; (2) ... he was either excluded from participation in, or denied the benefits of a public entity's services, programs, or activities or was otherwise discriminated against; and (3) ... such exclusion, denial of benefits, or discrimination was by reason of [his] disability.

Snell v. Neville, 998 F.3d 474, 499-500 (1st Cir. 2021) (internal quotation marks and citations omitted).

Mr. Justice has asserted sufficient facts to demonstrate that he is a qualified individual with a disability.  He has not, however identified the individuals who he alleges violated his rights under the ADA, what any such defendants did or failed to do which violated his rights, or what benefits or services he was excluded from or denied.  More importantly, Mr. Justice has

not stated any facts which suggest that he has been mistreated, or denied access to services or programs, based on discrimination against him because he is mentally ill.  Stripped of conclusory allegations, the complaint does not assert sufficient facts to state a claim for discrimination under Title II of the ADA, and the District Judge should dismiss Claim 6(a) for failure to state a claim upon which relief can be granted.

## 2.   Consent Decree – Claim 6(b)

Mr. Justice asserts that the defendants have violated his Fourteenth Amendment right to due process by violating a consent decree incorporated into a settlement agreement approved by a judge of this court on February 12, 2014, in Amanda D. v. Hassan, No. 12-cv-53-SM (D.N.H.) ("Amanda D.").  Amanda D. is a class action suit brought in this Court against New Hampshire officials responsible for the provision of public mental health care, in which the plaintiffs alleged that the defendants' conduct violated their rights under the ADA.  The plaintiff class in Amanda D. consisted of thousands of individuals defined as:

> All persons with serious mental illness who are unnecessarily institutionalized in New Hampshire Hospital or Glencliff or who are at serious risk of unnecessary institutionalization in these facilities.

> At risk of institutionalization means persons who, within a two year period: (1) had multiple hospitalizations; (2) used crisis or emergency room services for psychiatric reasons; (3) had criminal

justice involvement as a result of their mental
illness; or (4) were unable to access needed community
services.

Feb. 12, 2014 Class Action Settlement Agreement ("Settlement

Agreement"), Amanda D. (ECF No. 105, at 2).

Here, Mr. Justice has not asserted facts which demonstrate

that the Settlement Agreement entitles him to relief.  "[A]

consent decree is not enforceable directly or in collateral

proceedings by those who are not parties to it even though they

were intended to be benefitted by it." Blue Chips Stamps v.

Manor Drug Stores, 421 U.S. 723, 750 (1975).

Mr. Justice has not shown that he was a member of the

plaintiff class at the time the Settlement Agreement was

entered, and even if he could, the exclusive avenues available

to an Amanda D. plaintiff to enforce the Settlement Agreement

are set forth in that document, and do not include private suits

brought by members of the plaintiff class.  See Settlement

Agreement, at 25-27.  To the extent Mr. Justice claims that he

was at risk of institutionalization, and therefore should

benefit from the Settlement Agreement, that document

specifically states that:

> [n]o person or entity is intended to be a third-party
> beneficiary of the provisions of this Settlement
> Agreement for purposes of any other civil, criminal,
> or administrative action.  No person or entity may
> assert any claim or right as a beneficiary or
> protected class under this Settlement Agreement in any
> separate action.  This Settlement Agreement is not
> intended to expand the right of any person or

organization to seek relief against the State or their
officials, employees, or agents.

Settlement Agreement at 24.

Accordingly, Mr. Justice may not assert a claim based on
any alleged violation of the Amanda D. Settlement Agreement.
The District Judge, therefore, should dismiss Claim 6(b),
without prejudice to Mr. Justice's ability to seek enforcement
of the Settlement Agreement as set forth in that document to the
extent he has standing to do so.

### C.   Claim 7 – Humiliation

Mr. Justice states that on January 22, 2019, CO Logan
humiliated and belittled him, in violation of his Fourteenth
Amendment right not to be subjected to punishment during his
civil commitment.  "Persons who have been involuntarily
committed are entitled to more considerate treatment and
conditions of confinement than criminals whose conditions of
confinement are designed to punish." Youngberg v. Romeo, 457
U.S. 307, 321-22 (1982).  De minimis impingement of a civilly
committed person's constitutional interests, however, does not
violate the constitution.  See id. at 320.

