FILED - USDC -NH
2023 JUL 12 AM 11:00

Civil No. 120-CV-00517-PB

# UNITED STATES DISTRICT COURT DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

William Soler (Justice),          *

*

Plaintiff,          *

v.          *     Civil No. 1:20-CV-00517-PB

*

Christopher T. Sununu, et al.,          *

*

Defendants.          *

*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**In response to Mattis, Ferrier, Robinson and Hanks**

Plaintiff was prevented from properly exhausting his available administrative remedies.

As ruled on by this court (3-2-2021) plaintiff is not subject to PLRA.

1

ENDORSED ORDER vacating [4] ORDER granting 3 Application to Proceed Without Prepayment of Fees or Costs. *Text of Order: Plaintiff filed a motion to proceed in forma pauperis, which was granted by order issued May 19, 2020. (Doc. No. 4). On May 20, 2020, plaintiff filed a motion claiming that, as a person civilly committed, he is not subject to the repayment requirements of the Prison Litigation Reform Act, 28 U.S.C. § 1915. The court agrees with plaintiff's position on this matter. See Ardaneh v. U.S. Govt, No. CV 20-1-037-WGY, 2020 WL 5525371, at \*1, 2020 U.S. Dist. LEXIS 170520, at \*2-\*3 (D. Mass. Sept. 1, 2020) (civilly committed person is not a prisoner within the meaning of 28 U.S.C. § 1915(h)), appeal filed on other grounds, No. 20-1887 (1st Cir. Sept. 14, 2020). While the court still finds that plaintiff is entitled to proceed in forma pauperis (only for the purpose of waiving the filing fee), the court also waives the filing fee, and directs that plaintiff be refunded any money collected from him in this case. The order of May 19, 2020, is vacated and replaced by this Endorsed Order.* So Ordered by Magistrate Judge Daniel J. Lynch.(vln)

Secondarily plaintiff was so profoundly mentally ill that a guardian was appointed. Office of Public Guardian failed to assert claims to the prison or other state authorities. Additionally Plaintiff attempted to assert his own claims through the prison grievance process and his documents were taken, misplaced and or not returned thus he was prevented from exhausting remedies. Had Defendant been hospitalized at New Hampshire Hospital he would have had the assistance of an Ombudsman to file complaints. Instead he was subjected to the closed loop system in the Department of Corrections. Please see case # 1:23-FP-308

Plaintiff claims are not limited to mental or emotional including penetration of taser, bruises, abrasions. Gomez v. Chandler, 163 F.3d 921 (5th Cir. 1999) (allegations of cuts and abrasions satisfy physical injury requirement); Liner v. Goord, 196 F.3d 132 (2d Cir. 1999) (intrusive body searches qualify as physical injury) The plaintiff reasserts that he was civilly committed to a prison rather than being hospitalized in a licensed, accredited psychiatric hospital. The plaintiff's violation of the US Constitution is for the convenience and financial benefit of the state.

Plaintiff has suffered damages in addition to the preexisting mental illness he has suffered PTSD, exacerbation of paranoia, humiliation and loss of trust for the State and State actors.

Defendants have violated Plaintiff's federal constitutional right to receive adequate medical care.

The Secure Psychiatric Unit (SPU) functions with no independent oversight or evaluation of the standards of care. SPU is an unlicensed facility. Therefore, it is not subject to the regular survey and inspection requirements of a licensed facility. The Secure Psychiatric Unit is not accredited. So therefore it is not subject to inspections or evaluations by an accreditation body. The Secure Psychiatric Unit was denied reimbursement for services delivered by the Centers for Medicaid and Medicare Services (CMS) in 1990.[1] CMS does not recognize it as a hospital because of it's location within the Men's State Prison. The Secure Psychiatric Unit operates in a regulatory vacuum. So therefore there can be no valid assertion that SPU is providing adequate care because there are no independent standards or metrics being used to evaluate the standards of care. Given all of the above there is a lack of transparency to determine what actual standards that are being provided. The state can not simply make a conclusory statement that the standards are adequate in the absence of any independent

---

[1] 1999_DRCvSPU

evaluation by an independent body. As of July 16, 2018 SPU has not even completed the statutorily required state inspections.[2]

Defendants have not violated Plaintiff's Eighth or Fourteenth Amendment rights.

