NOWCAST — Live Now

WMUR 9 abc

Manchester, NH 03101 — 47°

47° Partly Cloudy / 1%

2 / 2

**BILL WOULD ESTABLISH A COMMISSION TO STUDY INSANITY AND COMPETENCY RESTORATION IN NH**

Advertisement

# Commission proposed to examine restoring competency to those found incompetent to stand trial in NH

Mental health advocates say changes to system are long overdue

Updated: 5:51 PM EST Feb 7, 2024

Infinite Scroll Enabled

Hannah Cotter 

**CONCORD, N.H.** — A push is being made in Concord to improve the system of care for people in New Hampshire with severe mental illness who have been deemed incompetent to stand trial.

Lawmakers are considering a bill that would create a commission to oversee competency restoration.

Advertisement

The commission would consist of representatives from the legislature, the Department of Corrections, the judicial branch and more to come up with improvements over what some call outdated practices and standards.

Forensic psychologists and mental health advocates said the need for reform is urgent.

**>> Download the free WMUR app to get updates on the go: Apple | Google Play <<**

"I've been doing competency evaluations for 8 1/2, almost nine years now," forensic psychologist Jim Bomersbach said. "And this needed to get done when I first got here. When I first got here, it needed to get done 10 years before that."

Lawmakers are proposing creating a commission that would review existing statutes and current needs in the state and work to come up with improvements, including to the system of care for people with severe mental illness who have been found incompetent to stand trial and coming up with a plan for restoration – a process advocates said doesn't currently exist.

Recommended



**New Hampshire man reported missing arrested after allegedly trying to steal car, breaks into home**

"Essentially, if somebody is not competent to stand trial, the court just says, 'Go get restored. Come back in a year,'" Holly Stevens, director of public policy for NAMI-New Hampshire, said. "And what we've found is that there are a lot of folks in New Hampshire that do not get restored.

The competency rate for New Hampshire restoration is about half that of what the national average is."

Erin Creegan, general counsel for the judicial branch, said the courts would welcome new guidance.

"The courts implement the laws that are written, so if the legislature wants to give us a more updated direction, a more specific direction, we're always happy to receive that," she said.

There are also concerns that some of the language, practices and standards are outdated. Lawmakers said other states have been working to reform their systems.

"There's new ideas floating around. Different states have implemented them," state Rep. Mark Pearson, R-Rockingham, said. "We want to see what they've done and how that worked for them and see what might work here in New Hampshire."

Stevens said that nationwide, more than 80% of people found incompetent to stand trial have had their competency restored and can return to court. In New Hampshire, only about 44% were restored in 2019.

## TOP PICKS

**Live updates and big moments from the Super Bowl | Gates are open, fans arriving**

**This Day in History: Nelson Mandela freed from prison**

**Rossen roundup: Top consumer stories from the past week**

**What a comeback! Three longtime friends have attended every Super Bowl – and don't intend to stop**

NEXT STORY

InDepthNH.org | (https://indepthnh.org/2024/02/08/ex-corrections-officer-faces-murder-charge-in-death-of-secure-psychiatric-unit-patient/)

**COURTS & CORRECTIONS**

# Ex-Corrections Officer Faces Murder Charge in Death of Secure Psychiatric Unit Patient

By Nancy West 🐦 February 8, 2024



Former corrections officer Matthew Millar's booking photo

By NANCY WEST, InDepthNH.org

CONCORD – A former corrections officer has been charged with second-degree murder for allegedly causing the death of a patient at the Secure Psychiatric Unit at the men's prison in Concord.

Former Corrections Officer Matthew Millar, 39, of Boscawen has been arrested in connection with the death of Jason Rothe, 50. Millar is being held without bail and a probable cause hearing is slated for Feb. 14 at 10 a.m. in Concord Circuit Court.

The charge alleges Millar recklessly caused Rothe's death under circumstances manifesting an extreme indifference to the value of human life, by using his arms and/or legs to apply force and pressure to Rothe's torso and/or neck, thereby causing his death by combined traumatic (compressional) and positional asphyxiation, Formella said in a news release.

The police affidavit (https://indepthnh.org/wp-content/uploads/2024/02/Statement-of-Probable-Cause.pdf) alleges that on April 29, 2023, six corrections officers in the Secure Psychiatric Unit engaged in a use of force incident that resulted in Rothe's death. The affidavit is here: https://indepthnh.org/wp-content/uploads/2024/02/Statement-of-Probable-Cause.pdf (https://indepthnh.org/wp-content/uploads/2024/02/Statement-of-Probable-Cause.pdf)

Formella said he doesn't anticipate any other charges against any of the other corrections officers involved in this incident.

In 2019, Rothe was committed to New Hampshire Hospital, the state's psychiatric hospital, as he was deemed incapable of taking care of himself, according to the police affidavit filed in the case.

On Aug. 16, 2022, New Hampshire Hospital sought a court order to transfer Rothe to SPU due to likelihood of him causing harm to himself and others. From the day of his transfer until the day of his death, Rothe was housed and treated at SPU. He also had a colostomy bag which collected stool after a self-inflicted injury, the affidavit said.

Rothe's mental health diagnosis was blacked out of the police affidavit.

SPU is a secure unit at the men's prison for mentally ill individuals who are deemed too dangerous to be housed at the New Hampshire Hospital even if they didn't commit a crime or individuals convicted of crimes who require additional mental health-related services beyond the capabilities of the general prison setting.

