# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

```
****************************************
William Soler Justice,               *
                                     *
            Plaintiff,               *
      v.                             *        Civil No. 1:20-cv-00517-PB
                                     *
Christopher T. Sununu, et al.,       *
                                     *
            Defendants.              *
                                     *
****************************************
```

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

The Secure Psychiatric Unit of the New Hampshire Department of Corrections is the most secure setting for individuals with serious mental illness who are deemed dangerous. Plaintiff was committed to the Secure Psychiatric Unit on February 9, 2018 and for all times relevant to his Complaint. Corrections officers were involved in four incidents with Plaintiff in which they used reasonable force to protect the safety of Plaintiff and themselves on February 18, 2018, April 10, 2018, July 13, 2018, and January 22, 2019.

Despite the Secure Psychiatric Unit's role in handling some of the most mentally ill and dangerous individuals in the State, seasoned correctional officers still found Plaintiff to be "out of control," "a mess," "paranoid and delusional," and "noncompliant" during the four incidents complained-of by Plaintiff. SUF ¶ 10. Their description of Plaintiff's behavior was confirmed by Plaintiff's medical providers at the time, who described Plaintiff as "experiencing severe psychotic symptoms with persistent delusions that many people around him [were] part of the conspiracy against him." SUF ¶ 11.  Plaintiff could not, or did not, respond to commands. He refused to be

1

medicated and denied mental illness. He verbally threatened staff on several occasions, verbally expressing desire to hurt them. He collected urine in cups to throw on staff. Plaintiff was extremely tall and heavy. He engaged in dangerous, self-harming behavior. He covered up his cell so that staff were unable to ensure his safety. All these behaviors led to medical declaring several "Personal Safety Emergency Interventions" and ordering him to be involuntarily treated during these incidents.

The Defendant Corrections Officers performed the extremely difficult task of protecting Plaintiff while protecting staff safety. Thankfully, Plaintiff suffered no serious injuries from any of the incidents alleged in his Complaint, which cannot be said for the officers tasked with trying to protect him. SUF ¶ 74. The officers named in Plaintiff's Complaint acted reasonably in their interactions with Plaintiff during the alleged incidents, such that no reasonable juror could find in favor of Plaintiff on his claims.

## BACKGROUND AND PROCEDURAL POSTURE

Plaintiff filed his Complaint in April 2020 alleging various claims arising from his commitment in the Secure Psychiatric Unit (SPU) in 2018 and 2019. In its Amended Report and Recommendation, the Court allowed several claims to proceed against Corrections Officers Joshua Deblois, Frank Logan, Nathaniel Seabron,[1] Benjamyn Carver, and Page Kimball[2] regarding use of force incidents involving Plaintiff on February 18, 2018, April 10, 2018, July 13, 2018, and January 22, 2019. ECF 29 [Am. Report and Recommendation ("R & R")], at *10-

---

[1] Nathaniel Seabron was not served and claims against him are therefore not addressed in this Motion. *See* ECF 95.
[2] Defendants Page Kimball and Benjamyn Carver were originally misidentified by Plaintiff as Mark Kimball and Randall Carver, respectively. ECF 1; ECF 76; ECF 91.

2

12, 15. Plaintiff amended his Complaint on February 28, 2025 to add Officers Kenneth Kum, Jonathan Boisselle, and Riley Morissette as additional defendants, alleging involvement by these officers in the same four incidents. ECF 131. Officers Deblois, Logan, Carver, Kimball, Kum, Boisselle, and Morissette will hereafter be referred to collectively as the "Officer Defendants." This Court allowed three Fourteenth Amendment constitutional claims involving the Officer Defendants to proceed: unreasonable use of force (identified in the R&R as Claim 1); failure to intervene (Claim 2); and unnecessary strip search (Claim 3). ECF 29 [R & R], at *10-12, 15. The Court also allowed several related State law claims to proceed (identified as Claims 15(a)-(e)) against the Officer Defendants. *Id.* at *14-15.

The Court also allowed a failure to train claim under the Fourteenth Amendment (Claim 11) and a related supervisory liability claim under State law (Claim 15(h)) to proceed against Helen Hanks, Paula Mattis, Carlene Ferrier and Deborah Robinson,. *Id.* at *13, 15.

### STATEMENT OF MATERIAL FACTS

There is no genuine dispute about the following facts relevant to this motion:

1.      Plaintiff William Justice resided in the Secure Psychiatric Unit (the "SPU") in Concord, NH starting on February 9, 2018, and continued to reside there through at least January 2019. Am. Compl. [ECF 131] ¶¶ 2; 28.

2.      The SPU is a psychiatric unit operated by the NH Department of Corrections. Am. Compl. ¶ 3. The SPU provides psychiatric services to inmates and to civilly committed individuals in a secure setting. Am. Compl. ¶ 3; *see also* RSA 622:41 [Unit Established] (establishing "a secure psychiatric unit to receive and provide appropriate treatment for persons transferred under RSA 622:45 to a secure environment.").

3

3.      Any person who is involuntarily committed pursuant to RSA Chapter 135-C [Involuntary Admissions] or RSA Chapter 171-B [Involuntary Admission for Persons Found Not Competent to Stand Trial] may be transferred to the SPU "upon a determination that the person would present a serious likelihood of danger to himself or to others if admitted to or retained in a receiving facility in the state mental health services system." RSA 622:45.

4.      Plaintiff was diagnosed with paranoid schizophrenia on or around 2002. Pl. Dep. 10:15-20.

5.      Plaintiff was committed to the SPU after he was found not competent to stand trial and not restorable for charges of attempted murder, assault, and reckless conduct with a dangerous weapon for attempting to run over several people with his car in August 2017. Am. Compl. ¶ 28; Ex. 12 [Involuntary Admission Order].

6.      The 6th Circuit – Probate Division issued an involuntary admission order on February 9, 2018, ordering Plaintiff to "be admitted to the Secure Psychiatric Unit (SPU) Concord, New Hampshire on an involuntary basis for a period of five (5) years pursuant to [RSA] 135-C with a conditional discharge when and if clinically appropriate." Ex. 12 [Involuntary Admission Order]. The Court found that Plaintiff "is in such a mental condition as a result of mental illness as to create a potentially serious likelihood of danger to himself and/or others." *Id.*

7.      Plaintiff had been medicated at the time he allegedly attempted to run over individuals with his car, but while he was incarcerated in the county jail awaiting resolution of his case, he stopped taking psychiatric medications. Ex. 12 [Involuntary Admission Order].

8.      Plaintiff's examining psychiatrist testified at his commitment hearing on February 8, 2019 that "[Plaintiff's] dangerous behavior is recurrent threatening." *Id.*

4

9.      While at the SPU, Plaintiff refused to take psychotropic medications and only received emergency injections for his schizophrenia until a guardian was appointed on August 10, 2018. Am. Compl. ¶ 37. Plaintiff refused psychiatric medications because he believed (and still believes) that he does not have any mental illness. Pl. Dep. 91:14-21.[3]

10.     When Plaintiff arrived at the SPU, he was unmedicated and out of control. Kimball Dec. ¶ 9; Logan Dec. ¶ 6. Within days of his arrival, Officer Kimball was made aware of Plaintiff threatening to throw feces on officers and that Plaintiff urinated on the door of his room. Kimball Dec. ¶ 9. Plaintiff was a "difficult patient and was a mess when he arrived." Kum Dec. ¶ 9. During his stay at the SPU, Plaintiff was paranoid and delusional. Logan Dec. ¶ 6.

11.     According to an examining medical provider, at all times relevant to Plaintiff's Complaint, Plaintiff was "experiencing severe psychotic symptoms with persistent delusions that many people around him [were] part of the conspiracy against him. He [had] poor insight into having a mental illness. He [had] a history of engaging in dangerous behaviors toward others based on these delusions." Ex. 13 [Dr. Hincks Letter].

12.     For all times relevant to his Complaint, Plaintiff weighed approximately 350 pounds and was approximately 6'7" tall. Ex. 1 [2.18.18 Medical Records], DOC_1356; Logan Dec.¶ 6; Kimball Dec. ¶ 7.

13.     The policy in place during the time period when Plaintiff was at the SPU allows officers to use "the reasonable level of physical force in situations [for] self-defense, …to protect others, prevent loss of life, prevent serious bodily injury, protect from self abuse, protect serious

_____

[3] Plaintiff's Deposition Transcript is attached as Exhibit 11, and will be referred to as "Pl. Dep."

destruction of property, prevent escapes, or to affect an arrest." Ex. 10 [PPD 5.58]; Deblois Dec.

¶ 5.

14.     Under the use of force policy in place while Plaintiff was at the SPU, OC spray

(or pepper spray) can be used "to temporarily incapacitate or disorient an individual in order to

reduce the likelihood of injury to the individual and to reduce the likelihood of injury to staff

involved in bringing an individual under control." Ex. 10 [PPD 5.58]; Logan Dec. ¶ 5.

15.     Tasers "are a less than-lethal use of force option that is designed to disrupt muscle

control in order to temporarily incapacitate or disorient a hostile individual" and they are

intended to be used "to reduce the possibility of injury to staff or subjects when attempting to

bring an individual under control." Ex. 10 [PPD 5.58, III, G, 6]; Deblois Dec. ¶ 5.

16.     Frank Logan, Page Kimball, Joshua Deblois, Benjamyn Carver, Riley Morissette,

Kenneth Kum, and Jonathan Boisselle all received training on the use of force policies and

procedures at the SPU and received annual trainings regarding use of force and de-escalation for

the relevant time period. *See* Logan, Kimball, Deblois, Carver, Kum, Morissette, and Boisselle

Decs.

