*ORIGINAL*

WILLIAM SOLER JUSTICE

vs

CHRISTOPHER T. SUNUNU

Docket No. 1:20-CV-00517-PB

WILLIAM SOLER JUSTICE

July 09, 2025

AVICORE REPORTING

15 Constitution Drive, Suite 1A • Bedford, NH 03110 • (603) 666-4100
info@avicorereporting.com • www.avicorereporting.com

UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

ORIGINAL

* * * * * * * * * * * *

WILLIAM SOLER JUSTICE

No. 1:20-CV-00517-PB

vs.

CHRISTOPHER T. SUNUNU,
et al.

* * * * * * * * * * * *

--o0o--

REMOTE DEPOSITION OF WILLIAM SOLER JUSTICE

on Wednesday

9th day of July, 2025

Via Zoom Video Teleconference

10:00 a.m.

--o0o--

Court Reporter:

Nancy J. Theroux, LCR/RPR
N.H. LCR No. 100 (RSA 310-A)

APPEARANCES: (Via Zoom Video Teleconference)

For the Defendant:

OFFICE OF THE ATTORNEY GENERAL
BY: Catherine A. Denny, Esq.
Rylee Ames, paralegal
One Granite Place
Concord, New Hampshire 03301
(603) 271-1354
catherine.a.denny@doj.nh.gov

For the Plaintiff:

Wanda Duryea, Guardian Ad Litem
Advocates for Ethical Mental Health Treatment
nh_cherokee@yahoo.com

* * * *

STIPULATIONS

It is agreed that the deposition shall be taken in the first instance in stenotype and when transcribed, may be used for all purposes for which depositions are competent under Federal practice.

Notice, filing, caption and all other formalities are waived.  All objections except as to form are reserved and may be taken in court at time of trial.

It is further agreed that if the deposition transcript is not signed within the 30 days after submission to counsel, the signature of the deponent is waived.

what was it, Wanda?

COURT REPORTER: Off the record.

(Discussion off the record.)

Q. (BY MS. DENNY) All right. So we discussed some of the technological concerns there. It sounds like you're on your laptop, so we'll try to share the screen for any exhibits we use, okay?

All right. So is there any reason why you are not able to answer a question truthfully today?

A. No, there's not.

Q. Are there any medical conditions that could affect your memory or ability to be truthful?

A. Not that I know of.

Q. What mental health diagnoses do you have?

A. Paranoid schizophrenia.

Q. Anything else?

A. That's it.

Q. When were you diagnosed with that the first time?

A. 2002, I think.

Q. Do you consider yourself currently stable?

A. Yeah, I'm fine.

Q. Okay. Are you taking any medications for your

were going to ask me. She told me not to do that, so that's what I did.

Q. Okay. And so you talked to Wanda about the deposition?

A. Yes.

Q. And what else did you two discuss?

A. The facts of the case.

Q. In what way? I guess what do you mean?

A. What is in our favor, what is something that is potentially best not said. That's basically it.

Q. So what facts did you discuss being in your favor?

A. Oh, the fact that the defendant, with the exception of the administrators, but the correctional officers, they pretty much sealed their fate because they put that in their report, that they physically -- that they assaulted me. They didn't put it that way, but they mentioned that they physically restrained me and they physically used weapons against me, so that's in our favor because they're not supposed to do that because I'm a patient. I'm not an inmate.

Q. Okay. And what about the facts best not said?

I was -- I was sitting on the floor and I was tased. But I wasn't attempting to spit at the female officer while I was on the ground. It was when I -- when they dragged me up -- when Frank Logan dragged me up and started escorting me from the -- from my cell rooms, infirmary cell room through the hallway into the four-point restraining room.

Once I was in the hallway from the -- from my cell room -- from my infirmary cell room, he accused me of attempting to spit at a female correction officer. That's why he grabbed my face and forced it upward in a belittle and humiliating manner and kept forcing my face in an upward manner.

Then after that, once I made it to the four-point restraining room, and they restrained me, they had me strapped down on all four points, the psychiatric nurse practitioner, Scott Congdon, he started questioning me. And I was being very -- I was upset naturally with all the harassment I had been receiving, all the mistreatment I had been receiving. I wasn't in

the greatest mood in the world, so I wasn't cooperating with his questions.

