## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| William Soler Justice, | \* |
| | \* |
|       Plaintiff, | \* |
|   v. | \*    Civil No. 1:20-cv-00517-PB |
| | \* |
| Christopher T. Sununu, et al., | \* |
| | \* |
|       Defendants. | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### DECLARATION OF FRANK LOGAN

I, Frank Logan, with personal knowledge, hereby declare, pursuant to Federal Rules of Civil Procedure 56(c)(4) and 28 U.S.C § 1748, as follows:

1.      I am providing this declaration in support of the Defendants' Motion for Summary Judgment in the above-captioned case.

2.      I worked as a Corrections Office with the New Hampshire Department of Corrections from December 1999 to January 2021. I was assigned to the Secure Psychiatric Unit for two different time periods. I was assigned to the SPU for approximately 4 years prior to my retirement in January 2021.

3.      I attended the South Carolina Corrections Academy in approximately 1997 and attended the Berlin Academy, run by the State of New Hampshire Police Standards and Training, in 2000.

4.      During my experience working for the Department of Corrections, I received yearly in-service trainings on the use of force and de-escalation. I received training on the use of OC spray (also known as pepper spray) approximately every two years. I was not certified on the taser and was not assigned the taser throughout my career.

5.      During the use of force trainings, we were trained on the current use of force

policies and procedures for the Department of Corrections (DOC). The procedure is the

same for those who were committed in the SPU and residents housed in any other DOC

facility. The policy in place during the time period when Plaintiff was at the SPU allows

officers to use "the reasonable level of physical force in situations [for] self-defense, ...to

protect others, prevent loss of life, prevent serious bodily injury, protect from self abuse,

protect serious destruction of property, prevent escapes, or to affect an arrest." PPD 5.58.

Further, OC spray can be used "to temporarily incapacitate or disorient an individual in

order to reduce the likelihood of injury to the individual and to reduce the likelihood of

injury to staff involved in bringing an individual under control." PPD 5.58.

6.      I was a Corrections Officer while Plaintiff was housed at the SPU in 2018

and 2019. I remember that Plaintiff was very large – he was over 6 ft 5 in and weighed 368

pounds. I also remember that Plaintiff was paranoid and delusional and he refused to take

his medications.

7.      While Plaintiff was at the SPU, I was required to take steps to protect myself

and others from Plaintiff, and to protect Plaintiff from self-harm, on several occasions. I was

involved in three incidents related to this case. I wrote statements regarding the incidents on

April 10, 2018 and January 22, 2019. My incident report from April 10, 2018 is numbered

DOC_010 in Exhibit 6. My statement form from January 22, 2019 is numbered DOC_026 in

Exhibit 8. These statements are true and accurate accounts of what occurred and my

involvement in these incidents to the best of my recollection. I reviewed the additional

incident reports and statements by other officers within Exhibit 8, and these statements and

reports also are consistent with my understanding of what occurred on January 22, 2019.

2

8.      I also reviewed the incident reports from other officers from July 13, 2018, numbered DOC_012-020 (Exhibit 7). While I do not see an incident report that I wrote, the reports by the other officers from that date are correct as to my involvement in the incident and are consistent with my recollection of what occurred on this date.

### April 10, 2018 Incident

9.      The first incident with Mr. Justice that I was involved in was on April 10, 2018. On April 10, 2018, Soler was on a low swing of his cycle and had become disruptive and combative and had taken to cursing at me from his cell. He had also been threatening staff with throwing urine on them.

10.      I was conducting a security round, walking down the E-tier and looking into each room to verify the individual was safe and not violating any rules. I had almost reached room 8 from which I could see Plaintiff standing at his door in room 10. I could see him because was a ¼ to maybe a ½ inch gap between the door and the wall. I saw him looking at me and holding a white Styrofoam drinking cup. As I finished looking in on room 8 and started to move to 9, I saw him change his position which gave reasonable belief that he was going to throw urine on me. I looked in on room 9 (having to complete the round even under the threat of assault) and that's when Soler said "Fuck you Logan" and moved quickly inside of his room, leading me to believe in that split second that I was about to be "Bombed" (meaning, that he was going to throw his cup of urine on me). I deployed the pepper spray for no more than a second.

11.      I then informed the officer in charge, Sgt. Carver, of the incident. CO Seabron and I went back to the E Ward and tried to get Plaintiff to cuff up to be placed in the showers to decontaminate and he refused, stating "fuck you, you little faggot!" over and

3

over. I returned again with CO Seabron, CO Ryan and Nurse John Lombard to attempt to have Plaintiff cuff up. I observed a cup of yellow fluid in Plaintiff's right hand. After several direct orders to empty the cup, cuff up, and come to the door, staff was able to place him into handcuffs and escort him to the shower. Once Mr. Soler was removed from his cell, officers confirmed that Plaintiff had three more cups of urine sitting next to his door. My commanding officer later informed me that Plaintiff had said "I wanted to get Logan" after the incident.

