UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| William Soler Justice, | \* |
| Plaintiff, | \* |
| v. | \* Civil No. 1:20-cv-00517-PB |
| Christopher T. Sununu, et al., | \* |
| Defendants. | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## DECLARATION OF JOSHUA DEBLOIS

I, Joshua Deblois, with personal knowledge, hereby declare, pursuant to Federal Rules of Civil Procedure 56(c)(4) and 28 U.S.C § 1748, as follows:

1. I am providing this declaration in support of the Defendants' Motion for Summary Judgment in the above-captioned case.

2. I have been a Corrections Officer at the NH Department of Corrections (DOC) since August 8, 2014. I was assigned to the SPU from October 2016 until December 2022. I have been a Training Lieutenant for the Department of Corrections since 2024.

3. I attended the State of New Hampshire Police Standards and Training Academy in March-May 2015.

4. Corrections officers are required to attend trainings on defensive tactics, firearms, critical decision making (covering use of force) every year, and training on defensive tactics (yearly as well). I teach defensive tactics, critical decision making, simunitions instruction, and handcuffing. I was certified on the Taser (also known as Electronic Control Device, or ECD) during my time at the SPU.

5.      Through my training and experience, I am familiar with the use of force policies and procedures for the Department of Corrections (DOC). The procedure is the same for those who were committed in the SPU and residents housed in any other DOC facility. The policy in place during the time period when Plaintiff was at the SPU allows officers to use "the reasonable level of physical force in situations [for] self-defense, …to protect others, prevent loss of life, prevent serious bodily injury, protect from self-abuse, protect serious destruction of property, prevent escapes, or to affect an arrest." PPD 5.58, III, A. Tasers "are a less than-lethal use of force option that is designed to disrupt muscle control in order to temporarily incapacitate or disorient a hostile individual." and they are intended to be used "to reduce the possibility of injury to staff or subjects when attempting to bring an individual under control." PPD 5.58, III, G, 6. A true and correct copy of the policy that was in effect during Plaintiff's commitment at the SPU is attached as Exhibit 10.

6.      While Plaintiff was at the SPU, there were several incidents in which Corrections Officers, including myself, were required to take steps to protect themselves and others from Plaintiff, and to protect Plaintiff from self-harm. I was involved in two incidents with Plaintiff relevant to this Complaint on February 18, 2018 and January 22, 2019.

7.      The incident report that I wrote regarding the February 18, 2018 incident is on page DOC_002 of Exhibit 5. The incident report is a true and accurate statement of what occurred and my involvement in this incident to the best of my recollection. I reviewed additional statement forms from February 18, 2018 in Exhibit 5, numbered DOC_001-008, which are also consistent with my recollection of what occurred.

8.      I completed a statement form regarding the incident on January 22, 2019, located on page DOC_025 of Exhibit 8. I reviewed the other incident reports and statements by other

staff from the January 22, 2019 incident in <u>Exhibit 8</u>, numbered DOC_021-026, which are also consistent with my recollection of what occurred.

9. My actions and those of the other correctional officers on February 18, 2018 were reasonable and necessary under the circumstances to safely restrain Plaintiff while keeping staff safe, as explained on the statement I wrote on that same date. Medical had determined that Plaintiff needed to go into 4-point restraints (Patients go to restraint beds also known as 4 points only inmates go to the chair) due to his unsafe and self-harming behavior. He was refusing to comply with our commands and many verbal requests by medical staff. When we entered his cell, Plaintiff continued to fail to comply. Due to his size and lack of compliance, I believe it was necessary to use the Taser device to temporarily incapacitate Plaintiff in order to handcuff him, consistent with DOC policy and procedure. By using the Taser, there were no injuries to staff or to Plaintiff.

10. My actions and those of other correctional staff were also reasonable during the incident I was involved in on January 22, 2019, as explained in my statement and statements completed by other staff from that same date. On January 22, 2019, Plaintiff was in the infirmary and standing on a shelf, threatening staff if they entered, but also threatening to jump off the shelf. He was trying to break the light in his cell. We had to move quickly to avoid further self-harming behavior. When we went in, Plaintiff was openly aggressive and swatting at CO Logan.

11. CO Seabron used the taser on Plaintiff in order to gain Plaintiff's compliance so that I could handcuff him. His use of a Taser was reasonable under the circumstances. During this incident, Plaintiff was not tasered while he was restrained, but prior to my securing Plaintiff with the handcuffs.

- 4 -

12. Contrary to Plaintiff's Complaint, I did not "strip search" Plaintiff during this incident on January 22, 2019 – However, Plaintiff's clothes were likely removed prior to getting placed in a safety smock or heavy clothes once he was released from the restraint chair, as this is common for individuals on 1:1 observation after a self-harming incident. Safety smocks, or heavy clothes, are used for patients to keep patients safe and to prevent them from using their own clothing for self-harm.

**I declare under penalty of perjury that the foregoing is true and correct. Executed on the date listed below.**

Date:   11/12/2025

_____
Joshua N. DeBlois