In the claim identified in this R&R as Claim 7, Mr. Justice
asserts that his right not to be punished was violated when CO
Logan held Mr. Justice's head up while roughly dragging him to a
restraint room, in front of other officers.  Mr. Justice's

allegations are insufficient to assert more than a de minimis insult to his right to nonpunitive civil confinement, and therefore fail to assert a claim under the Fourteenth Amendment. Accordingly, the District Judge should dismiss Claim 7 for failure to state a claim.

### D.  Medical Care

#### 1.  Legal Standard

In the claims identified in this R&R as Claims 8(a) and 8(b), Mr. Justice asserts that on two occasions, shortly after he had been subjected to a use of force by DOC personnel, he was seen by a SPU nurse who paid insufficient attention to his medical issues.  To state a Fourteenth Amendment claim alleging that a plaintiff was denied adequate medical care while confined to a facility by the State, the plaintiff must, at a minimum, allege facts showing that the defendant, in failing to provide the plaintiff with adequate medical care, did so purposely, knowingly, or recklessly, as "'liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process.'"  Kingsley v. Hendrickson, 576 U.S. 389, 396 (2015) (emphasis in original) (citation omitted).  If the plaintiff fails to demonstrate that a medical provider's actions were more than merely negligent, she or he cannot state a Fourteenth Amendment claim for inadequate medical care.

2.   Nurse John Lombard – Claim 8(a)

In Claim 8(a), Mr. Justice asserts that on April 10, 2018,
Nurse Lombard examined him after he had been pepper-sprayed, but
failed to note in Mr. Justice's medical records that Mr. Justice
was experiencing breathing distress.  Mr. Justice has attached
to his complaint a copy of a DOC document titled "Post Pepper
Spray – Completed by: John Lombard on 4/10/2018."  Apr. 10, 2018
Medical Note of Nurse John Lombard (Doc. No. 1-21) ("Lombard
PPS").  That document indicates that on April 10, 2018, Nurse
Lombard evaluated Mr. Justice for distress or acute injuries
after he was pepper-sprayed in his cell on that date.  In
completing the Lombard PPS, Nurse Lombard checked "Normal" under
the section titled "Respiratory," and did not check the boxes in
that section which would, if checked, indicate that Mr. Justice
was coughing, short of breath, or wheezing.  Id. at 2.  Further,
Nurse Lombard noted in that document that Mr. Justice's oxygen
saturation level was not below ninety percent, that he was not
in acute respiratory distress, and that he should be sent to the
emergency room if his medical condition became life-threatening.
See id.

In this claim, Mr. Justice appears to challenge Nurse
Lombard's incorrect completion of a medical form, but does not
otherwise allege that he was denied any necessary medical care.
The Lombard PPS indicates that Mr. Justice was seen and examined
after he was pepper-sprayed, and that that examination included

23

Nurse Lombard's evaluation of Mr. Justice's respiratory condition and symptoms.  While Mr. Justice asserts that he had "breathing distress," Nurse Lombard did not reach that conclusion after examining him.  If Nurse Lombard's assessment was incorrect, Mr. Justice's assertions, at best, allege negligence, and fail to assert a constitutional violation. Accordingly, the District Judge should dismiss Claim 8(a) from this action for failure to state a claim upon which relief might be granted.

### 3.   Nurse Mark Gagne – Claim 8(b)

In Claim 8(b), Mr. Justice asserts that on July 13, 2018, Nurse Gagne conducted only a "cursory" examination of Mr. Justice after he had been pepper-sprayed and had suffered "painful injuries" to his wrists.  Compl. (Doc. No. 1, at 6). Mr. Justice has attached to his complaint a copy of a DOC document entitled "Post Use-of-Force – Completed by: Mark Gagne on 7/13/2018."  July 13, 2018 Medical Note of Mark Gagne (Doc. No. 1-22) ("Gagne PUOF").  The Gagne PUOF indicates that on July 13, 2018, Nurse Gagne attempted to examine Mr. Justice after Mr. Justice complained of a wrist injury, but that Mr. Justice "would not allow [Nurse Gagne] to conduct a full assessment." Id. at 2.  Nurse Gagne further noted that Mr. Justice ultimately agreed to a partial examination, and to take ibuprofen, as needed, for his wrists.  See id. at 2.