Plaintiff objects to this statement. Plaintiff's 14th Amendment right under the equal protection clause have been violated by his incarceration in the Secure Psychiatric Unit. Similarly situated individuals have been hospitalized in a forensic unit at New Hampshire Hospital (NHH) while the plaintiff was imprisoned at SPU. Plaintiff's 8th Amendment rights were violated when he was sent to a prison rather than a hospital while suffering acute and serious mental illness. Prisons do not provide a therapeutic milieu, prisons are designed to control and punish. Prisons are inherently more violent than hospitals. The plaintiff was co-mingled with felons.

The plaintiff's care was not equivalent to care delivered in the state hospital. The cost of delivering care in SPU is approximately $300 – $500 daily. The cost of delivering care at New Hampshire Hospital daily can range from $1,500 - $2,000. These numbers speak for themselves. It is clear evidence that the state has failed to provide the plaintiff with care that he would have received in a hospital. Had plaintiff been hospitalized none of his care would have been left to the discretion of corrections officers.

Defendants have not violated professional standards of medical care.

---

2   no-treatment-reviews-for-decades

Plaintiff objects to the statement above. Defendant Mattis was a licensed clinical social worker until June 30, 2017 when her license expired.[3] Ms. Mattis remains unlicensed to practice social work in the State of New Hampshire. In addition to her license, when defendant Mattis's was licensed her practice was also governed by the National Association of Social Workers Code of Ethics.[4]

Inherent in both licensure and the Code of Ethics, Ms. Mattis's first responsibility was to the health and safety of the individuals she serves. However, both her actions of what she has written and her continued complicity with allowing civilly committed individuals to be tased, pepper sprayed, and incarcerated in a prison are egregious failures both clinically and ethically. Defendant Mattis had a due diligence burden both as an administrator and a clinician to protect the plaintiff from unsafe conditions in a facility that does not comport with recognized clinical and legal standards for civilly committed individuals. As the attachment[5] to this document will show Defendant Mattis on February 18, 2016 submitted written testimony to the New Hampshire State Legislature acting as a representative in her official capacity for the Department of Corrections (DOC). In her written testimony Ms. Mattis states the following about the Secure Psychiatric Unit , "In fact, the SPU is a forensic hospital that provides a great range and depth of therapeutic services." Ms. Mattis goes further to state, "that it (SPU) is not part of the prison."

Ms. Mattis's misrepresentation that the facility is a hospital clearly shows that she was not interested in promoting the individuals best interests, but was complicit with promoting the State's continued misrepresentation of a prison as though it were a hospital.

---

3  Mattis NH License verify 7-1-2023
4  NASW_Ethical Responsibilities to Clients
5  mattis testimony2_18_2016

5

Defendant Mattis, based on her Linked In[6] profile was employed at New Hampshire Hospital (NHH) as Chief Operating Officer from September 2004 through December 2008, and Interim Chief Executive Officer from January 2009 through January 2011. As the CEO of NHH Defendant Mattis was required to sign to authorize transfers of patients to SPU. Based on Ms. Mattis's previous employment at NHH[7] she would have knowledge that civilly committed individuals were routinely transferred to the prison from NHH. For Ms. Mattis to testify in a written signed submission that SPU is a forensic hospital was disingenuous and irresponsible after having spent over 11 years working in an accredited and licensed hospital. Defendant Mattis in her position at NHH was familiar or should have been with the regulatory, licensing, and accreditation processes. Defendant Mattis can not assert that the care is adequate in the absence of any independent oversight which NHH was required to participate in and SPU is not.

Defendant Mattis is presently employed by the Department of Corrections as the Director of Medical and Forensic services. Attached hereto is the Job Qualifications as posted when reviewed on July 1, 2023[8] for that position. The job description states that the position of Director of Medical and Forensic Services shall be held by a Board Certified Psychiatrist. What has been learned is the Department is being run by defendant Mattis, an unlicensed social worker. In 2018 the Administrative Rules for the Department of Corrections[7] were reauthorized requiring the Director of Medical and Forensic Services to be a Board Certified Psychiatrist. Defendant Mattis' license had already expired in 2017. Any clinical assessments, recommendations, determinations and supervision of Licensed Social Workers were prohibited activities after her license expired.[17][18] Because of her license being expired, Ms. Mattis was not required to engage in continuing education to satisfy licensing and standards requirements.