Rothe's is the third suspicious death there since 2015.

Charles Mealer was 47 when he committed suicide at the Secure Psychiatric Unit on June 22, 2015. The cause of death was suicide due to acute amitriptyline intoxication, an antidepressant that was prescribed to Mealer, according to a lawsuit filed by attorney Larry Vogelman.

Vogelman said at the time the unit had a problem with residents hoarding their prescribed drugs. Mealer had been transferred to the unit several times since he was sentenced to the prison in 2011 on two counts of felonious sexual assault. The lawsuit was settled for $75,000.

Vogelman also represented the family of Phillip Borcuk, 34, a mentally ill man from Cornish that he says died from positional asphyxiation from being taken out of the Residential Treatment Unit on his stomach Dec. 6. 2017, with his hands cuffed behind his back. The RTU is part of the same building on the grounds of the men's prison upstairs from SPU.

Shortly after Rothe's death, New Hampshire State Police in conjunction with the New Hampshire Department of Justice conducted an investigation into the facts and circumstances surrounding his death.

On October 25, 2023, Dr. Mitchell Weinberg of the Office of the Chief Medical Examiner determined that Rothe's manner of death was homicide and that the cause of death was combined traumatic (compressional) and positional asphyxiation.

"The investigation produced evidence that Matthew Millar applied downward pressure with his knee and arms onto Mr. Rothe's torso/neck area for several minutes while Mr. Rothe was handcuffed and faced down on the floor, contrary to DOC's use-of-force protocols and training.

"Matthew Millar received training on asphyxia and use of force which detailed the risk of death inherent with the specific manner of restraint he applied," the release said.

Beatrice Coulter, co-founder with Wanda Duryea of Advocates for Ethical Mental Health Treatment, responded to the arrest. Coulter and Duryea have been longtime critics of SPU.

"We have known for a very long time that the Secure Psychiatric Unit (SPU) is a dangerous place. Egregious tragedies such as this occur because they are allowed to," Coulter said. "Until there is a commitment by state actors and the Legislature this culture will persist. SPU is a prison with prison problems. The continued tormented logic to represent it as anything else is simply absurd gaslighting. How many more have to die in SPU?"

The state Department of Corrections also issued a news release saying the corrections officers still employed were initially placed on leave but returned to work after an administrative hearing, including Millar.

The separate statemen (https://indepthnh.org/wp-content/uploads/2024/02/NHDOC-Statement-following-Arrest-of-Matthew-Millar-1.pdf) t detailed the actions taken after Rothe's death. See full DOC release here: https://indepthnh.org/wp-content/uploads/2024/02/NHDOC-Statement-following-Arrest-of-Matthew-Millar-1.pdf (https://indepthnh.org/wp-content/uploads/2024/02/NHDOC-Statement-following-Arrest-of-Matthew-Millar-1.pdf)

"Following the completion of the Department's administrative review, the officers were returned to full duty based on information available to the department at that time.

"Based on new information made available to the department today, Commissioner (Helen) Hanks has directed another administrative review and placed the officers on administrative leave."

Since Dec. 13, 2023, Millar is no longer employed with the Department of Corrections.

"The alleged actions of Mr. Millar ultimately contributing to or causing the death of Mr. Rothe is completely unacceptable, is contrary to Department of Corrections training, and is not representative of our department or the rest of the Department's staff. The Department is firm in its stance that people who abuse their authority should face the full prosecution of the law."

Commissioner Hanks said in the release: "I personally extend my sympathies to the family and loved ones of Mr. Rothe. The allegations released today are reprehensible and do not align with my expectations of staff, nor do they align to the Department's mission and responsibilities.

"The Department prides itself on the dedicated staff that provide exemplary humane care in pursuit of our mission. Everyday New Hampshire Department of Correction's staff commit themselves to doing difficult work in a challenging environment."

---

# ATTACHMENT A

### Statement of Probable Cause

I, Trooper Kevin P. Pratt being duly sworn, do depose and say:

1. I am a Trooper with the New Hampshire State Police assigned to the Major Crime Unit based out of Concord, New Hampshire. I have been employed by the Department of Safety, Division of State Police since December 2015. I hold a Bachelor's Degree in Psychology with a Minor in History from Boston College in Chestnut Hill, Massachusetts, from which I graduated in May 2014. I was certified as a full-time police officer in April of 2016 in the State of New Hampshire as a member of the 169th Police Academy through New Hampshire Police Standards and Training. I have held the position of Detective within the Major Crime Unit since August of 2021, and prior to that, served as the TDY (Temporary Duty Assignment) Detective for the New Hampshire State Police-Troop C beginning in March 2020. While holding both positions, I have been involved in a number of homicide investigations in a variety of capacities. Further, since my time in the Major Crime Unit began, I have held the position of New Hampshire State Police- State Prison Liaison, a role maintained by the Major Crime Unit which exists to provide investigative support and guidance to the New Hampshire Department of Corrections, especially as it pertains to the investigation of in-custody deaths in the New Hampshire Prison system. While in this role, I have been called to investigate multiple in-custody deaths and have also worked to assist DOC investigators on other cases unrelated to death and/or homicide.

2. The information set forth below is based upon my personal involvement in the investigation into the death of Jason ROTHE ███████████ on April 29, 2023, at the New Hampshire Men's Prison-Secure Psychiatric Unit ("SPU") in Concord, New Hampshire as well as discussions with other members of law enforcement involved in said investigation.