17.     Officers Boisselle, Officer Morissette, and Officer Kum did not receive notice of

Plaintiff's claims or this lawsuit until March 2025. Kum Dec. ¶ 9; Morissette Dec. ¶ 8; Boisselle

Dec. ¶ 10. They were never contacted by Plaintiff or Plaintiff's representatives regarding this

lawsuit. *Id.*

**I.      February 18, 2018 Incident**

18.     On February 18, 2018, Plaintiff was housed in the infirmary of the SPU. Am.

Compl. ¶ 37. Plaintiff was "irritated by Nurse Lombard's refusal to answer questions" and "began

banging on the cell door." *Id.*

6

19.     Defendants Page Kimball, Joshua Deblois, and Riley Morissette were corrections officers on duty at the SPU on that date on February 18, 2018. Ex. 5 [2.18.2018 Incident Report]. The officer in charge on that date was Corporal Murray. Ex. 5; Kimball Dec. ¶ 7.

20.     DOC Nurse John Lombard noted at 4:54 pm on February 18, 2018, "pt. kicking and punching his cell door with great force. Pt was asked then ordered to stop several times…pt then took off al [*sic*] of his clothes. P team assembled to medicate pt and place him in stretcher restraint." Ex. 1, DOC_1336. Nurse Lombard additionally noted "assaultive self injurious behaviors" in his assessment. *Id.*

21.     Medical staff and the Corrections Officers attempted to get Plaintiff to stop banging and kicking the door. Ex. 5, DOC_ 002; Kimball Dec. ¶¶ 7-9; Deblois Dec. ¶ 9. Plaintiff did not comply with the requests and orders. *Id.*

22.     Nurse Lombard issued a Personal Safety Emergency Intervention Order and determined that Plaintiff had to be placed in restraints. Ex. 1, DOC_1418.

23.     Corrections officers relied on the medical providers' order that Plaintiff needed to be placed in restraints for self-harming behaviors. Kimball Dec. ¶ 8. Based on Plaintiff's behavior, it was also apparent that Plaintiff was dangerous, agitated, and aggressive, and that he needed to be placed into restraints to keep him safe. Kimball Dec. ¶¶ 7-9.

24.     Corrections officers tried to get Plaintiff to come to the tray slot to be handcuffed. Ex. 5, DOC_002; Kimball Dec. ¶ 7. Multiple staff members spoke with Plaintiff to try to get him to de-escalate but he continued to self-harm. Kimball Dec. ¶ 7.

25.     Rather than come to the tray slot, Plaintiff stood on top of his counter in his infirmary room and stripped naked. Ex. 5, DOC_002.

7

26.     While staff tried to de-escalate, Plaintiff threatened staff. Ex. 1, DOC_1335-36. Plaintiff yelled that he wanted "to go to combat." Ex. 5, DOC_002; Kimball Dec. ¶ 7. While continuing to bang on his cell, Plaintiff yelled "I'm combat ready"; "Let's get busy, lets get ready to rumble"; "this is going to add billions to the lawsuit and your job"; "I going out swinging." Ex. 1, DOC_1335-36.

27.     Plaintiff continued to yell, threaten, and bang the door nonstop for 45-50 minutes prior to being extracted from his cell. Ex. 5, DOC_002; Kimball Dec. ¶ 7.

28.     Officers Ryan, Richardson, Morissette, Kimball, Deblois, and Murray prepared for a cell extraction. Kimball Dec. ¶ 7. The team suited up in their helmets, vests, and gloves. *Id.* Officer Kimball was the first one into the room with the shield. *Id.*

29.     Plaintiff was larger than all the corrections officers involved in the cell extraction. Kimball Dec. ¶ 8; Morissette Dec. ¶ 7.

30.     Due to Plaintiff's large size, his out-of-control behavior, his verbal threats, and his location on top of a counter, officers were concerned that Plaintiff would and could injure the officers and himself. Kimball Dec. ¶¶ 7-9. Prior to and during the extraction, Officer Kimball was concerned that Plaintiff would jump on top of them as the officers entered the room. Kimball Dec. ¶ 7.

31.     During the cell extraction, Officer Kimball utilized the shield and pushed Plaintiff into the corner, but he continued to refuse to cuff up. Ex. 5, DOC_002.

32.     Due to Plaintiff's size and lack of compliance, Officer Deblois used the taser to temporarily incapacitate Plaintiff so he could be handcuffed. Ex. 5, DOC_002; Deblois Dec. ¶ 9; Morissette Dec. ¶ 7.

8

33.     During the extraction, Officer Morissette placed his knee on Plaintiff's hamstring while restraint cuffs were being put on, but he applied little to no pressure as Plaintiff stopped resisting at that point. Morissette Dec. ¶ 7.

34.     Given Plaintiff's behavior leading up to this incident and his relative size and strength, it was necessary for Officer Morissette to continue to restrain Plaintiff while other officers applied restraint cuffs to maintain the safety of everyone in the room. Morissette Dec. ¶ 7.

35.     The Officer Defendants followed textbook procedure in performing the cell extraction and getting Plaintiff into restraints on this date. Kimball Dec. ¶ 8; Deblois Dec. ¶ 9; Morissette Dec. ¶ 7.

36.     In Plaintiff's medical record, Nurse Lombard noted that Plaintiff was "ordered several times[s] to cease behaviors due to risk of self injury and [disturbance] to the entire unit… pt refused…to cease behaviors, declined to deescalate via 1:1 with OIC [Officer in Charge,] this writer[,] or Cpl. Kimball. Pt placed into restraints and stretcher utilized per [Public Safety Emergency] PSE protocols, medicated via T/O from Dr Martin with 10mg IMzyprexa (stat) pt violently resi[s]ted officers, tased, prongs removed without incident." Ex. 1, DOC_1418.

37.     Once the officers were able to secure Plaintiff in restraints, medical staff administered injectable psychiatric medication to Plaintiff pursuant to an Involuntary Emergency Treatment Authorization. Ex. 1, DOC_1336, 1413-1416.

38.     Plaintiff's Psychiatric Progress Note by his medical provider, Dr. Martin, continued to document Plaintiff's threatening and hostile behavior even after being forcibly medicated after the extraction. Ex. 1, DOC_2646-2655.

**II.     April 10, 2018**

9

39.     On April 10, 2018, Plaintiff was on a low swing of his cycle, and was disruptive and combative. Logan Dec. ¶¶ 9-10. Plaintiff was cursing at Officer Logan and medical staff that he interacted with that day and the day prior. Ex. 2, DOC_1315-1316; Logan Dec. ¶¶ 9-10. Plaintiff had been threatening to throw urine at staff. Ex. 6 [4.10.2018 Incident Report]; Logan Dec. ¶ 9. Officer Logan was aware of this threat by Plaintiff. *Id.*

40.     At around 8:19 pm, Officer Logan was conducting a security round, walking down the E-tier and looking into each room to verify the individual was safe and not violating any rules. Logan Dec. ¶ 10.

41.     Officer Logan had almost reached room 8 of the E-tier, from which he could see Plaintiff standing at his door in room 10. Logan Dec. ¶ 10. Officer Logan could see Plaintiff because was a ¼ to a ½ inch gap between the door and the wall. *Id.* Officer Logan saw Plaintiff looking at him and holding a white Styrofoam drinking cup. *Id.*

42.     As Officer Logan finished looking in on room 8 and started to move to 9, Officer Logan saw Plaintiff change his position, which led Officer Logan to believe that Plaintiff was going to throw urine on him. *Id.*

43.     When Officer Logan looked into room 9, Plaintiff said "Fuck you Logan" and moved quickly inside of his room, leading Officer Logan to believe in that split second he was about to be "Bombed" (meaning, that Plaintiff was going to throw his cup of urine on Officer Logan). Logan Dec. ¶ 10. Officer Logan deployed the pepper spray for no more than a second. *Id.*

44.     After reporting the incident to the officer in charge, Officers Seabron and Logan returned to the E Ward and tried to get Plaintiff to cuff up to be placed in the showers to

decontaminate. Logan Dec. ¶ 11. Plaintiff refused, stating "fuck you, you little faggot!" over and over. *Id.*

45.    Officer Logan returned again with Officer Seabron, Officer Ryan and Nurse John Lombard to attempt to have Plaintiff cuff up. Logan Dec. ¶ 11.

46.    Officer Logan observed a cup of yellow fluid in Plaintiff's right hand. Logan Dec. ¶ 11; Pl. Dep. 91:22-92:22. Plaintiff told Officer Logan, "If you try to force me [] to do something, I'm going to throw this urine at you." Pl. Dep. 92:20-22. After several direct orders to Plaintiff to empty the cup, cuff up, and come to the door, staff was able to place him into handcuffs and escort him to the shower. Logan Dec. ¶ 11; Ex. 2, DOC_1315-1316.

47.    Once was escorted to the shower, Plaintiff refused to have his eyes assessed by stating "go fuck yourself jabbah the hut" and yelling racist statements regarding a female nurse who was not present at the time. Ex. 2, DOC_1315-1316.

48.    Once Plaintiff was removed from his cell, officers confirmed that Plaintiff had three more cups of urine sitting next to his door. Logan Dec. ¶ 11.

49.    After the incident, Plaintiff told the commanding officer, "I wanted to get Logan." Logan Dec. ¶ 11.

50.    There was one taser assigned to the SPU. Logan Dec. ¶ 12. Officer Logan did not carry or use a Taser throughout his career, and did not trigger a taser on April 10, 2018. *Id.*

51.    The use of OC spray is authorized if used for self-defense and to restore order. Logan Dec. ¶ 13; Ex. 10. In this instance, Officer Logan used the OC spray to respond to what he perceived to be an imminent threat of assault by Plaintiff. *Id.*

52.    Officer Logan's actions on April 10, 2018 were reasonable and necessary to avoid what appeared to be an imminent threat by Plaintiff based on his prior experience with Plaintiff,

Plaintiff's threats to throw urine on staff leading up to the incident, and his observations of Plaintiff that day holding a Styrofoam cup which he reasonably (and accurately) believed had urine in it. Logan Dec. ¶ 13.