So that's when Seabron decided to tase me was I while restrained in the four-point restraining room, in the four-point restraining bed. And he modified the Taser so he can -- so he can tase me in rapid succession multiple times. He did that for five to ten seconds, if not 15. It was a long time.

And then there was a -- after that, I was -- I was left alone, and I fell -- then when I fell asleep, they woke me up right away. They knew when I was falling asleep. They can read my mind.

Once they got me out of the restraining room and sent me back to my cell, they strip-searched me unnecessarily. That was also a very humiliating and belittling situation. So it was actually four or five events in that one day.

Q. Okay. So there are four dates, though, I guess different events you would consider incidents --

A. Yeah, the first three dates -- the first three

dates, there was one incident in each of those dates. But the last date, the 22nd of January, 2019, there were four -- I don't know if you consider the strip-search an incident, but it was unnecessary, so maybe. It will be five incidents in one day. Because it was totally unnecessary. They didn't have to strip-search me. They had me all that time, all those hours. They searched me when they -- before they restrained me. So why did they have to -- on top of everything that happened, at the end of the day, they strip-searched me. So it could be five incidents, actually, in that date, but there was definitely four.

Q. When they took you out of the restraints, did they put you in a special outfit?

A. No. Well, wait -- wait a minute. I don't remember. I don't remember if -- I don't remember, actually, because I'm confusing some of the dates with -- like, I remember that when I was in -- I don't remember, actually, to be honest. I don't know if they put me in a restraining outfit or not. I don't remember.

Q. Are there times that they have put you in a restraining outfit?
A. Yes.
Q. So is it possible that they put you into one of those on January 22nd, 2019?
A. It's possible. It's possible. Like I said, I don't remember every single detail. I remember the mean stuff, but I don't remember every single detail.
Q. What do you recall about Frank Logan forcing your face upward?
A. Oh, well, I mean -- like I said, I was looking at the female. I believe her name was Ledger, Correctional Officer Ledger. And I was looking at her, and I was -- I got to be honest, the thought did cross my mind to spit at her, but I restrained myself. But, like I said, they can read my mind, so they knew I was thinking that, so that doesn't surprise me that Logan would say something like that.
So I was -- it crossed my mind, because I was upset at her, because that was the reason the whole incident started that day -- the

series of incidents that happened that date was because of Ledger for her ignoring me.

So when Logan was transporting me there, when I was walking and I saw staff -- I was walking across the hallway, and I saw Ledger, and he -- and Logan anticipated that I was going to spit at her. The thought did cross my mind, like I said, but I refrained from doing it.

But then Logan he -- he -- he pushed his hand over my face and forced it up and kept it up, and he manhandled my face. He made me look upward. And it was a very belittling and humiliating situation to have someone disrespect your face like that, so --

Q. Do you believe that he was doing that to try and make sure that you weren't going to spit on Officer Ledger?

A. How would he know that, unless he's not reading my mind? How would he know that? How can he tell that just by looking at somebody, that somebody was thinking of spitting at her, unless he was reading my mind?

Q. Well, so you wrote that he -- that Officer Logan

accused you of attempting to spit on a correction officer.
A. Yeah.
Q. So my question is whether -- my question is whether you believe that he did that to your face to prevent you from spitting on the officer?
A. I don't know what his intentions were, to be honest with you. I mean, maybe. Perhaps. Maybe he thought I was going to do it. He wasn't going to take any chances, so it's possible what you're saying.
Q. Did you file any request slips or grievances specifically regarding the incident on February 18th, 2019?
A. Well -- well, eventually, that day -- that day I remember it, because my cousin -- my cousin, Madeleine Laroche -- I believe that's her last name, unless she got divorced or whatever -- examined me.
It was supposed to be Dr. Wendy Martin after the incident in 2018 -- on February 18, 2018. And I filed a complaint with -- I believe it was Helen Hanks, or what's the name -- Paula

Mattis or Helen Hanks. I don't remember. I have the slip -- the original slip that I sent them of the complaint in my house where they responded and they said that it wasn't -- it couldn't -- it wasn't possible for it to be my cousin who examined me pretending to be Dr. Wendy Martin.
Q. Was Madeleine Laroche an employee of the SPU?
A. From my understanding, no. From what I understand, she was a secret employer. I didn't know about it.
Q. Okay. And so other than that complaint regarding your cousin standing in for Dr. Martin, did you file any other grievance or request slip regarding the incident on February 18, 2018? Sorry, if earlier I said 2019 -- but 2018.
A. The Board of Medicine -- I filed a complaint with the Board of Medicine regarding my cousin, Madeleine Laroche posing as Dr. Wendy Martin. But they said they investigated it, and they said it was silly of me to have said that.
Q. Did I just see, did Wanda just leave?
A. She went to the bathroom.
MS. DENNY: Do you want to take just a

15-minute break or ten-minute actually? Let's meet at 11:30.