12.    There was one taser assigned to the SPU. Since I was not Taser-certified, I did not carry or use a Taser during my career. Therefore, Plaintiff's belief about hearing a Taser being triggered by me on that date is incorrect.

13.    My actions on April 10, 2018 were reasonable in preventing myself from being assaulted by Plaintiff. In my training and experience, throwing bodily fluids on another constitutes assault. The use of OC spray is reasonable if used for protection of self and to restore order. Despite this, I did not typically carry OC spray and did not use OC spray during my 21-year career except during this instance. In my experience, I could often speak with individuals to gain compliance. Plaintiff's behavior was unusually difficult to manage. My actions on April 10, 2018 were reasonable and necessary to avoid what appeared to be an imminent threat by Plaintiff, based on my prior experience with Plaintiff, Plaintiff's threats to throw urine on staff leading up to the incident, and my observations of Plaintiff that day holding a Styrofoam cup which I reasonably (and accurately) believe had urine in it.

4

### July 13, 2018 Incident

14.    The second incident with Mr. Justice occurred on July 13, 2018 when Plaintiff was in Ward E. Ward E did not have cameras inside of the cells.

15.    I was informed on that date that Plaintiff was blocking his window and vent, preventing officers from being able to observe him and to ensure that he was safe. When I arrived, Plaintiff's window and vent were blocked, and he was refusing to come to the door to cuff up. The other staff had already tried to gain Plaintiff's compliance using OC spray, and those attempts were unsuccessful.

16.    Under these circumstances, Plaintiff needed to be removed from his cell to decontaminate the cell and Plaintiff and to remove the items blocking the windows and the vent.

17.    I was assigned to the shield on the extraction team. On the shield, I was the first to enter. Plaintiff was standing on a shelf above his bunk.  The cell was slippery and wet and it appeared that Plaintiff had flooded his cell. In grappling to get him off of the shelf, I brought him down to his bunk. Another officer was then able to secure his wrists in handcuffs.

18.    The cell extraction was necessary given Plaintiff's flooding of his cell and boarding up of his windows and vent. In this extraction, my actions and the actions of my team were reasonable and necessary to gain compliance and to prevent self-harm by Plaintiff. During the extraction, we used no more force than necessary in order to gain Plaintiff's compliance and to remove him from the high shelf inside of his cell to ensure his safety.

5

### January 22, 2019 Incident

19.    The third incident occurred on January 22, 2019 starting around 6:40 pm. On that date, Plaintiff was observed attempting to break a light in his room in the infirmary, or in his words "Break this bitch." I arrived at his room, ISO #5, to witness Soler standing on a four-foot high concrete shelf, attempting to hit his light. I instructed him to get down which he responded with "Fuck you Bitch". As additional staff arrived, Plaintiff stated that he would hit his head on the bed, and we (staff) would be dead and lose their jobs. Two other staff and I stood outside his room for roughly 10 minutes trying to have Plaintiff get off the shelf. He was only escalating and becoming more and more agitated. It appeared that he was getting ready to jump off the shelf, so I instructed CO Deblois to unlock the door to the cell. I entered the cell to stop him for jumping, which at that time it was apparent that he was going to swing at me. I moved over to remove him from the shelf. My thought was to "bear hug" him and pull him off the shelf to land on his feet. Instead of getting down, Mr. Soler sat down on my hand and broke it.

20.    I then brought him down to the floor, which at that time he refused to bring his hands out to be handcuffed. Officer Seabron then deployed the Taser. After the Taser stopped, I pulled his hands out from under him and placed handcuffs on him that Officer Deblois supplied. Deblois and myself then assisted Plaintiff to a standing position, escorted him to four points, and secured his left wrist in the restraint. During the escort, before reaching the 4-points room, Plaintiff saw Correctional Officer Leger and stated: "Fuck you, you lying Cunt!" I told him to stop insulting staff and it was my perception that he was about to spit at Officer Leger. I grabbed his face and turned his head to face me. Applying pressure to the chin, which closed his mouth and raised his head which prevented any

6

attempt to spit. I performed this action to prevent what appeared to be an imminent threat to staff safety, and used minimal force to Plaintiff to prevent him from spitting.

21.    My actions in detaining Plaintiff and escorting Plaintiff to the 4-points room during this incident were reasonable and necessary to protect Plaintiff from self-harm and to protect harm to others, given the apparent imminent concerns I had about Plaintiff jumping off a shelf and spitting on another officer. I also believe that the actions of the other correctional officers, including CO Seabron's use of the Taser when Plaintiff was acting dangerously/violently and refusing to bring his hands out to be handcuffed, were reasonable and necessary under the circumstances.

22.    My shift ended at 11:00 pm, but I believe I left early to go to the emergency department for my broken hand. I was admitted to the emergency department at 10:33 pm that night. I do not believe I remained with Plaintiff while he was in 4-point restraints and I do not recall any other taser incident that night. A true and correct copy of my Emergency Documentation from my visit to the Emergency Department on January 22, 2019 is attached as Exhibit 9.

**I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on the date listed below.**

Date:_11/11/25___                                   /s/_____
                                                    Frank Logan

7