Mr. Justice's assertion that Nurse Gagne's examination of him was "cursory," even if true, fails to assert a violation of Mr. Justice's Fourteenth Amendment rights.  Here, Nurse Gagne heard Mr. Justice's complaint, attempted to examine Mr. Justice, and recommended treatment for his injuries.  Nothing in Mr. Justice's allegations about Nurse Gagne's conduct is sufficient to state a constitutional claim for relief.  Assuming, without deciding, that Nurse Gagne's examination of Mr. Justice was cursory, that fact, without more, does not equate to an assertion of unconstitutional medical care.  The District Judge, therefore, should dismiss Claim 8(b) from this action for failure to state a claim upon which relief might be granted.

E.    <u>Mental Health Care – Claim 9</u>

In Claim 9, Mr. Justice alleges that he has not received adequate mental health care at the SPU, in violation of his Fourteenth Amendment right to such care, because that facility is neither licensed nor accredited as a mental health treatment facility.  Those assertions, standing alone, are insufficient to demonstrate that the mental health care Mr. Justice received at the SPU was actually inadequate.

Where a plaintiff confined to a facility pursuant to a civil commitment seeks to "challeng[e] the treatment provided as constitutionally inadequate, [the] civilly committed person[] must show that 'the defendant failed to exercise a reasonable

25

professional judgment.'" Healey v. Spencer, 765 F.3d 65, 78
(1st Cir. 2014) (citation omitted); see also Youngberg, 457 U.S.
at 321.  Mr. Justice does not assert facts demonstrating that
any defendant to this action failed to exercise reasonable
professional judgment in providing or failing to provide Mr.
Justice with mental health care.  Accordingly, the District
Judge should dismiss Claim 9 as it fails to state a claim upon
which relief might be granted.


       F.    <u>Missing Property – Claim 10</u>

     In the claim identified in this R&R as Claim 10, Mr.
Justice asserts that SPU staff members conducted "shakedowns" of
his cell, and that after each such shakedown, he would discover
that he was missing personal property.  "[A]n unauthorized
intentional deprivation of property by a state employee does not
constitute a violation of the procedural requirements of the Due
Process Clause of the Fourteenth Amendment if a meaningful
postdeprivation remedy for the loss is available." Hudson v.
Palmer, 468 U.S. 517, 533 (1984).

     The State of New Hampshire provides a postdeprivation
remedy, pursuant to RSA 541–B:9 and 541–B:14 (1997), which is
adequate to redress Mr. Justice's loss of property.
Accordingly, Mr. Justice's assertions underlying Claim 10 do not
assert an actionable claim under the Fourteenth Amendment, and
the District Judge should dismiss that claim without prejudice

to Mr. Justice's ability to bring a claim under state law concerning the property missing from his SPU cell.

G.    Failure to Redress Grievances - Claim 12

In his claim identified in this R&R as Claim 12, Mr. Justice alleges that while he was held at the SPU, he sent at least one letter to Gov. Sununu, and sent Patient Request Slips and grievances to various supervisory DOC and SPU officials, including Commissioner Hanks, Director Mattis, Dr. Potenza, Ms. Robinson, and Ms. Ferrier.  Mr. Justice asserts that those individuals failed to adequately investigate or resolve his complaints.

"[T]he failure to respond to a grievance to the satisfaction of the inmate does not, standing alone implicate a liberty interest."  Spencer v. Bender, Civil Action No. 08-11528-RGS, 2010 U.S. Dist. LEXIS 23249, at *26, 2010 WL 972207, at *9 (D. Mass. Mar. 11, 2010).  To allege a Fourteenth Amendment violation based on the conduct of supervisory officials, such conduct:

> "must be based upon active unconstitutional behavior. The acts of one's subordinates are not enough . . . . For the same reason that a supervisory relationship is insufficient to establish liability for the misconduct of a subordinate, denying a grievance or failing to act based on information contained in a grievance is insufficient to establish § 1983 liability."

El v. Hazlewood, No. 19-cv-647-JL, 2020 WL 3086289, at *6 (D.N.H. May 7, 2020) (citation omitted), R&R approved sub. nom,

Re El v. FCI Berlin, Warden, No. 19-cv-647-JL, 2020 U.S. Dist. LEXIS 101518, at *1, 2020 WL 3086273, at *1 (D.N.H. June 9, 2020).  To state a claim against supervisory officials based on the conduct of their subordinates, a plaintiff must show "an affirmative link" between the constitutional violation alleged and "some action or inaction on the supervisor's part."  Parker v. Landry, 935 F.3d 9, 14 (1st Cir. 2019).