---

6     Paula Mattis_LinkedIn
7     Section He-M 611.03
8     Section Cor 102.02

The plaintiff asserts that defendant Mattis's written statement to the legislature is inconsistent with New Hampshire law and that SPU is not a hospital as defined in New Hampshire law NH RSA Section XI 151:2.[9]

NH RSA Section XI 151:2 defines a hospital.

License or Registration Required. –

I. The following facilities shall not be established, conducted, or maintained without acquiring a license under this chapter:

(a) Hospitals, and infirmaries or health services maintained by an educational institution. For the purposes of this subparagraph " hospital " means an institution which is engaged in providing to patients, under supervision of physicians, diagnostic and therapeutic services for medical diagnosis, treatment, and care of injured, disabled, or sick persons, or rehabilitation services for the rehabilitation of such persons. The term " hospital " includes psychiatric and substance abuse treatment hospitals.

N.H. Code Admin. R. He-M 405.03 (f) [10]"Designated receiving facility (DRF)" means a hospital-based psychiatric unit or a nonhospital- based residential treatment program designated by the commissioner to provide care, custody, and treatment to persons involuntarily admitted to the state mental health services system.

N.H. Code Admin. R. He-M 405.03 (c) The inpatient capacity of a non-hospital-based DRF shall not exceed 16.

---

9  Chapter 151 RESIDENT_CARE_HEALTH_FACILITY_LICENSING
10 Section He-M 405.03 – Designation Requirements

In defendant Mattis's legislative testimony she states that SPU is a designated receiving facility. That statement is not supported by NH law or administrative rules cited above.[11]

Defendant Carlene Ferrier is a registered nurse holding an active New Hampshire nursing license.[12] Ms. Ferrier was the Director of Nursing (DON) at the time of the Plaintiff's incarceration. In addition to her licensure, Ms. Ferrier's practice is governed by the American Nurses Association (ANA) Code of Ethics.[13]

Per Defendant Ferrier's Linked-In profile[14] she was employed as a Quality Improvement Director prior to her employment with DOC. In that position she was responsible for the Quality Improvement of 25 Federally Qualified Health Centers. In that position Ms. Ferrier would have had significant knowledge of the quality and regulatory requirements of evidence based health care delivery.

However, while employed as the DON at DOC, Ms Ferrier worked in an unregulated health care environment. Defendant Ferrier was responsible for the administrative supervision of the nursing staff. Ms Ferrier had a responsibility in this role to know the populations served. As a registered nurse (RN) Ms. Ferrier had a due diligence burden to recognize (independent of state law and administrative rules) that civilly committed individuals were being incarcerated in SPU. Ms Ferrier also must have had knowledge that these individuals were being subjected to tasing, pepper spraying and solitary confinement. As an RN she should have known that such activities are inconsistent with recognized treatment standards of civilly committed individuals.

---

11  Section He-M 405.02 - Definitions
12  Ferrier NH License verify 7-2-2023
13  ANA-Code-of-Ethics
14  Ferrier _LinkedIn

Given Ms. Ferriers previous experience in Quality Improvement her conduct is contrary to her obligations under her RN license and the ANA Code of Ethics. Ms. Ferrier's failure to protect plaintiff was a failure under Provisions One, Two, and Three of the ANA Code of Ethics. Ms Ferrier failed to protect the plaintiff's dignity, rights, health, and safety.

Under New Hampshire (NH) law Ms. Ferrier is a mandated reporter. When she became aware of these abuses, she had an obligation to intervene and protect all individuals from unsafe conditions. There is no previous behavioral health experience listed in Ms. Ferrier's Linked-In profile. However, this lack of experience did not relieve Defendant Ferrier of her clinical, legal and ethical responsibilities to assure a safe environment. As part of Ferrier's responsibilities as DON she had an obligation to educate herself and her subordinates as to the inappropriateness of these activities. Ms. Ferrier also had an obligation to understand the difference between a civil commitment and a prison sentence. When providing care to those who have been deprived of liberty, ignorance to their individual legal status is not an excuse for a failure to protect their individual liberties. Defendant Ferrier through her actions and in-actions was complicit with the abuse and unlawful circumstances surrounding the plaintiffs' detention in SPU.

Defendant Robinson at the time of the plaintiff's incarceration was a licensed recreational therapist. As such Ms. Robinson had an obligation to understand the difference between a civil commitment and a prison sentence. When providing care to those who have been deprived of liberty, ignorance of their individual legal status is not an excuse for failing to protect their individual liberties. Defendant

...