3. On April 29, 2023, I received a call from Lieutenant John Sonia of the New Hampshire State Police-Major Crime Unit requesting that I respond to the New Hampshire Men's Prison located at 281 North State Street in Concord, New Hampshire for a report of an in-custody death. Upon arrival, I was notified that the deceased was identified as ROTHE. Additionally, I was informed that ROTHE was a patient who was being housed in SPU, and that he may have died as the result of a use of force incident.

4. On April 29, 2023, and a few days thereafter, members of the Major Crime Unit and I went to SPU and collected information and evidence surrounding the use of force incident. This involved preliminary interviews with some corrections officers and reviewing the available video footage. This initial investigation revealed that ROTHE was 50 years old and was 5'11", 244 pounds at his time of death. ROTHE had been diagnosed with ████████████████████████████████████████████████████████████████████████████████████████████████. In 2019, he was committed to NHH as he was deemed incapable of taking care of himself. On August 16, 2022, New Hampshire Hospital sought a court order to transfer ROTHE to SPU due to likelihood of ROTHE causing harm to himself and/or others. From the day of his transfer until the day of his death, ROTHE was housed and treated at SPU. ROTHE also had a colostomy bag which collected stool after a self-inflicted injury.

5. SPU is a secure unit for mentally ill individuals who are deemed too dangerous to be housed at NHH or individuals convicted of crimes who require additional mental health-related services beyond the capabilities of the general prison setting. The goal of SPU is to have residents/patients graduate back to the general population of NHH or DOC. At the time of ROTHE's death, he was in the Infirmary Ward, which is the most restrictive Ward in SPU. Each Ward within SPU has a day room. Inside the infirmary's day room where ROTHE was located at the time of his death are cement/metal seats and tables bolted to the floor. There are no electronics or other loose objects allowed inside the room, as they would be considered dangerous for those housed on the Infirmary Ward.

6. Further investigation into the incident revealed that on April 29, 2023 (Saturday), the following Corrections Officers ("CO") and staff were working in SPU: (1) CO Matthew MILLAR (DOB: 11/11/1984); (2) Cpl. Lesley-Ann COSGRO (the officer in charge for the shift); (3) CO Paul SANCHEZ; (4) RN Jennifer FITZGERALD; (5) CO Maria BISSONNETTE; (6) CO Josephine MCDONOUGH; (7) CO Ian REINHOLZ; and (8) Cpl. Timothy WRIGHT. On that day, CO REINHOLZ was assigned to the control room. The control room sits in the middle of SPU and allows the CO working inside to unlock doors and observe most of SPU both through the windows that surround the control room and via a number of cameras placed throughout the units. The CO in the control room cannot leave that post for any reason. CO REINHOLZ was assigned to the command center because he was on light duty status due to an injury.

7. At 9:03 AM on April 29, 2023, CO SANCHEZ brought ROTHE to the Infirmary Ward day room. Generally speaking, ROTHE was only allotted one hour to spend in the day room, but most COs stated in interviews and during testimony that they would allow inmates to stay longer if no other patients requested time. ROTHE had been in the day room for longer than his allotted time, but all COs testified they were not aware of another inmate who needed to use the day room on April 29, 2023, prior to the use of force incident.

8. At approximately 12:30 PM CO MILLAR called over the radio that ROTHE needed to be extracted from the day room. Cpl. COSGRO and CO MCDONOUGH responded to the day room to attempt to de-escalate the situation and persuade ROTHE to exit the day room willingly. By the time Cpl. COSGRO and CO MCDONOUGH arrived, CO MILLAR had left. Cpl. COSGRO and CO MCDONOUGH then tried to convince ROTHE to come out by giving him snacks. During this time ROTHE was experiencing some delirium, believing he was being starved to death and had not eaten in weeks. After 10 minutes Cpl. COSGRO made the decision that ROTHE would be extracted from the room by force. According to Cpl. COSGRO, in past instances ROTHE had come out willingly after a minor show of force.

9. Limited video footage exists of the incident. The initial investigation relied on statements from various witnesses who were present during the altercation that took place between corrections officers and ROTHE.

10. Pursuant to DOC policy, prior to any use of force incident, and prior to extracting a patient or inmate from a cell the COs are supposed to form an "extraction team." A member of the extraction team must be selected to record the incident with a handheld camera. On April 29, CO BISSONNETTE was determined to be the team member responsible for holding the camera and documenting the event. CO BISSONNETTE's footage of the incident lasts approximately 1 minute, 16 seconds, and shows the

extraction team preparing to enter the day room at what was later determined to be 12:51 PM. In this footage, ROTHE can be seen standing behind the door to the day room and appears to have taken a fighting stance (behind the door), and one of his fists is raised. Cpl. WRIGHT can be seen holding a plexiglass shield and Cpl. COSGRO can be seen readying a Taser. No COs are seen wearing any protective gear in the video. Several seconds into the video, the door to the dayroom is opened by CO MCDONOUGH and the officers rush in. ROTHE immediately pushes Cpl. WRIGHT's shield down and places a hand behind Cpl. WRIGHT's head. Cpl. WRIGHT drops the shield and begins to strike ROTHE repeatedly on his head and neck area. CO MCDONOUGH is seen grabbing one of ROTHE's legs which causes him to drop to the floor (fall). Cpl. WRIGHT is then seen straddling ROTHE's chest and punching his head. ROTHE is seen rolling from his back onto his stomach with his hands to the side, referred to as the prone position. He actively resists detention. The camera is then placed on the floor, and the video ends.