**III.    July 13, 2018**

53.    On July 13, 2018, an incident began when Plaintiff "opted to rebel against SPU staff … by covering up the tiny window of his cell door with newspaper." Pl. Dep. 94:16-95:3. Defendants PPO Boisselle, Officer Carver, Officer Logan, and Officer Kum were on duty and responded to this incident. Am. Compl. ¶¶ 49-53; *see also* Ex. 7 [7.13.2018 Incident Reports].

54.    Plaintiff was housed in Ward E. Ward E did not have cameras inside of the cells. Logan Dec. ¶ 14; Carver Dec. ¶ 7.

55.    Plaintiff climbed to the top of the concrete shelf and placed his pillow in front of his face. Am. Compl. ¶ 49. Plaintiff had flooded his cell with unknown substances. Carver Dec. ¶ 7; Ex. 7, DOC_017. Plaintiff refused to remove the paper on the window and vent and refused to come to the tray slot to "cuff up." Am. Compl. ¶ 49.

56.    Plaintiff blocked view into his cell, which prevented staff from ensuring his safety inside of his cell. Am. Compl. ¶ 7.

57.    Plaintiff refused to take down the newspapers because he "was trying to be a pain for [the officers]"; he was trying "to make their lives…miserable"; and he was "try[ing] to make it as rough as possible for them." Pl. Dep. 97:12-98:1.

58.    Plaintiff threatened staff, stating "Hey CO come in and slip, you're going to get hurt" and "I can't wait to hurt you." Ex. 7, DOC_013.

59.     After warning Plaintiff that he was going to use OC spray, Officer Carver deployed a one second burst of OC spray into Plaintiff's cell, but the spray only reached about 2 feet into the room.  Ex. 7, DOC_013; Carver Dec. ¶ 7.

60.     Even after the use of the OC spray, Plaintiff continued to refuse to come to the tray slot. Ex. 7, DOC_013.

61.     PPO Boisselle tried to deploy another canister, but the canister was malfunctioning and he could only get a small stream out of the can. Ex. 7, DOC_013.

62.     Officer Carver and Officer Boisselle attempted to deploy the OC spray into Plaintiff's room to gain Plaintiff's compliance and to get him to come to the tray slot to be cuffed up, prior to performing a cell extraction. Carver Dec. ¶ 7; Boisselle ¶ 7.

63.     Once other attempts to gain Plaintiff's compliance had failed (including the attempted use of OC spray, and about 30 minutes of verbal commands and nurse's attempt at de-escalation), the officers prepared for a cell extraction to remove Plaintiff from his cell. Am. Compl. ¶ 51, Carver Dec. ¶ 7; Boisselle Dec. ¶ 7; Ex. 7, DOC_017.

64.     While staff prepared for the cell extraction, Plaintiff was talking about how staff is going to rush in and get "fucked up." Ex. 7, DOC_012, 13.

65.     When the officers entered the cell, Officer Logan was on the shield. Ex. 7, DOC_013. Plaintiff stepped off the high shelf onto his bunk. Ex. 7, DOC_017.Officer Boisselle was then able to secure Plaintiff's legs while Officer Kum applied handcuffs.  Ex. 7, DOC_017; Carver Dec. ¶ 7; Kum Dec. ¶ 8. The cell extraction was made more difficult due to the wet and slippery conditions inside of Plaintiff's cell. Carver Dec. ¶ 7; Kum Dec. ¶ 8; Ex. 7, DOC_017, 20.

13

66.     Officer Boisselle utilized pain compliance to ensure that Plaintiff did not move while being handcuffed. Boisselle Dec. ¶ 8. Pain compliance and pressure points are tools to gain compliance for noncompliant individuals. *Id.* Officer Boisselle considered Plaintiff's dangerousness when utilizing this tool. *Id.* Even though Plaintiff was civilly committed, Officer Boisselle was aware that Plaintiff was dangerous because he would otherwise not be housed at the SPU. *Id.* Officer Boisselle used only a minimal level of force while Plaintiff was being handcuffed. *Id.*

67.     When Officer Kum applied handcuffs, he applied them with the lock facing inward. Kum Dec. ¶ 8; Boisselle Dec. ¶ 9. Applying the handcuffs with the lock facing inward did not affect the fit of Plaintiff's handcuffs, but it made it more difficult to remove the handcuffs later. *Id.* It is not aways possible the place handcuffs facing outwards in the heat of the moment, particularly with a noncompliant and threatening individual. Kum Dec. ¶ 8.

68.     The cell extraction was performed according to DOC policy. Carver Dec. ¶ 7. The cell extraction was necessary given Plaintiff's flooding of his cell and covering of his window and vent. Logan Dec. ¶ 18. The officers' actions were reasonable and necessary to gain compliance and prevent self-harm by Plaintiff, which included removing Plaintiff from the high shelf inside his cell. Logan Dec. ¶ 18.

69.     Plaintiff reported to medical that "he tried to jump down off the desk when security entered the room and he hurt his wrist. Patient was also handcuffed after he was taken down and removed from the cell so it could be cleaned. OC spray had been used prior to this with little to no impact on patient…" Ex. 3 [7.13.2018 Medical Records], DOC_1346.

70.     Plaintiff refused to shower and refused to show his wrists/hands to medical staff to be assessed or treated. Ex. 7, DOC_013; *see also* Ex. 3. Despite his refusal to have his wrists

14

assessed by medical staff, Patient reportedly "displayed the middle finder to several of the officers on the tier at the time, with no apparent restriction of motion." Ex. 3, DOC_1294, 1295; *see also* Ex. 7, DOC_013.

**IV.    January 22, 2019**

71.    On January 22, 2019 at around 6:40pm, Officers Logan, Seabron, and Deblois were on duty and responded to another incident with Plaintiff on a high shelf, this time in the infirmary. Ex. 8 [1.22.2019 Incident Reports], DOC_022, 025, 026.

72.    On January 22, 2019, Plaintiff was observed by staff, including Officer Seabron, attempting to break a light in his room.  Logan Dec. ¶ 19; Ex. 8, DOC_022.

73.    Officer Logan arrived and witnessed Plaintiff standing on a four-foot high concrete shelf, attempting to hit his light. Logan Dec. ¶ 19. Plaintiff stated that he was attempting to "[b]reak this bitch." *Id.* Officer Logan instructed Plaintiff to get down which he responded with "[f]uck you [b]itch." *Id.*

74.    As additional staff arrived, Plaintiff stated that he would hit his head on the bed, and staff would be dead and lose their jobs. Logan Dec. ¶ 19. Plaintiff made statements that he intended to jump, including "I'm going to jump and hit my head." Ex. 8, DOC_022; *see also* Ex. 8, DOC_025.

75.    Officer Logan and two other staff members stood outside Plaintiff's room for roughly 10 minutes trying to have Plaintiff get off the shelf. Logan Dec. ¶ 19. Plaintiff was only escalating and becoming more and more agitated. *Id.*

76.    It appeared to Officer Logan that Plaintiff was getting ready to jump off the shelf, so Officer Logan instructed Officer Deblois to unlock the door to the cell. Logan Dec. ¶ 19. Officer Logan entered the cell to stop him from jumping, which at that time it was apparent to

15

Officer Logan that Plaintiff was going to swing at him. *Id.* Plaintiff swatted at Officer Logan from on top of his shelf with his shoe. <u>Ex. 8</u>, DOC_022, 255.

77.     Officer Logan moved toward Plaintiff to get him down from the shelf, trying to utilize a "bear hug" to have Plaintiff land on his feet. Logan Dec. ¶ 19. Instead, Plaintiff sat down on Officer Logan's hand and fractured it. Logan Dec. ¶ 19; *see also* <u>Ex. 9</u> [Logan Medical Documents].

78.     Officer Logan was able to bring Plaintiff to the floor, at which time Plaintiff continued to refuse to bring his hands out to be handcuffed. Logan Dec. ¶ 20. Officer Seabron deployed the taser on Plaintiff in order to gain Plaintiff's compliance so that the officers could handcuff him. Logan Dec. ¶¶ 20-21; Deblois Dec. ¶ 11.

79.     During this incident, Plaintiff was not tasered while he was restrained, but prior to handcuffing Plaintiff. Logan Dec. ¶¶ 20-21; Deblois Dec. ¶ 11.

80.     Officer Deblois and Officer Logan assisted Plaintiff to a standing position, and escorted Plaintiff to 4-point restraints. Logan Dec. ¶ 20. During the escort, before reaching the 4-points room, Plaintiff saw a female correction officer, Officer Leger, and stated: "Fuck you, you lying [c]unt!" *Id.* Officer Logan told Plaintiff to stop insulting staff and Officer Logan believed that Plaintiff was about to spit at Officer Leger. *Id.* Officer Logan grabbed Plaintiff's face and turned his head to face Officer Logan. *Id.* Officer Logan applied pressure to Plaintiff's chin, which closed Plaintiff's mouth and raised his head and prevented any attempt to spit. *Id.* Officer Logan performed this action to prevent what appeared to be an imminent threat to staff safety and used minimal force to Plaintiff to prevent him from spitting. *Id.*

81.    During the escort, Plaintiff admits that he was upset at Officer Leger for "ignoring

[him]" and "the thought did cross [Plaintiff's] mind to spit at her." Pl. Dep. 53:12-54:2; *see also*

Pl. Dep. 50:9-15.