(Recess taken.)

Q. (BY MS. DENNY) So we are back on the record. Right before the break, I asked you whether you had submitted any request slip or grievances regarding the February 18th, 2018, incident.

So just to clarify whether -- did you submit any I.R.S.s or request slips or grievances regarding the other three dates, so that April 10th, 2018; July 13th, 2018; or January 22nd, 2019; incidents?

A. I may have, but -- because I filed a lot of complaints, so many complaints of all the harassment that they were doing against me, so it may have been mixed in with some of those other issues I had with the staff. I may or may not have. I'm not sure.

But I did -- when Wanda became a guardian -- not really when she became my guardian, when she was creating the lawsuit, she told me to write down the incidents exactly how they happened in my mind, and I wrote them down,

you to describe in detail the events leading up to each allegation of excessive force, that allegation was prepared by you?

A. Yes.

Q. Okay. And so it shows -- or describes each of the incidents. And then --

A. Yeah. Yeah.

Q. All right. So then is it -- the only part that was prepared by Wanda was about the administrator, so like Helen Hanks and Paula Mattis?

A. Exactly.

Q. Okay. And so is that referring to just the -- the supplemental response to one of the last questions. Let's see. Were you referring to Interrogatory 14 in which we were asking your allegations against Paula Mattis and Helen Hanks?

A. Yes.

Q. Okay. All right. And is that because you didn't have any personal interactions with Commissioner Hanks while you were there?

A. I mean, she could have seen me. She knows who I am. I'm pretty sure staff told her, but whether

they introduced me to her formally -- I never -- they never told me, "Oh, this is Helen Hanks, the commissioner." So she could have seen me close up, and I could have even spoken to her, but I didn't know who she was.

And there was a couple of incidents there that was like that. I wasn't in -- around the last three or four months of my stay there at the SPU, the harassment was reduced noticeably. I still got harassed from time to time, but it was a lot less.

And they -- they started -- actually, on the contrary, they started treating us a little better. When I say us, I mean me and my peers. They bought us Monopoly games, board games. They bought us the Monopoly game. And they also bought us a video game system so we could play.

And I remember during the time that me and my peers were playing Monopoly, Deb Robinson, an administrator -- I believe it was an administrator, because she looked official, entered the room and saw us playing and said,

"Oh, you're having a good time, huh?" I don't know if it was Helen Hanks or Paula Mattis because they didn't introduce me, but it could have been.
Q. So from your own memory, you don't believe you have had any personal interactions with former Director Mattis or Commissioner Hanks?
A. Well, I mean, now that you mention it, I did see Helen Hanks' face on TV recently when she resigned. And I said to myself, you know what, I've seen that face before that was looking at me at Sal's Pizza, across the street from where my father lives, at the pizzeria. And she was looking at me, and I noticed she was looking at me. I noticed her body language. She was observing me.
And I seen her at Sal's Pizza, or was it somewhere else? I could have sworn I saw her at Sal's Pizza looking at me, but she didn't introduce herself to me or anything like that, but, you know...
Q. At least at the SPU -- at the SPU, you didn't have any interactions with Commissioner Hanks?

confused. Were you saying that because you think you got them confused, or -- or what?

A. No, no. To the casual observer, the person who doesn't know those two individuals well, may get them confused. But I know my cousin, and I recognized her voice. And the voice that Dr. Wendy Martin eventually showed -- when it got to Wendy Martin examining me years later -- or months later -- I should say months or years later. I don't remember when was the first time I interacted with the actual Dr. Wendy Martin. But their voices are different. But their bodies and their face -- especially that face, they're almost identical. I mean, like I would believe that my --

Q. Is your cousin -- sorry. Keep going.

A. I believe that Madeleine's mother, my aunt, would get those two confused if they put her in front of her. Her own mother would get her confused, because that's how much they look alike.