Mr. Justice does not allege that any of the defendants to Claim 12 had any direct role in their subordinates' allegedly unconstitutional conduct.  Further, he has not alleged facts to show an affirmative link between the conduct of any of the supervisor defendants and the allegedly unconstitutional acts underlying the claims asserted in this action.  Mr. Justice's allegations, therefore, do not give rise to a Fourteenth Amendment claim against any supervisory official for their handling of his administrative claims.  Accordingly, the District Judge should dismiss Claim 12 from this action for failure to state a claim upon which relief might be granted.

## H.   OPG and Eric VanGelder – Claim 13

In the claim identified in this R&R as Claim 13, Mr. Justice alleges that the OPG and Eric VanGelder, who was Mr. Justice's guardian on behalf of the OPG from July 2018 to March 2021, failed to protect Mr. Justice from violations of his civil rights at the SPU.  In Claim 13(b), Mr. Justice alleges that

once he was deemed able to be safely transferred from the SPU to a less restrictive mental health facility, but was retained at the SPU because there were no beds available at NHH, the OPG and Mr. VanGelder were obliged to seek an alternative placement for Mr. Justice which was less restrictive than the SPU, but did not.

To assert a § 1983 claim, Mr. Justice must demonstrate that the defendants, while engaging in the conduct he alleges violated his constitutional rights, did so while acting "under color of state law."  42 U.S.C. § 1983.  State action is a necessary element of a § 1983 claim.  See Runge v. Kelly, No. 05-CV-10849, 2006 WL 167497, at *2 (D. Mass. Jan. 23, 2006).

The Probate Court appointed the OPG to serve as the guardian of Mr. Justice's person, and Mr. VanGelder served as Mr. Justice's guardian on behalf of the OPG.  See In re Soler, No. 317-2018-GI-00414 (Probate Court).  According to its website, the OPG is "a private non-profit corporation" which "provides services throughout the state of New Hampshire to legally incapacitated adults."  Office of Public Guardian, https://www.opgnh.org/ (last visited Feb. 11, 2022).

In Polk Cty. v. Dodson, 454 U.S. 312 (1981), the Supreme Court held that court-appointed public defenders are not state actors, notwithstanding the fact that the state pays for their services and appoints them to represent their clients, as public defenders act in the best interest of their client and have no

"obligation to the mission of the state." 454 U.S. 312, 320, 325 (1981).  Courts which have considered whether court-appointed guardians are state actors for purposes of § 1983, relying on Polk Cty., have found that a guardian is not a state actor, but is instead analogous to a public defender in that the guardian serves her or his ward's best interests and not the interests of the state.[8]  See e.g., Milan v. Wertheimer, 808 F.3d 961, 964 (2d Cir. 2015) (citing Kirtley v. Rainey, 326 F.3d 1088, 1093 (9th Cir. 2003) and Meeker v. Kercher, 782 F.2d 153, 155 (10th Cir. 1986)).

Mr. Justice has not asserted facts which provide a basis to find that the OPG and Mr. VanGelder were state actors, or "acting under color of state law," while serving as Mr. Justice's guardian.  Mr. Justice cannot, therefore, maintain a federal constitutional claim upon which relief might be granted with regard to the OPG or Mr. VanGelder, and the District Judge should dismiss Claims 13(a) and 13(b) from this action without prejudice to Mr. Justice's ability to seek relief in the Probate Court or other state court as appropriate.

---

[8] New Hampshire law states that "[a] guardian shall act with respect to the ward in a manner which safeguards to the greatest extent possible the civil rights of the ward, and shall restrict the personal freedom of the ward only to the extent necessary." RSA 464-A:25, I(h).

I.   Failure to Report – Claim 14

In the claim identified as Claim 13 in this R&R, Mr. Justice alleges, that each of the defendants named in this lawsuit was aware that Mr. Justice was being abused at the SPU, and failed to report those abuses to state authorities as required by state law.  State law requires that the abuse of an adult be reported as follows:

> Any person, including, but not limited to, physicians, other health care professionals, social workers, clergy, and law enforcement officials, suspecting or believing in good faith that any adult who is or who is suspected to be vulnerable, at the time of the incident, has been subjected to abuse, neglect, self-neglect, or exploitation or is, or was living in hazardous conditions shall report or cause a report to be made . . ..