Robinson through her actions and in-actions was complicit with the abuse and unlawful circumstances surrounding the plaintiffs detention in SPU.

Defendant Hanks was and currently remains the Commissioner of the Department of Corrections. Ms. Hanks has overall responsibility for all areas of the DOC. Part of the responsibilities is safeguarding the health and safety of persons detained in DOC facilities.[15] Further evidence of Ms. Hanks's failure to monitor the standards of care, is a letter from Psychiatrist Hink sent to Dr. de Nesnera indicating the plaintiff's serum levels of medication were to low. This prevented the transfer request of SPU for Plaintiff to New Hampshire Hospital.[16] Defendant Hanks should know or should have known that the placement of civilly committed individuals in a prison psychiatric unit is not an accepted standard of practice. The Plaintiff directs the court's attention to DOC Policy and Procedure Directive (PPD) 6.08[17] effective on 11/30/2018 and reviewed on 11/30/2020 signed by Ms. Hanks. The subject matter is medication assisted treatment. In this document page 3 item # 5 notes that the Administrator of Medical and Forensic Services, Defendant Mattis (as noted on page 1) can determine final recommendations for treatment. As of 6/30/2017 Ms. Mattis's license had expired and remained expired in 2020. She was not licensed to perform any clinical determinations or assessments. Defendant Hanks had a responsibility to know that Defendant Mattis was unlicensed and could not legally engage in licensed activities. In an unrelated case, [18] then Attorney General Gordon Mc Donald determined that the professional conduct of an unlicensed Director of Nursing was a violation of the Consumer Protection Act. It was further determined that an unlicensed individual cannot supervise licensed individuals. Therefore, Ms Mattis could not supervise any of the licensed Clinical Social Work staff.

---

[15] Section 622_46 Treatment Standards
[16] 7_12_19 letter Hinck to deNesnera_Redacted
[17] NH DOC PPD 6-08
[18] Unlicensed DON

licensed individuals. Therefore, Ms Mattis could not supervise any of the licensed Clinical Social Work staff.

Defendant Hanks according to her Linked-In profile[19] was previously a social worker for the DOC from 2003-2005. Next Ms. Hanks was the Director of Medical and Forensic Services from 2005-2014. Defendant Hanks was promoted to Assistant Commissioner for the DOC in 2014 and to Commissioner in 2017.

Furthermore, Ms. Hanks knowledge in her previous position as Director of Medical and Forensic Services was aware that civilly committed men and women are routinely tased, pepper sprayed, and placed in solitary confinement in SPU. If these individuals had been hospitalized these interventions would have been prohibited by CMS regulations.[20]

Ms. Hanks has been employed by DOC for nearly 20 years. Defendant Hanks by her actions and in-actions has clearly failed to protect the plaintiff. Ms. Hanks has the responsibility to set the standards of care throughout the Department of Corrections. Yet, under her tenure the plaintiff was subjected to ongoing abuses. This clearly demonstrates Ms. Hanks failure to ensure the health and safety of the individuals under the DOC's custody and care. Defendant Hanks has a responsibility to create a culture of safety and dignity.

The plaintiff's experience was antithetical to both safety and dignity. Defendants here have stated they provided adequate care. Conclusory statements cannot be used as facts.

---

19  Helen Hanks_LinkedIn
20  PAGE 120 APPX A hospitals_42 CFR CMS

In 1999 The Disability Rights Center sued The Department of Corrections SPU for review of Quality Assurance documents in the NH Supreme court.

Cited in that case is NH State law NH RSA TITLE XI Section 151-D:2 5 that holds those records as confidential. A provision of that law states, "Although, in the case of the division of medical and psychiatric services, the commissioner of the department of corrections, may waive the privilege under this section and release information or present records of the quality assurance program by discovery, subpoena, or admission into evidence in any judicial or administrative proceeding." Defendant Hanks is the Commissioner of the Department of Corrections. It is clear that Ms. Hanks has the discretion to provide quality assurance records, findings, protocols, and plans of correction.

SPU is not a forensic hospital. New Hampshire does not have a forensic hospital.[21] These defendants statements in this response are an attempt to misapply the PLRA provisions to a civilly committed non convicted plaintiff. The states' inappropriate utilization of the prison for civilly committed persons does not qualify them as convicted inmates.