11. Later investigation revealed that the handheld digital camera utilized in this incident was equipped with a fold-out viewfinder which allowed the person filming to view the content being filmed on the screen. If that viewfinder is folded back into the body of the camera, the camera immediately powers down and stops filming. CO BISSONNETTE stated that she placed the camera on the floor of the day room to assist in the altercation with ROTHE, at which point the viewfinder was unintentionally closed and the camera stopped filming.

12. Within SPU there are several cameras positioned across the various wards, to include camera views of the different day rooms. However, there is not a camera that covers the interior of the SPU infirmary ward day room. As such, the handheld digital camera was the only one capable of capturing what occurred during the altercation between the corrections officers and ROTHE. Once the handheld camera stopped filming, 1 minute and 16 seconds into the interaction, the next time ROTHE can be seen on camera is approximately 8 minutes later at 12:59 PM, at which point he is wheeled into the hallway of the infirmary ward on a stretcher. ROTHE can be seen face down in the prone position handcuffed behind his back and strapped to the stretcher. ROTHE does not appear responsive, is not moving, and shows no other signs of life at that point.

13. In the 8 minutes between the end of the handheld camera footage and the next time ROTHE is visible, corrections officers and staff were captured on a camera in the hallway entering and exiting the day room. A summary of those movements is as follows:

    - *12:52 PM- CO MILLAR enters the infirmary day room*
    - *12:55 PM- RN FITZGERALD enters the Infirmary Ward (and per later interviews, the day room)*
    - *12:55 PM- CO MCDONOUGH exits the day room (per later interviews, CO MCDONOUGH stated that she went to the control room to acquire shackles for ROTHE's legs)*
    - *12:55 PM- RN FITZGERALD exits the Infirmary Ward*
    - *12:56 PM- CO BISSONNETTE exits the day room and infirmary ward (per later interviews, CO BISSONNETTE was operating the elevator to allow additional officers entry into SPU to assist)*
    - *12:56 PM- CO SANCHEZ exits the day room, and he and RN FITZGERALD retrieve a stretcher from a storage closet*
    - *12:58 PM- RN FITZGERALD enters the day room with the stretcher*

14. Based on video obtained during the investigation, at 12:59 PM COs can be observed moving ROTHE on the stretcher from the day room to another room known as the 'four-points restraint room,' within which there is a four-point restraint table upon which inmates and patients are placed and each of their arms and feet are shackled as a method of restraint. Officers transfer ROTHE from the stretcher to the four-points table and begin to shackle him. ROTHE remains face down, and at no point in this process displays any signs of life. Approximately 1 minute and 30 seconds after ROTHE is wheeled into the restraint room and 10 minutes after the altercation with ROTHE began, at 1:01 PM, Cpl. WRIGHT can be seen checking ROTHE for a pulse. At this point officers roll ROTHE onto his back on the table and Cpl. COSGRO begins performing a sternum rub, a technique often used on individuals who have overdosed. Almost simultaneously, CO MILLAR begins pumping ROTHE's legs in a manner that was described in one interview as "bicycling." RN FITZGERALD, who had exited the room moments before, returns with an AED and attaches it to ROTHE. Investigators were later informed that the AED reported that a pulse had not been detected and as such, no shock was administered. At this point, ROTHE is moved from the table to the floor of the restraint room and CO MILLAR begins performing CPR on ROTHE.

15. CPR was performed on ROTHE continuously by both officers and Concord EMS personnel who arrived on scene until they departed by ambulance with ROTHE at 1:44 PM. ROTHE was transported to Concord Hospital where he was pronounced deceased.

16. In the days and months that followed ROTHE's death, an investigation was conducted during which parties were interviewed, Grand Jury testimony was collected, all available video footage from April 29, 2023, was reviewed, Department of Corrections policies and procedures, personnel files of the involved parties, and any and all other records pertaining to the incident were obtained. The involved officers completed statements concerning the use of force and at a later date several officers completed revised statements containing additional information. Given these facts, a number of the involved officers provided up to four separate statements pertaining to the death of ROTHE over the span of the investigation. The content of the paragraphs that follow were compiled from these statements in order to create a clear picture of how ROTHE died.

17. CO MCDONOUGH wrote an initial statement following the incident. Later, at the request of the Commissioner of the Department of Corrections Helen HANKS, she wrote a revised statement. She also agreed to a recorded interview with investigators and testified before the Grand Jury. CO MCDONOUGH recalled that during the altercation she ordered ROTHE to stop resisting and told him to release his hold of the handcuffs. She said that he told them that "[he could not] open [his] hand . . ." and that he could not let the handcuffs go. At that time, five officers were on top of his various body parts. She observed Cpl. WRIGHT striking Rothe's head and face, and Cpl. COSGRO administering repeated 'drive-stuns' with the Taser. It should be noted that a drive-stun is an application of the Taser which utilizes an electric shock to obtain compliance through pain. It does not achieve the neuro-muscular incapacitation which is the goal of deploying the prongs of the Taser from the Taser cartridge. At one point during the altercation CO MCDONOUGH felt what she believed was a shock from the drive-stuns. Towards the end of the struggle CO MCDONOUGH left the room to obtain leg shackles from the SPU control room. When she left the day room, she recalled that ROTHE was face down with CO MILLAR at ROTHE's right shoulder area, and that MILLAR "could have been" holding ROTHE down. She also mentioned that Cpl. WRIGHT may have been holding ROTHE's head or shoulder down on the side opposite CO MILLAR. She recalled (not with 100% certainty) that CO MILLAR and Cpl.