82.    Nurse Lombard declared a Personal Safety Emergency Intervention, and Plaintiff

was involuntarily treated with injectable psychiatric medications at approximately 6:50 pm and

8:20 pm pursuant to an Involuntary Emergency Treatment Authorization. Ex. 4 [1.22.2019

Medical Records], DOC_1394-1399. According to his Involuntary Emergency Treatment

Authorization,

> Patient requested time in the day room and was instructed that he needed to wait
> for the day room to empty. At that point he became angry and was observed
> standing on his desk swatting at the lights and smoke detectors attempting to
> break them. This was witnessed by officers and nursing staff. The patient refused
> to come down, refused to cuff up and in an attempt to keep the patient safe he was
> tased with pinpoints and taken to SPU in four points. Patient was found to be in 6
> shirts possibly anticipating a taser event.

Ex. 4, DOC_1394-1395. The same record described Plaintiff as "psychotic." *Id.*

83.    Officer Logan left work prior to the end of his shift to visit the Emergency

Department for his hand. Logan Dec. ¶ 22.  He was admitted to the Emergency Department at

10:33 pm. Logan Dec. ¶ 22. He does not believe he was with Plaintiff while he was in 4-point

restraints and is only aware of the single tasing event by CO Seabron while seeking to restrain

Plaintiff in his room. *Id.*

84.    After being placed in 4-point restraints for several hours, Plaintiff was released on

1:1 observation, wearing heavy clothes. Ex. 4, DOC_1256. Safety smocks, or heavy clothes, are

used for patients to keep patients safe and to prevent them from using their own clothing for self-

harm. Deblois Dec. ¶ 12. Plaintiff's clothes would have been removed in order to place him in

heavy clothes. *Id.*

17

85.     The only injury observed on Plaintiff was a small 1-2 inch wound on his buttocks from hitting the edge of the table, which was treated with a band-aid. Ex. 4, DOC_1260, 1344.

### STANDARD OF REVIEW

Summary judgment is appropriate "if there is no genuine issue of material fact . . . ." *Theriault v. Flynn*, 162 F.3d 46, 46 (1st Cir. 1998). To defeat summary judgment, the nonmovant must offer some "concrete evidence from which a reasonable" fact-finder "could return a verdict in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). The court is not obliged to credit "conclusory allegations, improbable inferences, acrimonious invective, or rank speculation.'" *Gray v. Cummings*, 917 F.3d 1, 5 (1st Cir. 2019) (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010)). "The non-movant cannot merely rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." *Feliciano-Muñoz v. Rebarber-Ocasio*, 970 F.3d 53, 62 (1st Cir. 2020) (quotations and citations omitted). "At the summary judgment stage, the absence of evidence on an issue redounds to the detriment of the party who bears the burden of proof on that issue." *Perez v. Lorraine Enters., Inc.*, 769 F.3d 23, 30 (1st Cir. 2014).

### ARGUMENT

**I.     Plaintiff has failed to allege a claim against the supervisory defendants.**

In his Complaint, Plaintiff identified several administrators and supervisors who were not directly involved in any of the use of force incidents. Plaintiff named Paula Mattis, the former Director of Medical and Forensic Services; Deborah Robinson, the former Administrator of the SPU; Helen Hanks, the former Commissioner of the New Hampshire Department of Corrections; and Carlene Ferrier, R.N., the former Director of Nursing at the SPU (collectively, "Supervisory Defendants"). Am. Compl. ¶¶ 10, 11,12, 14.

Plaintiff asserts no allegations against any of these individuals in his Complaint. *See generally*, Am. Compl. However, the Report and Recommendation, approved by this Court, allowed the following claim to proceed against these individuals: "Supervisory DOC and SPU defendants…violated William Justice's Fourteenth Amendment right not to be subject to a significant risk to his health and safety while he was in the SPU by failing to train SPU employees to properly interact with and protect SPU patients with serious mental illness, where the lack of and need for such training was obvious due to previous multiple injuries and deaths of mentally ill patients at the SPU." ECF 29 [R & R], at *13. The Court identified this claim as Claim 11.

This Court also allowed Claim 15(h) to proceed against the Supervisory Defendants. ECF 29 [R & R], at 15. Claim 15(h) alleges that "[t]he defendants identified in Claim 11 are liable to Mr. Justice for negligent supervision of SPU COs Frank Logan, Mark Kimball, Nathaniel Seabron, Joshua Deblois, and Randal Carver, including by "failing to prevent COs… from engaging in abusive behavior" and "failing to ensure that SPU COs … communicated with Mr. Justice in a nonaggressive and nonconfrontational manner." *Id.*

For a Section 1983 claim for failure to supervise, "supervisors may only be held liable under § 1983 on the basis of their own acts or omissions." *Whitfield v. Melendez-Rivera*, 431 F.3d 1, 14 (1st Cir. 2005) (citation omitted). "Supervisory liability can be grounded on either the supervisor's direct participation in the unconstitutional conduct, or through conduct that amounts to condonation or tacit authorization." *Id.*, citing *Camilo-Robles* v. *Zapata*, 175 F.3d 41, 44 (1st Cir. 1999). Where the supervisors did not directly participate, "a supervisor may only be held liable where "(1) the behavior of his or her subordinates results in a constitutional violation and (2) the supervisor's action or inaction was affirmatively linked to the behavior in the sense that it

19

could be characterized as supervisory encouragement, condonation or acquiescence or gross negligence amounting to deliberate indifference." *Id.* (cleaned up). To be deemed deliberatively indifferent, the supervisor must have actual or constructive knowledge of the risk of harm. *Saldivar v. Racine*, 818 F.3d 14, 18 (1st Cir. 2016). Finally, Plaintiff must satisfy causation by showing that "the supervisor's conduct led inexorably to the constitutional violation." *Justiniano v. Walker*, 986 F.3d 11, 20 (1st Cir. 2021) (citations omitted). Causation "is a difficult standard to meet." *Id.* (quotations and citations omitted).

No reasonable trier of fact could find judgment in Plaintiff's favor on his claims for failure to supervise against Helen Hanks, Paula Mattis, Deborah Robinson, and Carlene Ferrier. First, Plaintiff has not alleged that any of the Supervisory Defendants have directly participated in any unconstitutional conduct, or indeed, any conduct at all, related to training or supervision, in either his Complaint or through discovery. When asked in his deposition regarding the actions by each of these individuals, Plaintiff confirmed that he had no knowledge of their involvement in his case. *E.g.* Pl. Dep. 139:20-140:3; Pl. Dep.147:6-7 ("Again, the administrators, I don't know how they participated in the conspiracy against me.").

Plaintiff confirmed that he is unaware of any facts relevant to his claims of failure to train or failure to protect against either Helen Hanks or Paula Mattis. Pl. Dep. 139:20-140:3 ("I don't know how [Helen Hanks and Paula Mattis] broke the law against me. Even though they're the administrator, and I'm sure they had a role in it – maybe they looked the other way or whatever, but I let Wanda take care of that for me."). Plaintiff, when asked whether he had any personal interactions with former Commissioner Hanks when he was at the SPU, testified "I mean, she could have seen me. She knows who I am. I'm pretty sure staff told her…So she could have seen me close up, and I could have even spoken to her, but I didn't know who she was." Pl. Dep.

20

69:19-70:5. Plaintiff testified that at some point, Deb Robinson and a female administrator, who "could have been" Helen Hanks or Paula Mattis, visited the SPU. Pl. Dep. 70:6-71:4.

Similarly, Plaintiff is unaware of Ms. Ferrier or Ms. Robinson's involvement in this matter. As for Carlene Ferrier, the Administrator of the SPU, Plaintiff testified that "I don't even know who she is." Pl. Dep. 146:11-13. When asked why she was included as a defendant, he testified that "she was an administrator who knew what was going on, and she looked the other way." Pl. Dep. 146:14-17. When probed further, Plaintiff testified that the only basis for his belief that she "knew what was going on" is that "Wanda [Duryea] told me that she was…an employee there at the time that I was there." Pl. Dep. 146:19-147:1.

As for Deborah Robinson, when asked "what do you know she did or didn't do related to your complaint?" Plaintiff responded, "[a]gain, the administrators, I don't know how they participated in the conspiracy against me, but Wanda said that she had knowledge of the things that were happening to me, and they did nothing to help me out, so that's how she was included." Dep. 147:4-10.

Finally, Plaintiff is unable to show that any administrator was on notice of his concerns of mistreatment: Plaintiff is "not sure" whether he filed any request slips or grievances regarding the incidents to the Supervisory Defendants, that may have placed them on notice of his concerns related to this case, and he has not produced any. Pl. Dep. 55:12-56:6; 57:4-18.[4] While Plaintiff

_____

[4] Plaintiff recalls filing "a complaint" with Paula Mattis or Helen Hanks regarding his concerns that his cousin, who was not a DOC employee or a medical professional, examined him on February 18, 2018, rather than Dr. Wendy Martin, the SPU psychiatrist who authorized his Involuntary Emergency Treatment according to his medical records. Pl. Dep. 55:12-56:6; *see* Ex. 1, [2.18.2018 Medical Record]. Plaintiff continues to hold this belief, but his concerns regarding this "conspiracy" with his cousin are not the subject matter of the instant litigation. Pl. Dep. 83:21-85:1.

believes he sent complaints to Deborah Robinson, Plaintiff does not remember what he wrote to her about. Pl. Dep. 148:11-12.