Q. Okay. So you think that it was Madeleine, and that everyone else was confused?

A. No, no. Why would anybody else be confused? I

mean, they know that that wasn't my cousin -- they knew that that wasn't Dr. Wendy Martin. I'm assuming that the staff didn't know that that wasn't Dr. Wendy Martin, that that was my cousin posing as Dr. Wendy Martin.
Q. And why do you think that?
A. Because they were in on it.
Q. In on what?
A. On the conspiracy against me.
Q. That includes having your cousin visit you?
A. Exactly -- pose as my doctor. I know my cousin, and that was my cousin that day.
Q. Is your cousin a medical provider?
A. I don't know what she is. I don't know what she does for a living. She lives in South Carolina, but she travels back and forth from New Hampshire because her children are still here in New Hampshire. I don't keep up with her regularly.
Q. You don't know what she does for work?
A. I don't know what she does for work. Years ago, I know she worked for a company called Abacus as a telephone operator. That was in Manchester. That was decades ago, though. I'm sure she's

moved on since then.
Q. When you were injected with the drugs on February 18th, did that assist you in calming down?
A. No, that didn't do anything for me. Those drugs didn't do anything to me.
Q. Okay. And then are all the allegations against any of the defendants from February 18th included in this Interrogatory No. 4 that you drafted?
A. Can I see it?
Q. Yeah. So starting at the top, first incident. And then let me know when you're ready to scroll.
A. Scroll. Okay. What about it?
Q. Are all of the allegations you have against each of the defendants included in your interrogatory response there?
A. Well, I mean, against Page Kimball, he was the first one behind the shield. He was the first one that I saw. That's why I say that he's part of the defendants who attacked me.
And then after I was -- immediately after I was crushed by the force of the shield against the wall, I saw Deblois who used a Taser on me, Devo.

certain extent maybe Nurse Esther didn't know that was poison in that cup.

Q. Okay. And so was Officer Logan the only person involved in this April 10th incident?

A. As far as I can tell. I couldn't see -- I couldn't see from the angle that I was in whether there were more correctional officers in the hallway, but I think he was doing a solo operation.

Q. Okay. And then you mentioned the April 9th date that you had refused your medications, correct?

A. Yes, because I -- I wasn't going to take that poison they wanted me to take.

Q. And had you been refusing medications generally until you had a -- until you were appointed a guardian?

A. My physical medications are for my diabetes and stuff, I was taking. But psychiatric medications, I was denying them because I don't have any mental illness, so I don't need to take any psychiatric medications.

Q. All right. So the July 13th one -- let's go ahead with this -- sorry, going back to the April

10th, 2018, incident. Did you -- did you have a cup of urine that you were going to throw on Officer Logan?

A. Yes, that's true. When -- when he pepper-sprayed me, he -- he -- he let me stay -- he let me endure the incident for about half hour to an hour. I could be off on the time by 10 or 15 minutes. That's understandable, since this happened such a long time ago.

But he let me -- he let me -- he left me by myself so I could deal with the pepper spray attack. Then he came back to the cell room, and he told me that he wanted me to cuff up, because he wanted me to take a shower, I believe.

But I was so upset at him for pepper spraying me for no reason that I wasn't paying attention to anything he was saying. I didn't want to have anything to do with him.

So I told him, "If you try to force me what to do something, I'm going to throw this urine at you."

I peed in a cup, and I threatened to

level. That whole year was a blur really when you think about it, all the things they did to me.

And I didn't have any books. I didn't have any calendars. I didn't have any food in my cell room. They took everything, and then gave it back to me, and then they would take it again.

So what was the question again?

Q. I guess I was just asking how the incident started on July 13th, 2018.

A. I had -- what I meant by that is that I must have had a good reason for not wanting to cuff up. I don't remember what the reason was, though.

Q. Okay. And then you wrote that you opted to rebel against SPU staff.

A. Where does it --

Q. That's the second paragraph. So if you go to the third incident in the middle of the page, second -- the paragraph below that.