RSA 161-F:46.  State law further provides that "[a]ny person who knowingly fails to make any report required by RSA 161-F:46 shall be guilty of a misdemeanor."  RSA 161-F:50.

To the extent a violation of RSA 161-F:46 is a criminal, not civil, matter under state law, and Mr. Justice cannot assert a civil claim in a § 1983 action on the basis that the defendant's conduct was criminal.  See Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973) ("[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another.").  Moreover, RSA 161-F:42-:57 does not provide a private right of action for violations of RSA 161-F:46.  See Ahrendt v. Granite Bank, 144 N.H. 308, 315, 740 A.2d 1058, 1064 (1999); cf. Marquay v. Eno, 139 N.H. 708, 713-16, 662

A.2d 272, 276-78 (1995) (describing appropriate analysis for determining whether a state law provides a private right of action and holding there is none under the child abuse reporting statute).  Accordingly, the District Judge should dismiss Claim 14 as it fails to state a claim upon which relief may be granted.

### J.   State Law - Claims 15(f) and 15(g)

In the claims identified in this R&R as Claims 15(f) and 15(g), Mr. Justice asserts state law claims which arise out of the facts and events underlying Claims 6 and 8, against the defendants to those federal claims.  In this R&R, the undersigned recommends that the District Judge dismiss Claims 6 and 8 from this case.  The District Judge, therefore, should decline to exercise supplemental jurisdiction over Claims 15(f) and 15(g) under 28 U.S.C. § 1367, and dismiss Claims 15(f) and 15(g) from this action without prejudice to Mr. Justice's ability to assert those claims, as appropriate, in an action brought in state court.

### K.   Official Capacity and Sovereign Immunity

In his complaint, Mr. Justice identified the DOC and the SPU as defendants in this case.  Mr. Justice also asserts claims against a number of DOC employees in both their individual and official capacities.

A suit against a state agency, or a state official in her or his official capacity, is treated as a suit brought against the state. The Eleventh Amendment generally precludes suits against the state for damages, absent exceptions not applicable here. See Davidson v. Howe, 749 F.3d 21, 27 (1st Cir. 2014). Mr. Justice's claims against the DOC and the SPU, and his official capacity claims against DOC employees are thus precluded by the Eleventh Amendment, and the District Judge should dismiss those claims.


L.   Injunctive Relief

Mr. Justice seeks injunctive relief in that he asks the Court to prohibit the defendants from continuing to confine civilly committed individuals to either the SPU or to any another penal institution.[9] Since filing that request, Mr. Justice has been transferred from the SPU to NHH, rendering his request for an injunction moot. Accordingly, the district judge should deny Mr. Justice's claims for injunctive relief as moot.

**Conclusion**

For the foregoing reasons, the district judge should:

1.   Dismiss the claims identified in this R&R as Claims 5, 6(a), 7, 8, 9, 12, and 14, for failure to state a claim upon which relief might be granted;

---

[9] As a self-represented non-attorney plaintiff, Mr. Justice may not litigate claims on behalf of anyone but himself. See 28 U.S.C. § 1654; LR 83.2(d). Accordingly, the court construes Mr. Justice's request for injunctive relief to have been brought only on his own behalf.

2.    Dismiss the claims identified in this R&R as Claims 6(b), 10, 13, 15(f), and 15(g) without prejudice; and

3.    Dismiss the following defendants identified in the complaint, as Mr. Justice has not stated any cognizable claim against them: Gov. Sununu, the DOC, the SPU, Commissioner Hanks, Director Mattis, Dr. Potenza, Dr. Martin, Ms. Robinson, Ms. Ferrier, Nurse Lombard, Nurse Gagne, CO Scott J. Marshall,[10] the OPG, and Mr. VanGelder.

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  The fourteen-day period may be extended upon motion.  Failure to file specific written objections to the Report and Recommendation within the specified time waives the right to appeal the district court's order.  See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).  Only those issues raised by the objection(s) to this Report and Recommendation "'are subject to review in the district court and those not preserved by such objection are precluded on appeal.'"  Id. (citations omitted).

_____
Andrea K. Johnstone
United States Magistrate Judge

December 2, 2022

cc:  William Soler Justice

_____

[10] The undersigned recommends that CO Marshall be dismissed from this action as he was not mentioned anywhere in the complaint other than the caption.