In recent years, the state has placed a sign on the prison grounds with the universally recognized (H) Hospital symbol with the words Secure Psychiatric Unit affixed below.[22] Once again the state continues to misrepresent SPU as a hospital. To utilize a universally recognized symbol to misrepresent to the public the true nature of the facility is also disingenuous and irresponsible. There is no hospital on the grounds of the prison.

The Plaintiff's claims should not be barred and/or reduced by assumption of risk, and contributory and/or comparative fault.

---

21  No Forensic Hospital
22  SPU Hospital sign

By definition a person found incompetent to stand trial has serious mental illness. Individuals with serious mental illness have significant impairment in insight and judgment. Plaintiff cannot be held responsible for his behaviors or to be a contributor subject to his serious mental illness. This is evident by the plaintiff not being held criminally responsible for his behavior by a court of law. Plaintiff could not assume any risk as he was incompetent to do so. Plaintiff was not voluntarily admitted to a licensed accredited facility. Plaintiff was court ordered on a civil commitment to be placed in the Secure Psychiatric Unit under the control of the DOC in the absence of a criminal conviction. No hospital that cares for mentally ill patients could escape liability if their staff tased or pepper sprayed a patient. Hospitals are prohibited from using law enforcement tools by the Centers for Medicaid & Medicare Services.[23]

Plaintiff lacks standing to bring a private right of action under the referenced Settlement Agreement.

Plaintiff asserts that if the State of New Hampshire was in compliance with the Settlement in the Amanda D Agreement[24][25][26][27][28][29][30] it is less likely that Plaintiff's mental illness would have decompensated to the point where he became justice involved and was subsequently found incompetent to stand trial.

---

23  PAGE 120 APPX A hospitals_42 CFR CMS
24  First-Expert-Reviewer-Report_12_26_2014
25  Second-Expert-Reviewer-Report_6_30_2015
26  Third-Expert-Reviewer-Report_1_5_2016
27  Fourth-Expert-Reviewer-Report_6_29_2016
28  Fith-Expert-Reviewer-Report_1_6_2017
29  Sixth-Expert-Reviewer-Report_6_30_2017
30  Seventh-Expert-Reviewer-Report_01_10_18

Defendants should not be entitled to assert immunities to Plaintiff's claims against them, including but not limited to Eleventh Amendment immunity, sovereign immunity, qualified immunity, official immunity, and discretionary function immunity.

Some defendants were already severed from this lawsuit in the review process concluded on December 2, 2022 by the court. Defendants Hanks, Ferrier, Mattis, and Robinson were not severed in that review. The defendants cannot claim sovereign immunity as they are not a government, state, or nation. The defendants were working in a care giving and or administrative capacity for the plaintiff, not solely in a security capacity. Therefore, the defendants assertion that qualified immunity would apply here is incorrect, because the defendants were not working in a law enforcement role. Defendants should not qualify for official immunity as these were not reasonable actions given their respective responsibilities. Plaintiff asserts that defendants cannot claim discretionary function immunity without proof. The defendants cannot claim discretionary function immunity because their collective conduct departed from their knowledge and experience as health care professionals. Instead, the defendants capitulated and actively participated in a culture and environment of misfeasance. Rather, the defendants demonstrated that these actions were motivated by the culture in the prison as opposed to what would have occurred in a hospital psychiatric unit. The Defendants misfeasance is further demonstrated by the findings in the April, 2021 report of the New Hampshire advisory committee to the U.S. Commission on Civil Rights.[31]

Plaintiff likewise reserve the right to amend or to seek to amend this answer or the proofs asserted herein.

---

31 New Hampshire advisory committee to the U.S. Commission on Civil Rights

Plaintiff opposes dismissing any claims and requests the court make orders for discovery of audio, video, taser logs, pepper spray logs, and incident reports in the possession of the New Hampshire Department of Corrections. Plaintiff also requests discovery of SPU Policy and procedures related to use of tasers, pepper spray and restraints. Plaintiff disagrees with Defendants request for jury trial and requests a bench trial but will leave that decision to the Honorable Court. Plaintiff requests such other relief as the court deems just and proper.

*William Justice*

William S. Justice, pro se 07-03-2023

51 Storrs St. Apt 310

Concord, NH 03301

603-931-6357