WRIGHT were kneeling down, both applying pressure to ROTHE's shoulder and arms. CO MCDONOUGH noted that ROTHE was face down and had already been handcuffed with his hands behind his back. CO MCDONOUGH recalled that ROTHE was still moving as she left the room (as stated above, CO MCDONOUGH left the day room at 12:55 PM, and returned within the minute). When she came back into the day room with the leg shackles she did not specifically recall the locations of the officers inside the room, but did observe that ROTHE was not moving or speaking. CO MCDONOUGH applied the leg shackles to ROTHE, and once they moved Rothe to the restraint room, she was the first person to notice he was not breathing.

18. FITZGERALD is a registered nurse with a certification in psychology who was assigned to SPU at the time of ROTHE's death. She was the only nurse working on April 29, 2023. She gave an interview and testified before the Grand Jury. FITZGERALD testified that she was alerted to the use of force incident by CO REINHOLZ. When she arrived at the day room, she observed officers "catching their breath" and ROTHE lying in the prone position. Although she observed officers surrounding ROTHE she could not recall if any correction officers were touching him. During her time in the day room ROTHE did not resist, he did not speak, or move. She did not perform an examination of ROTHE in the day room because she believed he was playing "opossum."

19. Cpl. COSGRO, similar to CO MCDONOUGH, submitted an initial statement and a follow up statement concerning the incident. She also participated in an interview with investigators and provided testimony before the Grand Jury. Cpl. COSGRO was the only officer that was able to clearly observe the actions of each individual during the use-of-force incident. She was the shift supervisor and officer-in-charge on April 29, 2023. Her role during the extraction was to observe and direct per Department of Corrections policy. Prior to the extraction she observed an argument between ROTHE and CO MILLAR. She said that "[t]hey started arguing so [CO] Millar came over the radio and said that we [] would need to [] get him out of the room, cuz he's being argumentative, and he's not cooperating." Cpl. COSGRO described CO MILLAR as "agitated" during the interaction and said that he was not in a position to make demands to remove patients. She stated that CO MILLAR wanted to go into the room immediately to extract ROTHE; but she told CO MILLAR that she would talk to him first because her team had a good rapport with him.

20. Cpl. COSGRO stated that prior to the extraction she gathered the officers, and that when they entered the dayroom "no one had an idea of what they were supposed to do." She acknowledged that she did not respond appropriately to the incident, in that, she provided an immediate action response when the situation with the Victim called for a delayed action response. Pursuant to DOC's policy and procedure directives, officers have two options when responding to situations that may require using physical force against an individual in their custody and supervision.

> *(1) Immediate action: this action is necessary when the actions of the individual are such that a swift and sudden response from staff is needed to take control of a potentially dangerous situation. Immediate action may become necessary in an assault situation to prevent escape, self-harm, or in self-defense.*
>
> *(2) Delayed action: this action is always desired over immediate action, although it is certainly not always possible. When action is delayed,*

> *several benefits surface that help create a peaceful and safe resolution to the potential use of force situation.*

The procedures detail the benefits of using delayed action responses and notes that "[t]he OIC should be aware that frequently time is on the side of staff, especially where the individual is secured in a dayroom or a cell."

21. Cpl. COSGRO was able to provide information on the actions of each officer along with their positions on and around ROTHE throughout the duration of the incident. Cpl. COSGRO has maintained in her various statements to law enforcement and before the grand jury that during the incident, the COs were able to restrain ROTHE and that after he was restrained, CO MILLAR had a knee pressed into ROTHE's upper-back for an extended period of time. Cpl. COSGRO explained that initially she attempted to tase ROTHE but was unable to obtain an adequate connection to achieve neuromuscular incapacitation. She stated that when she failed in her attempts to tase ROTHE, she attempted to restrain him by kneeling on his left arm. While she controlled ROTHE's left arm with her knee, Cpl. WRIGHT and CO MCDONOUGH each had control of one of ROTHE's other limbs. Once ROTHE was handcuffed, Cpl. WRIGHT and CO MCDONOUGH stood up and moved away from ROTHE. Cpl. COSGRO also removed herself from ROTHE's arm; however, CO MILLAR remained on top of him, with his knee positioned on ROTHE's upper-back and neck area. Once the other officers stood up, CO MILLAR informed them that ROTHE was urinating and warned them to back away. At this point, ROTHE provided no resistance to the restraint. Still, CO MILLAR continued to restrain him with his knee firmly pressed against ROTHE's upper-back and neck area. According to Cpl. COSGRO, CO MILLAR restrained ROTHE with "all his weight." For the duration of the time that CO MILLAR knelt on ROTHE unassisted by other officers, Cpl. COSGRO did not observe ROTHE moving or speaking.

22. Cpl. COSGRO stated that one of the officers, identified during the investigation as CO SANCHEZ, was told to get a stretcher, and that while she and the other officers waited for the stretcher to arrive CO MILLAR said, "[d]on't worry Corporal. I've got him. He's not moving." When the stretcher was brought into the day room the officers placed ROTHE on it face down in the prone position. Cpl. COSGRO stated that this was the first time she observed CO MILLAR remove his knee from ROTHE's upper-back and neck area. During the transition from the day room floor to the stretcher, Cpl. COSGRO stated that ROTHE did not move, resist in any fashion, or speak.