Plaintiff has failed to allege that the Supervisory Defendants were engaged in any action that could be construed as "encouragement, condonation or acquiescence" of any of Plaintiff's alleged constitutional violations. In fact, the opposite is true: Plaintiff testified that after visits with people he believed to be DOC administrators, his treatment seemed to improve. Pl. Dep. 70:6-71:4 ("around the last three or four months of my stay there at the SPU, the harassment was reduced noticeably.").

Furthermore, the undisputed evidence shows that the Officer Defendants (Frank Logan, Page Kimball, Joshua Deblois, Benjamyn Carver, Riley Morissette, Kenneth Kum and Jonathan Boisselle) all received training on the use of force policies and procedures at the SPU and received annual trainings regarding use of force and de-escalation for the relevant time period. SUF ¶ 74. Plaintiff but does not set forth any evidence or support for a claim of inadequate use of force training at the SPU. Nor does Plaintiff make any allegations as to the Supervisor Defendants' role in training.

Plaintiff's failure to demonstrate that the Supervisory Defendants were on notice of his concerns, and his inability to tie any acts or omission to the Supervisory Defendants whatsoever, let alone actions rising to the level of "deliberate indifference," are fatal his claims. Further, as set forth in Section III, the Officer Defendants did not use excessive force during the incidents alleged in his Complaint, which would be a necessarily prerequisite for Plaintiff's supervisory claims. The undisputed facts show that Plaintiff's cannot succeed in either Claim 11 [Section 1983 Supervisory Liability] or Claim 15(h) [Negligent Supervision] against the Supervisory Defendants.

**II.    Plaintiff failed to timely file claims against defendants Kum, Boisselle, and Morissette.**

Plaintiff's claims against Defendants Kenneth Kum, Jonathan Boisselle, and Riley Morissette were filed well-outside of the applicable statute of limitations and his claims do not relate back to the filing of the initial lawsuit. Plaintiff filed his Complaint on April 28, 2020 related to incidents occurring in the SPU in 2018 and 2019. ECF 1. Plaintiff filed a motion on January 8, 2025 to add five additional current or former employees as defendants [ECF 126], which was granted. Plaintiff filed his Amended Complaint on February 28, 2025. ECF 131. Defendants Kum, Boisselle, and Morissette accepted service on April 1, 2025. ECF 139.

Section 1983 "borrows the appropriate state law governing limitations unless contrary to federal law." Fincher v. Town of Brookline, 26 F.4th 479, 485 (1st Cir. 2022) (citations omitted). "The limitation period applicable to a [§] 1983 claim is to be found in the general personal injury statute of the jurisdiction in which the claim arises." *Id.* Under New Hampshire law, claims of personal injury against the State or State officials shall be "brought within 3 years of the date of the alleged [injury]." RSA 541-B:14, IV.

Plaintiff's claims against Defendants Kum, Boisselle, and Morissette were filed outside of the 3-year statute of limitations window. The statute of limitations for claims against Defendants Kum and Boisselle expired, at the latest, on July 13, 2021. *See* Am. Compl. ¶ 52. The statute of limitations as to the claim against Defendant Morissette expired, at the latest, on February 18, 2021. *See id.* ¶ 39. To the extent that Plaintiff seeks to argue that the claims relate back to the date of the original pleading, this argument must fail.

When a claim is asserted against a new party after the limitations period expired, the plaintiff must show that the claim against the new parties relate back to the original pleading. *See*

23

*Coons v. Indus. Knife Co.*, 620 F.3d 38, 43 (1st Cir. 2010); *Gagne v. Barrington Police Dep't*,

No. 1:23-cv-00403-SM-TSM, 2025 LX 92553, at *7 (D.N.H. Jan. 24, 2025). Federal Rule of

Civil Procedure 15 sets forth three ways in which an amendment to a complaint can relate back

to the date of filing of the original pleading:

> (1) *When an Amendment Relates Back*. An amendment to a pleading relates back to the
> date of the original pleading when:
>> (A) The law that provides the applicable statute of limitations allows relation
>> back;
>> (B) The amendment asserts a claim or defense that arose out of the conduct,
>> transaction, or occurrence set out — or attempted to be set out — in the original
>> pleading; or
>> (C) The amendment changes the party or the naming of the party against whom a
>> claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided
>> by Rule 4(m) for serving the summons and complaint, the party to be brought in
>> by amendment:
>>> i. Received such notice of the action that it will not be prejudiced in
>>> defending on the merits; and
>>> ii. Knew or should have known that the action would have been brought
>>> against it, but for a mistake concerning the proper party's identity.

Fed. R. Civ. P. 15(c).

Neither Rule 15(c)(1)(B) or (C) apply here, where Plaintiff seeks to add additional parties

to his pleadings. Rule 15(c)(1)(B) "allows relation back of an amendment asserting a 'claim or

defense,' but it does not authorize the relation back of an amendment adding a new party."

*Gagne v. Barrington Police Dep't*, No. 1:23-cv-00403-SM-TSM, 2025 U.S. Dist. LEXIS

31316*, at *8 (D.N.H. Jan. 24, 2025), citing *Murphy v. Strafford Cnty.*, No. 19-CV-1162-PB,

2022 U.S. Dist. LEXIS 7097, at *4 (D.N.H. Jan. 13, 2022). Rule 15(c)(1)(C) permits a plaintiff

"to correct a formal defect such as a misnomer or misidentification." *Roman v. Townse*nd, 224

F.3d 24, 28 n.5 (1st Cir. 2000) (citing Fed. R. Civ. ¶ 15(c) Advisory Committee Notes).

Plaintiff's ignorance of the identities of the parties is insufficient to demonstrate that Rule

15(c)(1)(C) applies, as "the onus is on the plaintiff to determine the proper party to sue and to do

so before the statute of limitations expires." *Murphy*, 2022 U.S. Dist. LEXIS 7097, at *5-6.

Neither Rule 15(c)(1)(B) or (C) are applicable under the circumstances here, where Plaintiff

added additional defendants several years after filing his legal action, and the amendment was

not due to a misnomer or misidentification of the new parties.

Plaintiff will not be able to show that Rule 15(c)(1)(A) applies, either. Under Rule

15(c)(1)(A), an amendment relates back when "the law that provides the applicable statute of

limitations allows relation back." While the State of New Hampshire does not have any statute

explicitly allowing relation back, the statute on amendments to pleadings provides guidance:

> Amendments in matters of substance may be permitted in any action, in any stage of the
> proceedings, upon such terms as the court shall deem just and reasonable, when it shall
> appear to the court that it is necessary for the prevention of injustice; but the rights of
> third persons shall not be affected thereby.

RSA 514:9 [Amendments]."When an amendment seeks to substitute a defendant after the statute

of limitations has expired, the New Hampshire Supreme Court has observed that both potential

injustice to the plaintiff and potential prejudice to the intended defendant exist." *Murphy*, 2022

U.S. Dist. LEXIS 7097, at *7 (citing *Sharifova v. Riley*, No. 2011-0755, 2012 N.H. LEXIS 160*,

at *4 (N.H. Nov. 2, 2012)); *Dupuis v. Smith Props., Inc.*, 114 N.H. 625, 628 (1974). "In cases of

this nature, the prejudice inquiry typically focuses on 'whether the intended defendant received

notice before the statute of limitations expired.'" *Murphy*, 2022 U.S. Dist. LEXIS 7097, at

*7 (quoting *Sharifova*, 2012 N.H. LEXIS 160*, at *4 ).

The undisputed facts show that Defendants Kum, Boisselle, and Morissette did not

receive notice of the claims or complaint prior to the expiration of the statute of limitations. SUF

¶ 17. In fact, the Defendants were unaware of this litigation or Plaintiff's claims until on or

around March 2025. *Id.* As the newly added defendants had no notice of Plaintiff's claims, and

Plaintiff only added them well after the applicable statute of limitations expired, all claims against Officer Kum, Boisselle, and Morissette should be dismissed.

**III.    Officer Defendants Are Entitled to Qualified Immunity.**

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotations and citations omitted). To overcome qualified immunity, Plaintiff would have to show that the officer violated his constitutional rights, and that the right at issue was "clearly established at the time of defendant's alleged misconduct." *Id.* at 232 (quotations and citations omitted); *Justiniano v. Walker*, 986 F.3d 11, 26 (1st Cir. 2021). Courts may exercise discretion as to which prong of the qualified immunity analysis to address first. *Pearson*, 555 U.S. at 236.

####    A.  The Officer Defendants Used Reasonable Force and Did Not Violate Plaintiff's Constitutional Rights.

Defendants Kimball, Deblois, Morissette, Logan, Carver, Boisselle, and Kum (the "Officer Defendants") did not violate Plaintiff's constitutional rights[5] during the four incidents alleged in Plaintiff's complaint. Rather, the Officer Defendants used reasonable force given Plaintiff's self-harming, aggressive, and noncompliant behavior.

_____

[5] Because this Court's "determination of the reasonableness of the force used under § 1983 controls [its] determination of the reasonableness of the force used under the common law assault and battery claim," this Memorandum focuses on the analysis of Plaintiff's constitutional excessive force claim. *Velez v. Eutzy*, 152 F.4th 292, 300-01 (1st Cir. 2025). To the extent that this Motion does not resolve all State law claims, Defendants request this Court decline to exercise its jurisdiction over these claims.