A. Yeah.

Q. You wrote, "When William Soler, Jr. opted to rebel against SPU staff for righteous reasons that eventful evening, he did so by covering up

the tiny window of his cell door with newspaper, and this action obstructed staffs' outside view."
A. Yes.
Q. So I guess one question is -- so I guess you had kind of alluded to it before, you believe that there are actually hidden cameras that they don't tell you about in your cell?
A. Oh, yeah. They have a bubble room in the rotunda, and there's a bunch of monitors. And they have access to different parts of the prison, including the cell rooms and the bathrooms and everything.
And like I said, Carver confirmed it when he said that to the correctional officer that was on the outside of my cell room. He was describing what I was doing. But they wanted to know what I was doing, because the correctional officers outside of the door couldn't see me outside, because I had blocked off everything. But I guess Carver went to the -- I guess Carver communicated with the bubble -- with the bubble room.
And they told him, yeah, he's standing

Q. You don't recall doing that?
A. No. No. That's a lie.
Q. Okay. But you were up on the concrete shelf?
A. Yes. But when they -- but then I -- I -- I got to the furthest part -- when I saw that they were going to come in -- they were going to rush in, I prepared myself, and I got to the furthest part of the room on top of the shelf. And they -- yeah, I went to the furthest part -- I mean, not the furthest, the deepest part of the room and prepared myself.
Q. Why didn't you just take down the newspaper?
A. Well, I was trying -- I was trying to be a pain for them, because they were -- see, when people do things to me, I try -- especially at -- in the prison, when the staff would do things to me, I would try to do something to make their lives as miserable as they were making mine, so I wasn't cooperating with them, and I was trying to make it as rough as possible for them.
Q. And the corrections officers eventually performed a cell extraction and --
A. Yes.

Q. -- removed you from the shelf?
A. Yeah, Logan was the first one in. He was always the first one involved in my cases.
Q. And the officers brought you to the shower to decontaminate?
A. Yes. I was bruised up, and they brought me to the shower.
Q. Do you agree that you refused to be evaluated by the nurse at that time?
A. I don't recall an incident like that.
Q. You don't recall the nurse, or you don't recall the interaction with the nurse?
A. I remember the nurse. The nurse -- I believe the nurse's name was -- can you give me a hint?
Q. I don't --
A. I forgot the name of the nurse, but it was -- it was -- it was close as he's not corrupt as you can get with everyone involved in that place. I forget his name, but he -- he didn't do a really good job of checking me out.
But I -- I mean, so -- I didn't refuse his treatment. He treated me anyway. So if he said that I didn't -- didn't want his treatment,

outside of this litigation?

A. Oh, yeah. When I went to start my businesses, I had them do stuff like that.

Q. Anything else they helped you with?

A. No, that's basically -- it's a professional relationship.

Q. All right. All right. So then I'm just scrolling down so Interrogatory 14. You were asked to "Describe in detail and with specificity all action or inactions you allege were taken related to the claims in your complaint by the following defendants," and that included Paula Mattis, Helen Hanks, Benjamyn Carver, Frank Logan, Joshua Deblois and Page Kimball.

Did you prepare the answer to Interrogatory 14?

A. Yeah, I submitted that. I thought you received it already.

Q. Yeah, it's here. It's in front of you.

A. Oh, okay. Yeah. Yeah. Helen Hanks and Paula Mattis, I did not write that, because I don't know how they broke the law against me. Even though they're the administrator, and I'm sure

they had a role in it -- maybe they looked the other way or whatever, but I let Wanda take care of that for me.

Q. Okay. And with that caveat, is -- are your responses to Interrogatory 14 complete and accurate?

A. Well, let me see after Paula Mattis. Page down, let me see.

Q. Let me know when you want me to scroll.

A. All right. Stop.

That's accurate.

Q. Okay. Great. So you were just reviewing Page Kimball --

A. Page Kimball's, yeah.

Q. So now scrolling down to Joshua Deblois. Can you confirm that that is accurate? There's nothing you want to add at this point?