23. Cpl. COSGRO went on to discuss her training and the training the members of the extraction team received. She also described the typical extractions and her experience with them. Cpl. COSGRO provided the following information in grand jury:

> *Q:  You said it wasn't a formal extraction. Did all the people involved have experience with formal extractions?*
> *A:  Yes.*
> *Q:  Okay. And then you had mentioned that – I believe you said that typically you try to get the restrained inmate up on their feet quickly, but it almost sounded as if the gentleman had his knee on the person for an extended period of time?*
> *A:  Um-hmm (affirmative response).*

> Q: Would you say that was longer than protocol?
> A: Yes.
> Q: When the person had his knee on the right side, how long did the patient stop struggling with the knee on there?
> A: Maybe half a minute.
> Q: So, he had just – had just stopped struggling?
> A: Yes.
> Q: So, let me just clarify. While Officer Millar's knee was on Victim's back at some point before the stretcher came in, he stopped struggling?
> A: Yes.

24. CO REINHOLZ provided an initial written statement regarding his observations during the incident. CO REINHOLZ was also brought before the Grand Jury where he provided testimony regarding the incident. CO REINHOLZ was stationed in the SPU control room during the incident. He was able to observe the comings and goings of officers working on the unit through the surveillance system; however, his direct view of the incident with ROTHE was obstructed by a staircase. He stated that "it was just a pile of bodies" during the incident and that remained consistent throughout the altercation. He reported that he, along with other COs, had received specialized training in airway and blood flow obstruction in response to the "George Floyd case" between May of 2020 and May of 2021. Based on the training, as well as his common sense, he knew that downward pressure on the neck or back could cause the death of the person the pressure was being applied to. CO REINHOLZ was trained that when an individual is laying on their chest with their hands behind their back, you cannot kneel on them or apply downward pressure on them.

25. Several of the cooperating officers described CO MILLAR as agitated in his interactions with ROTHE prior to the use of force incident. He was also characterized as escalating ROTHE's behavior, creating the eventual conflict. This interaction between CO MILLAR and ROTHE was witnessed by Cpl. COSGRO. Cpl. COSGRO described CO MILLAR as "agitated" and stated that CO MILLAR demanded that they "go in right away to extract him –." During her Grand Jury testimony, Cpl. COSGRO was asked what CO MILLAR's demeanor was when he asked her to remove ROTHE from the day room. Cpl. COSGRO stated that she observed CO MILLAR arguing with ROTHE and then heard CO MILLAR on the radio demanding that they extract him.

26. As discussed above, CO REINHOLZ, who was stationed in the control room, did not have a clear line of sight of the dayroom; however, he was able to hear the altercation between CO MILLAR and ROTHE prior to the incident. During his Grand Jury testimony, CO REINHOLZ described CO MILLAR as being the cause of the escalated confrontation. He also testified, that based on his observations, he believed that CO MILLAR should have been removed from additional interactions with ROTHE.

27. Once it was discovered that ROTHE was not breathing, surveillance footage captured CO MILLAR acting frantic and emotionally overwrought. He is observed kicking the stretcher utilized to move ROTHE while leaving the four-points restraint room, as well as punching a door in the hallway with a closed fist. One officer who was not present for the use of force incident, Sergeant Christopher PELLETIER, stated that he asked CO MILLAR to leave the room while lifesaving measures were being performed on ROTHE because of his erratic behavior.

28. CO MILLAR provided two written statements following the incident. His first written statement was submitted two days after the incident with ROTHE took place. Later, after meeting with Commissioner Helen HANKS, he provided a revised statement at her request.

29. On May 01, 2023, CO MILLAR submitted his first written statement documenting his involvement in the use of force incident. While the statement is brief and lacks specificity, CO MILLAR admitted that during the incident he was on top of ROTHE. He wrote:

> "As soon as I entered the day room, I grabbed Roth[e]'s right leg to help roll him over. After this Roth[e] pulled his hands under him. At this point I moved to assist with his hands. As I reached for his right arm, I used my right leg to give me leverage to move some of his weight off to pull the arm out. I got his arm free and placed it behind his back and moved my right leg up to his side by the elbow to prevent movement as I reached over to his other side and with help from the other officer, we pulled his hands together and cuffed him. We then lifted him onto the stretcher."

30. Several of the responding officers' Grand Jury testimony included information regarding revised statements that they provided following their meetings with Commissioner HANKS. These meetings took place in May and June of 2023. Upon learning of the revised statements, investigators obtained copies of all existing revised statements. CO MILLAR wrote a revised statement regarding his involvement in the use of force incident. In his revised statement, CO MILLAR documented his interaction with ROTHE prior to the use of force incident. He wrote:

> "At approximately 1230 on 04/29/2023 I, CO. Millar, attempted to talk resident Rothe out of the infirmary day room. At this point Rothe was in the day room for over an hour and the dayroom was needed. With speaking with Rothe he became angry, started searing [sic] at me, and banged the table twice. At this point, to avoid further escalation I stopped speaking with him to let him calm down and went to report to my OIC in the security office. I notified both Cpl. Wright and Cpl. Cosgro who was in the office that Rothe was not cooperating, swearing and that he had been banging the table. I suggested that we may need to roll-in to remove him from the day room. They suggested to let CO. McDonough to try and speak with him because she has good rapport with him in the past. I agreed and asked if it was ok to eat while they did this."