In an excessive force claim, courts have applied an "objective reasonableness" standard to claims brought by civilly committed individuals. *Davis v. Rennie*, 264 F.3d 86, 108 (1st Cir. 2001) (citing *Andrews v. Neer*, 253 F.3d 1052, 1061 (8th Cir. 2001)). Unlike convicted inmates, involuntarily committed individuals are protected from conditions of confinement designed to punish. *Youngberg v. Romeo*, 457 U.S. 307 (1982). While not identical to the pretrial detainee context, the First Circuit has found civilly committed individuals are similarly situated to pretrial detainees for excessive force purposes. *See Davis*, 264 F.3d at 108. In reaching its decision to apply a reasonableness standard in *Davis*, the First Circuit relied on Eighth Circuit precedent, including the Eighth Circuit's decision in *Andrews v. Neer*. *Id.* at 102, 109 (citing *Andrews*, 253 F.3d at 1061). The Eighth Circuit in *Andrews* applied the objective reasonableness standard to an involuntarily committed patient's excessive force claim, reasoning that plaintiff's involuntary confinement in a state hospital "raised concerns similar to those raised by the housing of pretrial detainees, such as the legitimate institutional interest in the safety and security of guards and other individuals in the facility, order within the facility, and the efficiency of the facility's operations." 253 F.3d at 1061.

The objective reasonableness standard is derived "from cases concerning the use of excessive force during an arrest or traffic stop under the Fourth Amendment's protection against unreasonable search and seizure." Davis, 264 F.3d at 101-102; citing *Graham v. Connor*, 409 U.S. 386, 388 (1989). In applying a reasonableness standard, courts must account for the "legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained," *Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) (quoting *Bell* v. *Wolfish*, 441 U.S. 520, 540, 547 (1979)). Courts must "recognize that "[r]unning a prison is an inordinately difficult undertaking, and that safety and order at these institutions requires the

27

expertise of correctional officials, who must have substantial discretion to devise reasonable

solutions to the problems they face." *Id.* at 399-400 (cleaned up). The Supreme Court has held

that the following factors "illustrate the types of objective circumstances potentially relevant to a

determination of excessive force" under both the Fourteenth Amendment and Fourth

Amendment:

> the relationship between the need for the use of force and the amount of force
> used; the extent of the plaintiff's injury; any effort made by the officer to temper
> or to limit the amount of force; the severity of the security problem at issue; the
> threat reasonably perceived by the officer; and whether the plaintiff was actively
> resisting.

Kingsley, 576 U.S. at 397 (2015), citing *Graham*, 409 U.S. at 396.

The First Circuit has acknowledged that when dealing with possibly violent mental

patients, "not every push or shove, even if it may later seem unnecessary in the peace of a

judge's chambers, amounts to a Fourteenth Amendment violation." *Davis*, 264 F.3d at 111.

### 1. February 18, 2018 Incident

The Court found in its Report and Recommendation that Plaintiff asserted a Fourteenth

Amendment "objectively unreasonable use of force" claim against Officer Deblois regarding the

February 18, 2018 incident. ECF 29, at *10. In the Report and Recommendation, the specific

allegations of unreasonable use of force allowed to proceed against Officer Deblois include:

Officer Deblois' use of a taser on Plaintiff's thigh; pushing Plaintiff onto the cement mattress

frame in his cell; medicating Mr. Justice against his will; roughly transporting Mr. Justice to a

restraint room; and placing Mr. Justice in four-point restraints for one to two hours. ECF 29, at

*10.

The Report and Recommendation additionally found that Plaintiff asserted a claim

against Officer Kimball for "fail[ure] to protect Mr. Justice from being tased by CO Deblois,

28

despite having a realistic ability and opportunity to do so" on that same date.[6] ECF 29, at *11.  In Plaintiff's Amended Complaint, his only allegation against the additional defendant, Officer Morissette, during the incident is that he "applied painful pressure to plaintiff's left hamstring and unreasonably restrained him." Am. Compl. ¶ 39.

Officer Deblois' actions in handling Plaintiff's self-harming and out-of-control behavior on February 18, 2018 was reasonable under the circumstances. As confirmed by officer statements (Exhibit 5), the medical records (Exhibit 1), and the Declarations of Kimball, Morissette, and Deblois, Plaintiff was engaging in dangerous, threatening, and self-harming behavior on February 18, 2018 that required staff intervention. *See* SUF ¶¶ 18-38. Officer Kimball was concerned that he would break a foot or hand. The noise of Plaintiff's banging could be heard throughout the unit. Plaintiff was also verbally threatening staff. Plaintiff refused to follow commands to come to the tray slot to be handcuffed voluntarily for a period of 45-50 minutes. Instead, he stripped naked and perched on a shelf in his room. Plaintiff yelled that he was "combat ready" and that "this is going to add billions to the lawsuit and your job." SUF ¶ 26. Plaintiff was larger than all of the officers that were tasked with performing the cell extraction.

> **Commented [CD1]:** Cite to SUF?
> **Commented [DAE2R1]:** I would

Plaintiff's medical provider declared a Public Safety Emergency and authorized emergency treatment. Officers were entitled to rely on the medical provider's decision that Plaintiff was posing a risk to himself through his behavior and that he needed to be placed in restraints for his own protection. *See Youngberg*, 457 U.S. at 322-23 (the decision as to what

---

[6] The Court identified the date of this claim as "July 18, 2018," but this appears to be a typographical error, and the date is intended to be "February 18, 2018." ECF 29, at *11; see also ECF 1, ¶ 35 (asserting Officer Kimball was present on February 18, 2018).

restraints are reasonable for civilly committed individuals is "presumptively valid" if made by "appropriate professionals."). Thus, as Officers Morissette, Deblois, and Kimball relied on the medical providers' judgment that Plaintiff needed to be restrained, and they used the amount of force reasonably necessary to place Plaintiff into restraints (see SUF ¶¶ 30-34), their actions related to the restraint were not unreasonable under the circumstances. Further, the undisputed facts show that Plaintiff's medical providers, not Officer Deblois, forcibly medicated him to protect Plaintiff from self-harm. SUF ¶ 37.

The Officers' intervention was also consistent with prison policy. Officer Kimball described the cell extraction as "textbook." SUF ¶ 35. Prison policy authorized the use of the taser in instances such as this one, to "temporarily incapacitate or disorient a hostile individual" and "to reduce the possibility of injury to staff or subjects when attempting to bring an individual under control." SUF ¶ 15. That is exactly what Officer Deblois did when he deployed the taser to place Plaintiff in restraints. SUF ¶ 32. By following prison policies and responding in a reasonable manner to prevent injury to Plaintiff and staff, Officer Deblois' deployment of the taser did not constitute excessive force. *See Kingsley*, 576 U.S. at 39-400 ("deference to policies and practices needed to maintain order and institutional security is appropriate.").

Plaintiff cannot succeed on his claim of excessive force against Officers Deblois or Morissette, or his claim for failure intervene against Officer Kimball, based on the undisputed facts related to the February 18, 2018 incident.

### 2. April 10, 2018 Incident

Regarding the incident on April 10, 2018, the Court found in its Report and Recommendation that Plaintiff had asserted a claim against Officer Logan only, finding that

CO Logan, in response to his incorrect belief that Mr. Justice had continued to block his cell door with a mattress after being instructed to remove the mattress, and without sufficient provocation by Mr. Justice to make use of force by CO Logan objectively reasonable:

      i. pepper sprayed Mr. Justice in his cell, and

      ii. Left Mr. Justice for thirty to sixty minutes after deploying pepper spray into the cell.

ECF 29, at *10.

The undisputed facts supported by medical records, the incident report, and Officer Logan's sworn declaration show that Officer Logan acted reasonably on April 10, 2018 to respond to his reasonable expectation of an imminent assault by Plaintiff. SUF ¶¶ 39-52. On April 10, 2018 and the day prior, Plaintiff was disruptive and combative. SUF ¶ 39. Plaintiff was cursing at Officer Logan and the medical staff that he interacted with. *Id.* Plaintiff was on a "low swing of his cycle," where Plaintiff's baseline was already paranoid and delusional. SUF ¶¶ 39, 10. Officer Logan was aware of Plaintiff's threats to throw urine on staff members. SUF ¶ 39.

Officer Logan witnessed Plaintiff with a white Styrofoam cup through a gap in the door, which Officer Logan believed to hold urine. SUF ¶ 41-43. Plaintiff cursed at Officer Logan, and moved quickly inside his room, leading Officer Logan to believe he was about to be "bombed" by Plaintiff's cup of urine. SUF ¶ 43. Officer Logan deployed the OC spray for "no more than a second." SUF ¶ 43. Plaintiff continued to threaten to throw urine at Officer Logan when Officer Logan returned to get Plaintiff to cuff up to get decontaminated in the shower. SUF ¶ 46. After Plaintiff finally agreed to be cuffed up and leave his cell, officers found three cups of urine in his cell. SUF ¶ 48.

The policy regarding OC spray allows OC spray to be used to temporarily incapacitate or disorient an individual and to reduce the likelihood of injury to staff involved in bringing an individual under control. SUF ¶ 14. Officer Logan's deployment of pepper spray was consistent

31

with DOC policy and was a reasonable response to avoid an imminent threat by Plaintiff, based on the facts and circumstances that were available at the time. SUF ¶ 50.

Plaintiff's testimony, his medical record, and Officer Logan's sworn statement all confirm that Plaintiff refused to comply with officers to decontaminate in the shower, and any delay in treatment was due to his own conduct. SUF ¶¶ 44, 46. Officer Logan returned twice after deploying the pepper-spray, and Plaintiff refused to go to the shower and repeatedly cursed at Officer Logan (repeatedly calling him a "faggot"). SUF ¶¶ 42, 44. Plaintiff himself testified that *after* he was pepper sprayed, Plaintiff filled a cup of urine to throw at Officer Logan. SUF ¶ 46. In his Complaint, Plaintiff also admits that he "threatened to throw urine onto Correctional Officer Frank Logan, and refused to cooperate" when Officer Logan attempted to get Plaintiff to cuff up after he was pepper sprayed. Am. Compl. ¶ 48. Even after officers convinced Plaintiff to go to the showers to decontaminate, he still refused to have his eyes assessed by medical. SUF ¶ 47. The undisputed evidence shows that Plaintiff's own actions delayed his decontamination following the brief deployment of the pepper spray, despite persistent efforts by medical and security staff. SUF ¶¶ 44-47. No reasonable juror could find that Officer Logan's actions, given the facts and circumstances known to him at the time, were unreasonable related to both the deployment of OC spray or his efforts to get Plaintiff to decontaminate after the incident.