A. All right. Let me see.

Yes, that's accurate. Let me see No. 5. Hold on. These are shorter than I remember, though. Maybe my memory is going bad. Is this shorter -- I remember writing much more detail to them. Let me see.

time you were tased, though?
A. No. I just heard the voices of Scott Congdon, Seabron, and Logan.
Q. Okay. What did -- what are your allegations against Colleen Ferrier, and who is she?
A. I don't know who she is, to be honest with you. She's -- according to what Wanda told me, she's one of the nurses that was -- I have no idea. I have no idea how she's involved, to be honest with you.
Q. So you don't have any personal recollection of anything she did or didn't do to you?
A. I don't even know who she is.
Q. Okay. And so it's your understanding she was added as some sort of supervisor or administrator?
A. Yeah, she was an administrator who knew what was going on, and she looked the other way.
Q. What makes you think she knew what was going on?
A. Because Wanda told me that she was -- she was -- she was an employee there at the time that I was there.
Q. Any other reason?

A. Nope.
Q. Who's Deborah Robinson?
A. She's an administrator there.
Q. And what do you know she did or didn't do related to your complaint?
A. Again, the administrators, I don't know how they participated in the conspiracy against me, but Wanda said that she had knowledge of the things that were happening to me, and they did nothing to help me out, so that's how she was included.
Q. What makes you think that she had knowledge of things being done to you?
A. Because I would file complaints all the time.
Q. Did you ever have any interactions with Deborah Robinson?
A. Oh, yeah.
Q. Okay. What were your interactions?
A. I filed complaints -- I don't remember the details, but I remember Deb Robinson. I've written to her and she's written back to me in the request forms. And she was like in that conference that I had -- that Scott Marshall -- Captain Scott Marshall said that they can listen

to our -- they can record our conversations when we're in the cell room. She was the main -- she was the host of the whole conference, Deb Robinson.

And like I said, one time, when we were playing Monopoly with my peers, she came in with -- I think it was an administrator or somebody from the outside of the prison, and she -- she said hello to us as we were playing Monopoly.

Q. What did you write to her about?

A. I don't remember. I mean, I ran into her numerous times when I was there. It was in the request -- in the inmate request slips and the complaints I filed against certain people there.

Q. Okay.

A. It's so many. It's just too hard to distinguish right now, and it's just so long ago.

Q. Do you recall what her answers were to your requests?

A. They were like neutral is what I recollect. They weren't either/or. They weren't -- I don't remember.

SIGNATURE PAGE/ERRATA SHEET

I, WILLIAM SOLER JUSTICE, do hereby certify that I have read the foregoing transcript of my testimony in Justice vs Sununu, et al. on July 9, 2025, and further certify that said transcript (with/without) suggested corrections is a true and accurate record of said testimony (with the exception of the following corrections):

| Page | Line | Correction |
| --- | --- | --- |
| 56 | 9 | "employer" should be — employee |
| 58 | 16 | "Dr. Gary Grace" should be — Dr. Garrett Graves |
| 74 | 17-19 | That sentence doesn't make any sense. |
| 99 | 17 | Should be — Mark — instead of ~~Mark~~ Warren |
| | | |
| | | |
| | | |
| | | |
| | | |

William S. Justice
WILLIAM SOLER JUSTICE

Subscribed and sworn to before me this 5th day of August, 2025.

Lauren Fernald
Notary Public
My commission expires: 9-25-29

LAUREN M FERNALD STATE OF NEW HAMPSHIRE -MY- COMMISSION EXPIRES SEPTEMBER 25, 2029 NOTARY PUBLIC

Dear Ms. Denny:
Attached, ~~is a~~ are pages with a list of names of people whom I remembered (AFTER the deposition) that know of the case/conspiracy against me.
Bill Justice

Please forward a copy of any errata to:
ntheroux.avicore@gmail.com

C E R T I F I C A T E

I, Nancy J. Theroux, Licensed Court Reporter in and for the State of New Hampshire, do hereby certify that there came before me on the 9th day of July 2025, WILLIAM S. JUSTICE, who was by me duly sworn to testify to the truth and nothing but the truth of his knowledge touching and concerning the matters in controversy in this cause; that he was thereupon examined upon his oath, and his examination reduced to typewriting under my direction; and that the deposition is a true record of the testimony given by the witness.

I further certify that I am neither attorney or counsel for, nor related to or employed by, any attorney or counsel employed by the parties hereto or financially interested in the action.

In witness whereof, I have hereunto set my hand and affixed my notarial seal.

Nancy J. Theroux, LCR, RPR
N.H. LCR No. 100 (RSA 310-A)