The statement further documents CO MILLAR's movements following his initial interaction with ROTHE, and how he ultimately became involved in the use of force incident. In the revised statement, CO MILLAR also described entering the day room, observing that the handheld video camera was off, taking the camera out of CO MCDONOUGH's hand, and placing it on the day room table. That statement has not been corroborated by surveillance video obtained during the investigation or by statements made by other involved officers.

31. Cpl. WRIGHT provided a written statement following the incident. He later agreed to speak with investigators with his attorney present. On August 10, 2023, he participated in a recorded interview at the New Hampshire Department of Justice. During the interview he provided information that was contradicted by other available evidence and statements: (1) that each member of the extraction team knew their respective role in the extraction; (2) that the team members were equipped with their riot gear prior to entering the dayroom per Department of Corrections policy; and (3) that RN FITZGERALD examined ROTHE prior to leaving the day room. Cpl. WRIGHT was inconsistent

during the interview and repeatedly retracted previous statements. He was clear, however, that CO MILLAR placed his knee on ROTHE's upper back and held it there to restrain him. Cpl. WRIGHT clarified that his own knee was also on ROTHE's back but for "brief seconds." He stated that he and CO MILLAR placed their knees on ROTHE's back to "make it so he didn't move and run away from us... At that point, [ROTHE] has control of his arms. He could go anywhere he wanted." Cpl. WRIGHT admitted that this was a chaotic event and that he was not able to track the movement and actions of the other members of his team.

32. In addition to trainings on the use of force and interacting with inmates and patients suffering mental illnesses, the officers who responded to the day room to remove ROTHE all received specialized trainings specific to use of force and breathing. "One Breath" is a training the officers received which exclusively discussed methods to effectively restrain someone without impairing their ability to breathe. The training also focuses on signs and symptoms that officers should be aware of when using force, and preventative measures that can be taken as they relate to use of force and breathing. "One Breath" was utilized as an in-service training by the Department of Corrections, and was mandatory to have been completed by officers between January 01 and February 28 of 2021. Per CO MILLAR's DOC training records, he completed the "One Breath" training on February 28, 2021. The restraint used by CO MILLAR, namely kneeing on ROTHE's back, is expressly contrary to the "One Breath" training; a training that CO MILLAR received, and a training which detailed to him the risk of death inherent with this manner of restraint.

33. Investigators from New Hampshire State Police Major Crime Unit interviewed Lt. Miljan Lacmanovic who provides training to all recruits at the Police Standards and Training- Corrections Academy attended by every individual certified as a corrections officer in the State of New Hampshire. He also provides annual in-service training to all officers employed by the New Hampshire Department of Corrections. The training includes refreshers and considerations pertaining to defensive tactics and use of force. Lt. Lacmanovic provided a statement to investigators regarding the training provided and standards used by DOC. During his meeting with investigators, Lt. Lacmanovic disclosed that the last several years of in-service trainings have discussed use of force and breathing. He was provided CO MILLAR's conduct as a hypothetical scenario and asked to opine on whether the force used was consistent with current DOC standards and training. Lt. Lacmanovic informed investigators that even leaving an inmate in the prone position for an extended period of time is against policy and "against common sense." He stated that he has officers practice the prone position on "each other so they know first-hand from being here" that it is bad practice. Lt. Lacmanovic emphasized that leaving someone handcuffed in the prone position is "not right" and that an individual should never be placed in the prone position after they are handcuffed. Lt. Lacmanovic said that he trains all officers that "when the resistance ends, that's when [the officer should] stop the force," if the officer does not stop, "that's when it becomes excessive force."

34. On April 30, 2023, an autopsy of ROTHE's body was conducted by Deputy Chief Medical Examiner Doctor Mitchell Weinberg at the Concord Hospital Morgue. After several months of study and examination of both the autopsy findings and case materials provided by investigators to include transcripts of interviews and testimony, as well as pertinent video footage, on October 25, 2023, Dr. Weinberg concluded that ROTHE's cause of death was "combined traumatic (compressional) and positional asphyxia," and the manner of death was homicide. There were several injuries Dr. Weinberg noted which were likely manifestations of the struggle. They included: (1) multiple areas of bleeding beneath the surface of the upper back, which most likely relate to direct pressure applied to

this region of the body during restraint; (2) petechial hemorrhages (pinpoint-sized areas of bleeding) are present on the forehead, within the mouth, and within the lower respiratory tract. From Dr. Weinberg's report: "[p]ositional asphyxia refers to a situation a person is unable to adequately respire due to positioning of the body, and prone positioning with the wrists cuffed behind the back is a position that may impede respiratory activity. Traumatic asphyxia refers to a type of asphyxia due to compression of the torso, such as due to a heavy weight on the chest, or as in this case, due to compression of the torso. While I am unable to numerically differentiate the relative contributions of these two asphyxial mechanisms, I do believe that their combined effects provide the ultimate explanation for death in this case."