### 3. July 13, 2018 Incident

The Court allowed the following claim of unreasonable use of force to proceed against Officers Carver and Logan regarding the incident on July 13, 2018:

> On July 13, 2018, in response to Mr. Justice's refusal to remove newspaper from his cell window, and without sufficient provocation by Mr. Justice to make the use of force against him objectively reasonable:
> i. CO [Benjamyn] Carver repeatedly deployed pepper spray into Mr. Justice's closed cell; and

32

ii. CO Frank Logan forced Mr. Justice off a shelf in his cell and onto a concrete
mattress frame, causing "painful injury" to Mr. Justice's wrists and leg.

ECF 29, at *11. Plaintiff alleges in his Amended Complaint that Officer Boisselle "deployed

pepper spray into plaintiff's closed cell on involuntary seclusion Ward E and then secured

plaintiff's right leg by utilizing pain compliance with PPO's right leg shin on the back of

patient's lower calf/ankle." Am. Compl. ¶ 51. Plaintiff also alleges in his Amended Complaint

that Officer Kenneth Kum applied handcuffs incorrectly. *Id.*

On July 13, 2018, Plaintiff was still refusing psychiatric medications. SUF ¶ 9. That day,

Plaintiff chose to "rebel" against SPU staff. SUF ¶ 53. The incident began when Plaintiff covered

up the window of his cell door with newspaper. *Id.* Plaintiff then climbed on top of a concrete

shelf in his room. SUF ¶ 55. Plaintiff flooded his cell with unknown substances. *Id.* By covering

up his window, he blocked the view into his cell and prevented staff from ensuring his safety.

SUF ¶ 56. Plaintiff refused to remove the paper on the cell despite several orders for him to

remove it or "cuff up." SUF ¶ 55. Plaintiff refused to take down the papers from the window and

door because he was trying to "be a pain" and to make officers' "lives miserable." SUF ¶ 57.

Plaintiff also threatened staff, saying "[h]ey CO come in and slip, you're going to get hurt" and

"I can't wait to hurt you." SUF ¶ 58.

Officer Carver attempted to use OC spray to have Plaintiff comply with orders to come to

the tray slot and cuff up. SUF ¶ 59. Officer Carver warned Plaintiff that he would deploy OC

spray. *Id.* Officer Carver deployed the OC spray, but it did not reach Plaintiff and only made it

about two feet into the room. *Id.* Even after Officer Carver's use of the OC spray, Plaintiff still

did not comply and come to the tray slot. SUF ¶ 60. Officer Boisselle attempted to use another

33

canister of OC spray to gain Plaintiff's compliance, but that canister was also malfunctioning and only dribbled out of the canister. SUF ¶ 61.

After 30 more minutes of verbal commands for Plaintiff to cuff up and a nurse's attempt at de-escalation, the officers prepared for a cell extraction to forcibly remove Plaintiff from his cell to remove the papers, clean Plaintiff's cell, and observe Plaintiff's safety. SUF ¶ 63. While the officers were preparing for the cell extraction, Plaintiff continued his threats and yelled that officers would get "fucked up." SUF ¶ 64.

The actions by each of the officers that day were reasonable given the circumstances. Plaintiff admittedly began the conflict simply to make officers' lives "miserable." SUF ¶ 55. Plaintiff was provided with ample opportunity to comply with the officers' orders to step down from the shelf and cuff up, but he repeatedly refused. Officer Carver and Boisselle's actions in attempting to deploy OC spray was reasonable under the circumstances, as OC spray is a tool that can be utilized to bring an individual under control per policy. SUF ¶ 14. The OC spray was a first step to attempt compliance before resorting to a cell extraction or other force options. Plaintiff was warned prior to the use of the OC spray to come to the tray slot to cuff up, but he continued to refuse.

Officer Logan was reasonable in his efforts to restrain Plaintiff when entering the room. The cell extraction was necessary given Plaintiff's flooding of his cell and covering of his window and vent. SUF ¶ 68. When the officers entered the cell, Officer Logan was on the shield. SUF ¶ 65. Being on the shield, Officer Logan was the first one to enter, and was tasked with securing Plaintiff, who, at the time, was perched on a high shelf and yelling threats regarding "fuck[ing] up" the officers. SUF ¶ 64. According to Plaintiff's own statements that day, Plaintiff "jumped" down from the shelf onto his bed when the officers entered. SUF ¶ 69. While Plaintiff

34

stated at the time that he "jumped" off the shelf (SUF ¶ 69), even if Officer Logan had, in fact, "forced Mr. Justice off a shelf in his cell and onto a concrete mattress frame" (ECF 29, at *11), this would have been entirely reasonable under the circumstances. The officers entered Plaintiff's cell to extract Plaintiff, since Plaintiff refused to leave the cell voluntarily. All staff involved deemed it necessary to remove Plaintiff from the high shelf that he was perched on.

Similarly, both Officers Boisselle and Kum were reasonable in their efforts to restrain Plaintiff during the cell extraction. Officer Kum was entirely justified in handcuffing Plaintiff given Plaintiff's noncompliant and self-harming behavior and verbal threats to officers. Simply turning the handcuffs with the lock facing in does not change this calculus. Due to the slippery and wet conditions and Plaintiff jumping off a shelf as they entered, Officer Kum placed the handcuffs in the most expedient fashion, without causing injury to Plaintiff. Officer Boisselle reasonably utilized "pain compliance" to restrain Plaintiff during the cell extraction. "Pain compliance" is a tool used to ensure compliance by noncompliant individuals. SUF ¶ 64.  Officer Boisselle considered Plaintiff to be dangerous and still utilized only minimal force to control Plaintiff during handcuffing. Under the circumstances, Officers Kum and Boisselle did what was necessary, which was to restrain Plaintiff to ensure safety. Plaintiff was provided ample opportunity to be handcuffed voluntarily prior to the cell extraction but repeatedly refused.

Plaintiff's allegations regarding injuries are also inconsistent with his behavior on that date. Plaintiff claims he injured his wrists during the extraction, but he also refused to be assessed at the time by medical. Instead, he was observed moving his hands with no apparent restriction by displaying his middle finger repeatedly to staff. To the extent Plaintiff had any injury, such injuries were caused by his own actions and decisions.

**4. January 22, 2019 Incident**

35

The Court allowed claims of unreasonable use of force, failure to protect, and unreasonable search to proceed regarding the incident on January 22, 2019. ECF 29, at *11-12. The Court allowed the following allegations of unreasonable use of force to proceed against Officer Logan:

> On January 22, 2019, believing Mr. Justice had attempted to spit on a CO, and without sufficient provocation by Mr. Justice to make a use of force against him objectively reasonable:
> > i. CO Frank Logan forced Mr. Justice onto the floor of his cell while Mr. Justice was in restraints.

ECF 29, at *11. The Court also allowed Plaintiff's allegations that Officer Logan failed to protect Plaintiff from "being tased by CO Nathanial P. Seabron while Mr. Justice was in restraints on the floor of his cell" and "being tased by CO Seabron while Mr. Justice was in four-point restraints" to proceed. ECF 29, at *11. The Court allowed a claim to proceed against Officer Deblois to proceed for "subjecting [Plaintiff] to an unnecessary strip search" after Plaintiff was released from restraints. ECF 29, at *12.

On January 22, 2019, Plaintiff again perched on a high shelf, this time in the infirmary. SUF ¶ 69. The shelf was approximately 4 feet high. SUF ¶ 71. Plaintiff was observed trying to break the light on the ceiling in his room. SUF ¶ 72-73. Plaintiff was very agitated. SUF ¶ 75. Plaintiff was cursing at Officer Logan. SUF ¶ 73. He told staff that he would jump and hit his head, and that staff would lose their jobs. SUF ¶ 74. Plaintiff was psychotic. SUF ¶ 82.

Officer Logan entered the cell alone because Plaintiff appeared to be getting ready to jump off of the shelf. SUF ¶ 76. Officer Logan went into Plaintiff's cell to prevent him from what he believed to be imminent self-harm. *Id.* Plaintiff swatted at Officer Logan when he entered and attempted to take a swing at him. SUF ¶ 76. As Officer Logan tried to remove Plaintiff from the shelf, Plaintiff sat on Officer Logan's left hand, fracturing it. SUF ¶ 77. Officer

36

Logan was able to get Plaintiff down to the floor. SUF ¶ 78. At that point, Plaintiff continued to refuse to bring his hands out to be handcuffed. *Id.* Officer Seabron deployed the taser on Plaintiff one time in order to gain Plaintiff's compliance and so that the officers could handcuff him. SUF ¶ 76. Plaintiff was not tased while restrained, but prior to being handcuffed. SUF ¶ 77.

Given the exigent circumstances, including Plaintiff's violent and self-harming behavior, it was reasonable for Officer Logan to enter the cell and try to remove him from the shelf. Officer Logan, in facing Plaintiff's threatening behavior, acted quickly and decisively to detain Plaintiff. The undisputed facts show that Officer Logan took Plaintiff down off the shelf in order to restrain him, and did not "force [Plaintiff] onto the floor of his cell while [Plaintiff] was in restraints." ECF 29, at *11. Officer Logan's actions during the incident were not just reasonable, but commendable. Officer Logan's hand was unfortunately fractured during the extraction, while Plaintiff suffered no serious injury. SUF ¶¶ 77, 85.