35. In summation, on April 29, 2023, at approximately 12:30 PM a verbal altercation took place between ROTHE and CO Matthew MILLAR, which resulted in CO MILLAR calling over the radio and demanding that ROTHE be removed from the day room. Cpl. Lesley-Ann COSGRO, the officer in charge of SPU on April 29, responded to the day room with CO Josephine MCDONOUGH with the intent to de-escalate the situation and compel ROTHE to leave the day room peacefully. After a reported 10 minutes of attempted de-escalation, during which time ROTHE was offered snacks to combat the delusion that he was being starved, Cpl. COSGRO determined that they would forcibly remove ROTHE from the day room. At 12:51 PM, Cpl. COSGRO, Cpl. WRIGHT, and COs MCDONOUGH, BISSONNETTE and SANCHEZ made entry into the day room and a struggle immediately ensued. Notably, CO MILLAR was not a part of this initial entry team, having had what was described as causing the escalated situation with ROTHE by other officers and leaving prior to entry. However, at 12:52 PM in the midst of the incident, CO MILLAR entered the day room and based on witness accounts and his own statement, placed his knee on ROTHE's upper-back and neck area as a method of restraint. According to Cpl. COSGRO, shortly after CO MILLAR placed his weight on ROTHE's upper-back and neck area, all other officers restraining ROTHE removed themselves, leaving CO MILLAR as the only officer still applying force. Shortly thereafter estimated to be approximately 30 seconds by Cpl. COSGRO, any resistance from ROTHE ceased. Cpl. COSGRO also testified that CO MILLAR continued to apply pressure to ROTHE's upper-back and neck area until the stretcher arrived, which the investigation determined was at 12:58 PM, approximately 6 minutes after CO MILLAR entered the room. During that 6-minute interval, CO MILLAR warned the other officers that ROTHE was urinating and suggested that they step away. He also stated "I've got [ROTHE]. He's not moving" in response to Cpl. COSGRO asking whether he needed assistance in retraining ROTHE. After ROTHE was moved to the four-points restraint room, CO MILLAR was observed on camera "bicycling" ROTHE's legs, or pumping them rapidly in a circular fashion, in an apparent effort to revive him, and acting frantic and panicked to such a degree that he was eventually removed from the room by a senior officer. When that occurred, CO MILLAR was then seen on camera kicking the stretcher used to move ROTHE, as well as striking a door with a closed fist.

36. Based on the forgoing information and my training and experience, I believe that Corrections Officer Matthew MILLAR (DOB: 11/11/1984) did, on April 29, 2023, at approximately 12:55 PM, asphyxiate and kill Jason ROTHE ▓▓▓▓▓▓▓▓▓▓. Based upon the foregoing information (and upon my personal knowledge), there is Probable Cause to believe that on April 29, 2023, Matthew MILLAR (DOB: 11/11/1984) did commit the crime of Reckless Second Degree Murder, contrary to RSA 630:1-b, (b) in that he did recklessly cause the death of Jason ROTHE under circumstances manifesting an extreme indifference to the value of human life, to wit: by asphyxiating him through the mechanism of constant pressure on ROTHE's upper-back and neck area utilizing his knee while

ROTHE was handcuffed behind his back in the prone position, in direct contradiction with the training that MILLAR received from the New Hampshire Department of Corrections as well as the common sense and judgement of a reasonable person.

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

William Soler Justice Pro se

Plaintiff(s)

v.

Case No. 1:20-CV-00517-PB

Christopher T. Sununu, et al.

Defendant(s)

MOTION TO/FOR injunction to prevent placing civilly committed in SPU

---

PLAINTIFF REQUESTS TO REINSERT request for injunction to prevent the state of NH from placing civilly committed non-convicted patients in NHDOC SPU. At the time of the R&R Plaintiff believed his Conditional Discharge(CD) would expire, however the state of NH has renewed the CD.

It has become public that NH has no competency restoration. Therefore this issue is capable of repetition yet evading review. Plaintiff at anytime in the next 4 years can be returned to SPU, despite the lack of any program to restore his competency. The recent charging of a corrections officer with the murder of a patient in SPU clearly shows it is unsafe, inadequate and not therapeutic

Wherefore plaintiff prays the injunction request be reinstated to this lawsuit..

Date: 02/12/2023

*William Justice*
Signature

## MEMORANDUM OF LAW

Pursuant to LR 7.1(a)(2), every motion shall be accompanied by a memorandum with citations to supporting authorities or a statement explaining why a memorandum is unnecessary.

☐ I have attached a supporting memorandum of law to this motion.

☒ I have NOT attached a memorandum of law because none is required (explain your reasoning below).

## CONCURRENCES SOUGHT

Pursuant to LR 7.1(c), any party filing a motion other than a dispositive motion (a dispositive motion seeks an order disposing of one or more claims in favor of the moving party, for example, a motion to dismiss or a motion for summary judgment) shall certify to the court that a good faith attempt has been made to obtain concurrence/agreement in the relief sought. If concurrence is obtained, the moving party shall so note.

I certify the following (choose one):

☐ All parties have assented/agreed to this motion.

☐ I made a good faith attempt, but was unable to successfully obtain concurrence/agreement from all parties.

☒ I have NOT attempted to obtain concurrence/agreement because it is not required.

## CERTIFICATE OF SERVICE

I hereby certify that this motion was served on the following persons on the date and in the manner specified below:

Person(s) served electronically (via ECF):

Person(s) served by mail. Please include address(es):

Person(s) served by hand:

Date of Service: _____

Signature: _____

Name: _____

Address: _____

Phone: _____

Email: _____