Plaintiff's primary concern appears to be with Officer Seabron's use of a taser that night. While in the cell, Officer Seabron's use of the taser was entirely reasonable to gain Plaintiff's compliance during an episode where Plaintiff was not only self-harming and failing to comply, but also attempting to hit Officer Logan. Officer Logan believed that Officer Seabron's deployment of the taser was justified under the circumstances, such that there was no reason for Officer Logan to intervene to prevent its use. Even if he believed it necessary to avoid the use of the taser, Officer Logan was unable to prevent Officer Seabron from deploying the taser while Officer Logan was still trying to gain control of Plaintiff.

To the extent that Plaintiff alleges CO Seabron tased Plaintiff after the incident in question, while Plaintiff was restrained, neither Officer Logan nor Officer Deblois observed it. SUF ¶¶ 77, 81. Officer Logan went to the hospital soon after the restraint in order to treat his

fractured hand. SUF ¶ 81. Plaintiff cannot succeed in a claim against Officer Logan for failure to protect where Officer Logan was not present and could not reasonably have intervened during Officer Seabron's alleged subsequent use of force, even if such intervention were deemed necessary.

Finally, Plaintiff was not "unnecessarily strip searched" by Officer Deblois. After several hours in restraints, Plaintiff was eventually moved to 1:1 observation in heavy clothes. SUF ¶ 84. Plaintiff's clothes are generally removed to put on heavy clothes. *Id.* Officer Deblois did not perform a strip search of Plaintiff, but at some point, someone on staff would have removed Plaintiff's clothes for safety purposes. *Id.* Even if Officer Deblois was, in fact, responsible for removing Plaintiff's clothes on January 22, 2019, such conduct would have been reasonable, given the Personal Safety Intervention that was declared and other documentation within his medical records. SUF ¶¶ 82, 84.

**B.  Officer Defendants are entitled to qualified immunity.**

Not only is Plaintiff unable to show that the officers used unreasonable force against him, he is also unable to show that the officers violated a "clearly established" constitutional right. *Reichle v. Howar*ds, 566 U.S. 658, 664 (2012) ("Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was *clearly established* at the time of the challenged conduct." (emphasis added)).

In *District of Columbia v. Wesby*, the Supreme Court set forth a "demanding standard" for determining whether a right was "clearly established" that "protects all but the plainly incompetent or those who knowingly violate the law." 583 U.S. 48, 63 (2018) (internal quotations and citations omitted). Under the standard articulated in *Wesby*, a right is not "clearly established" for purposes of qualified immunity unless the law is "sufficiently clear that every

reasonable official would understand that what he is doing is unlawful." *Id.* (internal quotations and citations omitted). "A defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it, *i.e.*, existing precedent must have placed the statutory or constitutional question confronted by the official beyond debate," *Justiniano v. Walker*, 986 F.3d 11, 26-27 (1st Cir. 2021) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014)) (cleaned up). "[C]ourts must not define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Wesby*, at 63-64 (internal quotation and citation omitted).

Qualified immunity protects officers from reasonable decision making, in the line of duty, even if their decision-making turns out to be a "bad guess." *Justiniano*, 986 F.3d 11 at 26. "Courts penalize officers for violating bright lines, not for making bad guesses in gray areas." *Id.* (quotations and citations omitted).

Defendants have found no cases in this circuit that clearly establish that the conduct by each officer in responding to Plaintiff's actions during the four incidents was unreasonable under similar circumstances. Rather, the opposite is true. The few cases with somewhat analogous facts demonstrate that a reasonable officer would not be aware that their conduct was unlawful.

Regarding taser use, there are several cases that support the use of a taser by officers against dangerous, noncompliant individuals. Courts generally hold that the use of a taser against an actively resisting suspect either does not violate clearly established law or is constitutionally reasonable. *Abbott v. Sangamon Cty.*, 705 F.3d 706, 727 (7th Cir. 2013) (collecting cases). In an institutional context, the Seventh Circuit has held that the use of a taser is reasonable against a

pretrial detainee under the Fourteenth Amendment, where plaintiff was a large man in a confined

area who was intoxicated, defiant, belligerent, was clenching his fists and yelling obscenities.

*Forrest v. Prine*, 620 F.3d 739, 745-46 (7th Cir. 2010). In *Forrest*, the Seventh Circuit held that

plaintiff "posed an immediate threat to safety and order within the jail" and that "the use of a

taser in such circumstances constituted a permissible use of force." 620 F.3d at 745 (citing *Lewis

v. Downey*, 581 F.3d 477-78 (7th Cir. 2009) ("In a jail or prison setting, it is not hard to imagine

any number of scenarios that would justify the [use of]. . . taser guns.")).

      The First Circuit held that officers were entitled to qualified immunity when officers used

a taser in stun-gun mode against a nonviolent, mentally ill individual who was resisting arrest.

*Gray v. Cummings*, 917 F.3d 1, 11-12 (1st Cir. 2019). The plaintiff was a civilly-committed

person who had absconded from the hospital. *Id.* at 5. In that decision, the Court found that there

was a dispute of fact over whether the officers' conduct was reasonable considering factors such

as the relatively large size of the officers compared to the plaintiff and the lack of evidence that

plaintiff posed a threat to the officer or the community. *Id.* at 9. The Court nevertheless found

that the officer was entitled to qualified immunity because "an objectively reasonable officer in

[the officer's] place and stead could reasonably have believed, in 2013 that the use of a Taser

was generally permissible when a subject refuses to be handcuffed." *Id.* at 11.

      Here, unlike *Gray*, Plaintiff had been found to by a court to present "a serious likelihood

of danger to himself and/or others." SUF ¶ 5. Plaintiff repeatedly verbally threatened staff and

engaged in dangerous behavior throughout each of the incidents. Unlike a mentally ill individual

in the community, officers in the SPU are expected to intervene to avoid self-harming behavior.

*See Youngberg*, 457 U.S. at 317 ("State is under no constitutional duty to provide substantive

services for those within its border," but it owes a duty of care to institutionalized individuals).

Plaintiff, unlike the plaintiff in *Gray*, was relatively large, causing several officers to justifiably be concerned for their own safety. Where the officers in *Gray* are entitled to qualified immunity, such immunity should clearly apply here as well.

The First Circuit also held that an officer was entitled to qualified immunity for use of OC spray against a mentally ill individual in *Justiniano*. 986 F.3d at 26. In that matter, the Court found that the record "does not support a finding that a reasonable officer would have clearly understood [the officer's] conduct to be an unreasonable violation of Justiniano's rights." *Id.* at 28. In that case, the officer tried to calm down and prevent Justiniano from approaching; Justiniano was not complying with the officer's orders and continued to approach the officer; Justiniano appeared "confused" and "distraught" and "spoke unintelligibly." *Id.* The Court found "[f]rom an objective standpoint, a reasonable officer could have believed Justiniano posed a threat, and thus that same reasonable officer, in [the officer's] position, would not have believed that the initial use of pepper spray (a generally non-lethal deployment) against Justiniano constituted a violation of Justiniano's rights." *Id.* The facts in *Justiniano* do not contain many similarities to those in this matter. Nevertheless the facts relied on by the First Circuit in *Justiniano* provide further support for Defendants' position. Plaintiff, unlike Justiniano, was outwardly hostile, threatening, and known to be dangerous during his interactions with staff, rendering the use of OC spray even more justifiable.

In his Complaint, Plaintiff argues that, while the officer's "tactics are utilized by law enforcement they are not recognized as acceptable interventions in the psychiatric community." Am. Compl. ¶¶ 71-74. Plaintiff's position appears to be that *any* use of force or restraints is unacceptable for civilly committed patients at the SPU. *See* Pl. Dep. 13:13-22 ("they're not supposed to [physically restrain me or physically use weapons against me] because I'm a patient.

41

I'm not an inmate."). Plaintiff's position does not reflect the law as it relates to those who are civilly committed. The Supreme Court in *Youngberg* acknowledged that, "in operating an institution… there are occasions in which it is necessary for the State to restrain the movement of residents -- for example, to protect them as well as others from violence." 457 U.S. at 320. Consistent with Fourteenth Amendment precedent, officers were entitled to use reasonable force against Plaintiff to protect the safety of Plaintiff and officers and to restore order. *See, e.g.*, *Kingsley*, 576 U.S. at 397. Officers' actions during the four use of force events were reasonable and justified, and clearly established precedent provides further support for the officers' actions.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

Respectfully submitted,
DEFENDANTS:
HELEN HANKS, PAULA MATTIS, DEBORAH
ROBINSON, CARLENE FERRIER, FRANK LOGAN, III,
JOSHUA DEBLOIS, BENJAMYN CARVER, PAGE
KIMBALL, RILEY MORISSETTE, JONATHAN
BOISSELLE, KENNETH KUM

By their attorney,

JOHN M. FORMELLA
ATTORNEY GENERAL

Dated: November 24, 2025        /s/ *Catherine A. Denny*
                               Catherine A. Denny, Bar No. 275344
                               Assistant Attorney General
                               Duncan A. Edgar, Bar No. 266272
                               Assistant Attorney General
                               Civil Bureau
                               NH Department of Justice
                               1 Granite Place South
                               Concord, NH 03301
                               catherine.a.denny@doj.nh.gov
                               (603) 271-1354

42

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing was mailed to Plaintiff at 51 Storrs St., #310, Concord, NH 03301 on this same date.


Dated: November 24, 2025                     */s/ Catherine Denny*
                                             Catherine A. Denny

43