**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**

**William Soler Justice**

v. Case No. 1:20-cv-517-PB
Opinion No. 2026 DNH 123

**Nathaniel Seabron et al.**

## MEMORANDUM AND ORDER

William Soler Justice claims that he was repeatedly tased, pepper sprayed, and unlawfully restrained on four separate occasions while civilly committed to New Hampshire's Secure Psychiatric Unit ("SPU"). He has sued the individual officers who were involved in each incident as well as several of their supervisors. He asserts constitutional claims pursuant to 42 U.S.C. § 1983 and several state tort claims. Doc. 131. The defendants have filed a motion for summary judgment arguing that (1) the defendants who were directly involved in each use of force incident are entitled to qualified immunity, (2) Justice lacks sufficient evidence to support his supervisory liability claims, and (3) I should grant summary judgment as to three state tort claims and decline to exercise supplemental jurisdiction over the remaining state claims. Doc. 160.

## I. STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

Where the movant does not bear the burden of proof on a dispositive issue, it may satisfy its initial burden of production either by "affirmatively produc[ing] evidence that negates an essential element of the non-moving party's claim" or by pointing to "evidentiary materials already on file" that "demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000). Once this initial burden has been met, the non-movant must respond with evidence sufficient to "demonstrate that a trier of fact could reasonably resolve that issue in [its] favor." Alam & Sarker LLC v. United States, 113 F.4th 153, 162 (1st Cir. 2024) (alteration in original). In contrast, a movant with the burden of proof at trial is not entitled to summary judgment unless

it can "demonstrate every element of [its] case such that 'no reasonable trier of fact could find'" otherwise. Harley-Davidson Credit Corp. v. Galvin, 807 F.3d 407, 411 (1st Cir. 2015) (quoting Lopez v. Corporación Azucarera de P.R., 938 F.2d 1510, 1516 (1st Cir. 1991)). In either case, the court must construe the record in "the light most favorable to the nonmoving party." Friedman v. Cent. Me. Power Co., 174 F.4th 233, 240 (1st Cir. 2026) (quoting Appleton v. Nat'l Union Fire Ins. Co. of Pittsburgh, 145 F.4th 177, 184 (1st Cir. 2025)).

Under our local rules, the movant's memorandum in support of its motion for summary judgement "shall incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). In response, the nonmoving party's memorandum in opposition "shall incorporate a short and concise statement of material facts, supported by appropriate record citations, as to which the adverse party contends a genuine dispute exists so as to require a trial." L.R. 56.1(b). "All properly supported material facts set forth in the moving party's factual statement may be deemed admitted for the purposes of its motion unless properly opposed by the adverse party." Id.

It is worth noting that Justice is proceeding pro se. "[P]ro se litigants are generally held to a less stringent standard than lawyers." White v. Union

Leader Corp., 2001 DNH 127, 2001 WL 821530, at *2 (D.N.H. July 13, 2001). That said, "a litigant's 'pro se status [does not] absolve him from compliance with the Federal Rules of Civil Procedure,'" and that principle "applies with equal force to a district court's procedural rules." F.D.I.C. v. Anchor Props., 13 F.3d 27, 31 (1st Cir. 1994) (quoting United States v. Heller, 957 F.2d 26, 31 (1st Cir. 1992)).

Here, the defendants have supported their summary judgment motion with a detailed statement of material facts as required by our local rules. See Doc. 160-24 at 3-18. With limited exceptions, Justice has not disputed those facts. And, to the extent he does, he disputes them by introducing facts in his unverified amended complaint that appear to contradict the defendants' statement of material facts. Doc. 131. As such, the defendants' material facts largely remain undisputed. Accordingly, under Local Rule 56.1, they are deemed admitted for purposes of the defendants' motion.

Cognizant of the tension that exists between the deferential standard afforded pro se litigants and the parties' obligation to follow procedural rules, I describe the events underlying this action as follows. First, I summarize Justice's allegations with regard to each of the four use of force incidents. I then describe the evidence using the defendants' statement of material facts. Where Justice contests a particular fact, even if he improperly does so through his amended complaint, I adopt Justice's version of events pursuant

to the relevant standard for summary judgment. See Friedman, 174 F.4th at 240.

## II. BACKGROUND

### A. Statement of Facts

#### 1. Justice's Commitment to the SPU

In August 2017, Justice was charged in New Hampshire state court with attempted murder, assault, and reckless conduct with a dangerous weapon. Doc. 131-13 at 1. At a hearing in February 2018, that court found that Justice, who had been diagnosed with "Paranoid Schizophrenia," was "in such mental condition as a result of mental illness as to create a potentially serious likelihood of danger to himself and/or others." Id. at 1-2. Accordingly, the court determined that he was incompetent to stand trial and ordered him involuntarily committed to the SPU for a period of five years pursuant to N.H. Rev. Stat. Ann. ("RSA") § 135-C "with a conditional discharge when and if clinically appropriate." Id.; see also Doc. 131 at 4. The following events occurred during Justice's commitment at the SPU.

#### 2. February 18, 2018 Incident

**a. Justice's allegations**

Justice alleges that the following events occurred on February 18, 2018. On that day, he was housed in the infirmary. Doc. 131 at 6. After becoming irritated by nurse John Lombard's refusal to answer his questions, he says he

"began banging on the cell door for approximately 10 minutes." Id. Officers Joshua Deblois and Page Kimball were the employees at the nurses' station at the time, and Justice alleges that they "entered Mr. Justice's cell behind a shield and armed with a taser which Joshua N. Deblois deployed into the patient's outer left thigh . . . before forcing him down, face first onto the concrete mattress frame." Id. Officer Morissette then "applied painful pressure to [Justice's] left hamstring and unreasonably restrained him." Id. Officer Bret Richardson[1] "prevented movement of [Justice's] legs and unreasonably restrained him by securing the two lower straps of the 4 point restraints." Id. Meanwhile, "Officer Ryan assisted with the unreasonable restraint of patient plaintiff in violation of Federal and State law." Id. Then, while naked, Justice says he was "involuntarily medicated and roughly transported to the restraint room." Id. In his amended complaint, Justice does not identify the defendants who involuntarily medicated him and roughly transported him to the restraint room.

**b. Defendants' statement of facts**

According to the defendants' statement of material facts and other documents they submit in support of their motion, Kimball and Deblois were

[1] Justice's claims against officers Richardson and Spencer Ryan were dismissed without prejudice on June 4, 2025. See 06/04/2025 Dkt. Entry.

on duty at the SPU on February 18, as was officer Morissette. Doc. 160-24 at 6 (citing Doc. 160-7). That day, after nurse Lombard refused to answer his questions, id. at 6, Justice started banging on the door of his cell for ten minutes.[2] Kimball described Justice's behavior as "self-harm[ing]," and added that he was "hitting the steel door with his foot, leg, and hands or arm for so long and so hard that I believed he would break his hand or foot in many places." Doc. 160-22 at 2-3. The defendants state that medical staff and other officers tried to get Justice to calm down before Lombard decided that Justice needed to be placed in four-point restraints and declared the incident a "Personal Safety Emergency." Doc. 161 at 12; Doc. 160-22 at 3.

Relying on the medical providers' order to put Justice into restraints, the officers then attempted to encourage Justice to come to the tray slot to be handcuffed. Doc. 160-22 at 3. Justice refused to comply. Doc. 160-7 at 2. The defendants contend that during this interaction, Justice also called staff names and multiple times stated: "I am ready for combat and I will continue to bang and yell until I get my pin number." Id.

It was at that point that officers prepared for the cell extraction. Doc. 160-22 at 3. Kimball attempted to get Justice to "cuff up" before entering the

---

2 Defendants contend that Justice was banging "nonstop for approximately 45-50 minutes." Doc. 160-7 at 2. Because, however, Justice contests this fact in his allegations, I adopt his version of the facts for when deciding this motion.

cell, as did DeBlois, who "did a spark test with the Taser [to try] to get him to cuff up before we had to go in." Doc. 160-7 at 2. Instead of complying, Justice "stripped naked" and "stood on his bed in the corner." Id. The officers then equipped themselves with vests and helmets: Kimball "was on the shield," DeBlois had the taser, and Morissette, Ryan, and Richardson followed. Id. Kimball "believed that [Justice] would jump on top of [the officers] while going into the room." Doc. 160-22 at 3. When the officers entered the cell, they again told Justice to get down and "cuff up," but he allegedly refused. Doc. 160-7 at 2. DeBlois reported that "Kimball pushed [Justice] into the corner with the shield as he was refusing to cuff up, so [Deblois] pulled the trigger on the Taser." Id. When the taser "timed out," Justice was on his bed, the shield was ripped off him, and Kimball handcuffed him. Id. The defendants contend that Deblois used the taser to "temporarily incapacitate [Justice] so he could be handcuffed." Doc. 160-24 at 8.

Before Justice was put into restraint cuffs, Morissette alleges that he also "place[d his] knee on [Justice]'s hamstring while restraint cuffs were being put on, but little to no pressure was applied as the resistance had stopped at that point." Doc. 160-23 at 2. Morissette continued to restrain Justice while others applied restraint cuffs in order to "maintain the safety of everyone in the room." Id. at 3. After Justice was restrained, the defendants then transported him to the "portable stretcher," Lombard removed the two

taser probes and copper wire, and staff "strapped his legs and wrists into Humane Restraint Cuffs while strapping him to the stretcher." Doc. 160-7 at 2. Lombard's medical notes record that Justice was medicated at that point, and that he resisted officers. Doc. 161 at 12.

3. April 10, 2018, Incident

**a. Justice's allegations**

On April 10, 2018, Justice says that he was being held in the "E Unit" and confined for about twenty-three hours per day. Doc. 131 at 6. He alleges that he could hear "a taser being repeatedly dry fired" outside his cell by officer Frank Logan on that day. Id. In response, Justice "was using his mattress to block the gap between the door and the frame" because he anticipated "Logan would taser him unprovoked." Id. at 7. According to Justice, Logan allegedly ordered him to remove the mattress and then asked Justice why he was blocking the gap in the door assembly. Id. Justice alleges that when he tried to look through the gap to tell Logan he had followed the order, Logan deployed pepper spray into the cell. Id. He says he was left in the cell for thirty to sixty minutes before Logan returned and ordered him to "cuff up." Id. In response to Logan's use of the pepper spray, Justice says that he threatened to throw urine at Logan and refused to cooperate until Lombard and officer Nathaniel Seabron arrived. Id. Justice says that

Lombard assessed him but did not note Justice's breathing distress from the pepper spray in his assessment. Id.

**b. Defendants' statement of facts**

Logan says Justice was "on a low swing of his cycle" on April 10, adding that he "had become disruptive and combative and had taken to cursing at me from his cell." Doc. 160-18 at 3. Logan states Justice had previously "been threatening staff with throwing urine at them." Id. Logan performing check ins on April 10; when he reached a room two doors away from Justice's, he saw Justice "looking at me and holding a white Styrofoam drinking cup." Id. Justice says he then heard Logan "dry-fire" his taser.[3] As Logan neared Justice's room, he "saw [Justice] change his position which gave [Logan the] reasonable belief that [Justice] was going to throw urine on [him]." Id. When Logan looked into room nine, Justice, who was in room ten, said, "Fuck you Logan," and moved quickly inside his room, leading Logan to believe that he was about to throw a cup of urine on him. Id. It was at that time that Logan deployed pepper spray at Justice "for no more than a second." Id.

---

[3] The defendants dispute this fact. They emphasize that because Logan was never "Taser-certified," he did not carry or use a taser during his career and thus Justice's statement about hearing Logan "dry fire" a taser was incorrect. Doc. 160-18 at 4. Justice does not formally dispute this statement in his opposition motion. However, as discussed above, I accept Justice's version of facts for the purposes of this motion.

Logan says he then informed the officer in charge about the incident, and then, joined by Seabron, returned to the E Unit between thirty and sixty minutes later to attempt to get Justice to "cuff up" and decontaminate.[4] Id. Justice allegedly refused to do so and repeatedly stated, "fuck you, you little faggot." Id. Logan says he then returned once more with Seabron, Ryan, and Lombard to get Justice to "cuff up"; at that time, he "observed a cup of yellow fluid in [Justice]'s right hand." Id. at 4. After staff repeatedly told Justice to empty the cup, "cuff up," and come to the door, Logan alleges that the staff "was able to place him into handcuffs and escort him to the shower." Id. When Justice left his cell, the officers noted that Justice had three additional cups of urine sitting next to his door. Id. Logan says that his commanding officer told him that after the incident, Justice said that he "wanted to get Logan." Id. Lombard notes that once Justice was escorted to the shower, he made offensive comments to other staff and refused when staff attempted to assess his eyes. Doc. 161-1 at 2.

[4] The defendants do not state how long it took for Logan to return to Justice's cell. However, Justice alleges that he was left in his cell for thirty to sixty minutes before he was offered an opportunity to decontaminate, and I take his version of facts as true for the purpose of deciding this motion.

### 4. July 13, 2018 Incident

#### a. Justice's allegations

On July 13, 2018, Justice was standing in his cell when he decided to apply newspaper to his cell window. Doc. 131 at 7. When asked to remove the newspaper or "cuff up," Justice refused to comply and stood with his back against the wall in his cell. Id. He says he then climbed to the top of the concrete shelf in his room and placed a pillow in front of his face. Id. Justice alleges that officer Benjamyn Carver deployed pepper spray into Justice's cell. Id. He says that "[t]he pepper spray was repeatedly deployed by different actors into [his] locked cell" and "caused him to double over in pain, cough, and spit." Id.

After about thirty minutes, Justice alleges that Logan entered his cell and "forced [him] from the high shelf of concrete near the floor of concrete onto the mattress frame," which Justice says caused "painful injuries" to his wrists. Id. Justice alleges that officer Kenneth Kum initially filmed the incident and then "unreasonably and incorrectly" applied handcuffs to Justice by putting the keyhole facing inward. Id. He likewise alleges that "PPO Jonathan Bois[s]elle deployed pepper spray into [his] closed cell" and then "secured [his] right leg by utilizing pain compliance with PPO's right leg shin on the back of [Justice's] lower calf/ankle." Id. He says another unnamed officer subsequently ordered him to go to the shower, "at which point [he]

stated that he 'can't' breathe and was given a cursory exam by Nurse Mark Gange." Id.

### b. Defendants' statement of facts

Officers Boisselle, Carver, Logan, and Kum were on duty on July 13 and responded to Justice when he "opt[ed] to rebel against SPU staff . . . by covering the tiny window of his cell door with newspaper." Doc. 160-24 at 12 (quoting Doc. 160-13 at 22-23). Carver was told that Justice had covered the window in his cell and went to investigate the situation. Doc. 160-9 at 3. When Carver arrived, Justice began using vulgar language, would not remove the paper from the window that obstructed the officers' view, and "had covered his floor with water and all the trash inside his cell." Id. Justice told Carver, "I can't wait to hurt you," but Carver continued to attempt to get Justice to remove the paper. Id. Carver says that he instructed the other staff to use the vent, through which they could see Justice despite his efforts to obstruct their view into his cell, to check in on him. Id.

Later that day, Carver says Boisselle told him that Justice had covered the vent and staff now had no means of monitoring Justice's wellbeing. Id. Carver tried speaking with Justice again, which "had no effect as he was still using vulgar language." Id. He attempted to get a registered nurse to speak with Justice, to no avail. Id. At that point, he told Kum to record the incident with a video camera. Id.

The security staff then walked down to Justice's cell with a shield to "protect them from any fluids if thrown through the tray slot." Id. Carver tried once more to get Justice to remove the paper, then told him to come to the door and "cuff up" through the tray lot. Id. Justice refused. Id. Then, Carver told Justice that he would deploy OC (pepper) spray if he did not comply. Id. When Justice did not, Carver "deployed a one second burst of OC into the room" which "went about two feet into the room and only for one quarter of the second burst." Id. Carver said he attempted to use the spray a second time, but the container malfunctioned. Id. At that point, Boisselle tried to deploy the spray from a different cannister but could only "get a small stream out of the can." Doc. 160-24 at 13 (citing Doc. 160-9 at 3). When Boisselle attempted to use the spray again, it "still dribbled out of the can." Doc. 160-9 at 3.

At that point, Carver instructed staff to put on protective gear and remove Justice if he continued to refuse to comply with orders. Id. Carver recorded the incident. Id. Carver said that at the time, Justice was singing, talking about getting hurt by the staff, and said the staff was going to rush in and get "fucked up." Id. Carver informed the team about the incident before they entered the cell to perform the extraction. Id. According to Boiselle, Logan was placed on the shield, followed by Boisselle. Id. at 7. When the officers entered the cell, the floor was very slippery and covered in "multiple

unknown substances." Id. Boisselle stated that "[o]nce the shield made contact with [Justice]," Boisselle "attempted to reach for his arms" but Justice "began to step down from his elevated position." Id. He added that "[a]s a direct result of [Justice's] movements and where he was directed by the shield, his head laid opposite of [Boisselle's] location," so Boisselle secured both of his legs. Id. Boisselle described using pain compliance by putting his right shin on the back of Justice's lower calf or ankle. Id. He said that he "used both hands to help secure his left leg" while other officers "proceeded to secure [Justice's] upper extremities and place him in handcuffs." Id. Boisselle says he considered Justice's dangerousness when "considering whether and how to perform a restraint." Doc. 160-19 at 3. When Kum applied the handcuffs to Justice, he concedes that he applied them with the lock facing backwards. Doc. 160-9 at 10; Doc. 160-21 at 2. However, he contends it was not always possible to place the handcuffs facing outwards "in the heat of the moment" and that the backwards placement did not affect the fit of the cuffs. Doc. 160-21 at 2.

Carver says that during the extraction, Justice was "driven to the back on the cell on his shelf and was brought down to his bunk" then "laid down on his mattress and secured in handcuffs." Doc. 160-9 at 3. At that point, Justice was moved back to room ten, and Carver instructed the team to bring him to

the shower to decontaminate. Id. Boisselle and Logan helped escort Justice to the bathroom. Id. at 7.

Officers had some trouble removing Justice's handcuffs, but when they did and nurse Gange was able to "offer[] medical attention," Justice refused it. Id. at 3. Justice said his hands were broken, and a medical staff member assessed him but said the "assessment was very vague due to [Justice] refusing to let them see his wrists/hands." Id. Justice refused to shower and was brought back to room ten. Id.

5. January 22, 2019 Incident

**a. Justice's allegations**

On January 22, 2019, Justice alleges that Logan accused him of attempting to spit at a female correctional officer from his infirmary cell. Doc. 131 at 7. He says that he was tased while restrained and on the floor. Id. Then, while still cuffed, he alleges that he was pulled up to his feet and "dragged to the 4 point restraint room" by Logan. Id. at 8. He said that during this time he "begged for help because he was in pain from the aggravation of an old back injury." Id. While he was brought to the restraint room, Justice alleges that Logan "forced [his] face upward in a belittling and humiliating manner in front of approximately 6 other staff members." Id.

Justice alleges that he was tased again that evening. He says that Logan and Seabron "roughly placed Mr. Justice in four point restraints before

Correction Officer Nathaniel P. Seabron modified the taser gun and tased the restrained patient." Id. When he was in four-point restraints, Justice began to fall asleep and alleges he was "roughly awakened" by Deblois, who Justice alleges "performed an unnecessary strip search." Id.

**b. Defendants' statement of facts**

Logan, Seabron, and Deblois were on duty and responded to the incident on January 22. On that day, Seabron saw Justice "attempting to break his light" in his room in the infirmary and called for additional staff support. Doc. 160-10 at 2; see also Doc. 160-18 at 6. Seabron said that Justice "refused to get off his desk and cuff up" and that Justice said that he was "going to jump and hit [his] head." Doc. 160-10 at 2. Seabron believed him. Id. Logan heard Justice say that "he would hit his head on the bed, and we (staff) would be dead and lose our jobs." Doc. 160-18 at 6. Logan and two other staff members standing outside Justice's room attempted to get him to get off the shelf for ten minutes, but Justice only became "more and more agitated." Id. Logan believed that Justice was "getting ready to jump off the shelf," so he instructed Deblois to unlock the cell door. Id.

Logan then entered the cell to stop Justice from jumping off the shelf and believed that Justice was "going to swing" at him. Id. He then "moved over to remove [Justice] from the shelf," hoping he could "bear hug" Justice to

pull him off the shelf and still have Justice land on his feet. Id. Justice did not get down, however, and instead sat on Logan's hand, breaking it. Id.

After Justice broke Logan's hand, Logan "brought [Justice] down to the floor," at which point Justice refused to be handcuffed. Id. Then, Seabron "deployed the Taser," and after it stopped, Logan placed Justice in handcuffs supplied by Deblois. Id. Deblois's explained that Seabron tased Justice so that they could handcuff him. Doc. 160-20 at 3. Logan and Deblois then helped Justice to his feet, escorted him to the four-point restraints room, and secured his left wrist in a restraint. Doc. 160-18 at 6. During that escort, Justice shouted expletives at another officer. Id. Logan told Justice to stop and thought Justice was going to spit at the other officer, so he "grabbed [Justice's] face and turned his head to face [Logan]." Id. He applied pressure to Justice's chin to close his mouth and prevent an attempt to spit. Id. at 6-7. Logan believed all of his actions were reasonable and necessary to protect Justice from harming himself and to prevent harm that he would inflict by jumping off a shelf and spitting at an officer. Id. at 7.

While he was in four-points restraints, Justice was involuntarily treated with injectable psychiatric medications pursuant to an Involuntary Emergency Treatment Authorization. Doc. 161-3 at 10-14. Those injections were administered at approximately 6:50 p.m. and 8:19 p.m. Doc. 161-3 at 4.

The defendants say that Justice's only injury sustained during the incident was a two-inch wound he received from hitting the edge of the table. Id. at 8.

Logan left his shift early and was admitted to the emergency room at 10:33 p.m. to assess his broken hand. Doc. 160-18 at 7. He was not with Justice when Justice was in four point restraints, nor does he remember a second taser event on that evening. Id. Moreover, Deblois contends that he did not "strip search" Justice, although he acknowledges that Justice's clothes were likely removed before he was placed in "heavy clothes" upon release from restraints. Doc. 160-20 at 4.

**Procedural History**

Justice filed his complaint on April 28, 2020. Doc. 1. Magistrate Judge Johnstone renumbered Justice's claims and recommended that several of his claims be dismissed. Doc. 29. I approved Judge Johnstone's Report and Recommendation and ordered service of his remaining claims on December 2, 2022. Doc. 30; Doc. 31. I later allowed Justice to amend his complaint to add

new defendants who he claimed were also involved in the four use of force incidents.

The claims that remain seek damages from eight "officer defendants" and four "supervisory defendants."[5] All of the claims concern one or more of the four use of force incidents. As renumbered by the Magistrate Judge, Counts 1 and 2 allege that the officer defendants violated Justice's constitutional rights either by directly using excessive force against Justice (Count 1) or for failing to intervene to protect Justice from the improper use of force by others (Count 2). Doc. 29 at 10-12. Count 3 alleges that Deblois subjected Justice to an unlawful strip search during the January 22, 2019 incident. Id. at 12. Count 11 contends that the supervisory defendants violated Justice's constitutional rights by failing to properly supervise and train the officer defendants. Id. at 13. Finally, Count 15 alleges that both the officer defendants and the supervisory defendants are liable for assault, battery, negligence, intentional infliction of emotional distress, negligent

---

5 The officer defendants are Boisselle, Carver, Deblois, Kimball, Kum, Logan, Morissette, and Seabron. The supervisory defendants are Carlene Ferrier, Helen Hanks, Paula Mattis, and Deborah Robinson. Doc. 160. Seabron was named as a defendant in Justice's original complaint, but he did not join in the defendants' summary judgment motion because he had not been served when the motion was filed. Id. at 2 n. 1.

infliction of emotional distress, and negligent supervision under New Hampshire law. Id. at 14-15 (Counts 15(a)-(e) and 15(h)). [6]

All of the remaining defendants except Seabron have joined in a motion for summary judgment challenging Justice's claims. Doc. 160.

## III. ANALYSIS

The defendants seek summary judgment on several different grounds. The officer defendants argue that they are protected by qualified immunity. The supervisory defendants contend that Justice cannot prove that they are liable on his § 1983 failure-to-train claims. Finally, all of the defendants argue that they are entitled to summary judgment on the state law assault, battery, and negligent supervision claims, and that I should decline to exercise supplemental jurisdiction over the remaining state law claims. I begin with the defendants' qualified immunity argument.

### A. Qualified Immunity

"Government officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law." Zorn v. Linton, 607 U.S. 568, 571 (2026) (per curiam). Thus, the officer defendants are entitled to

---

[6] The Magistrate Judge also provisionally allowed Justice to proceed on a claim that unnamed defendants violated Justice's constitutional rights by subjecting him to seclusion in the SPU as a form of punishment. Doc. 29 at 12 (Count 4). Because, however, Justice has failed to comply with the Magistrate Judge's directive to identify the defendants who he claims are liable on this count, I deem this count to have been abandoned.

prevail even if they violated Justice's constitutional rights unless the rights they violated were clearly established when they engaged in the conduct that resulted in his claims. Cintron v. Bibeault, 148 F.4th 37, 47 (1st Cir. 2025).

To determine that a right is clearly established, I "'need to identify a case where an officer acting under similar circumstances . . . was held to have violated' the Constitution." Zorn, 607 U.S. at 572 (quoting Escondido v. Emmons, 586 U.S. 38, 42 (2019) (per curiam)). A clearly established right must "have a sufficiently clear foundation in then-existing precedent." District of Columbia v. Wesby, 583 U.S. 48, 63 (2018). "The relevant precedent must define the right with a 'high degree of specificity,' so that 'every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply.'" Zorn, 607 U.S. at 572 (quoting Wesby, 583 U.S. at 63). The annunciation of general principles ordinarily will not suffice to clearly establish a right. Id. Instead, officers are entitled to qualified immunity "unless they could have 'read' the relevant precedent beforehand and 'know[n]' that it proscribed their specific conduct." Id. (quoting City and County of San Francisco v. Sheehan, 575 U.S. 600, 616 (2015)). The central question thus becomes "whether in the particular factual context of [this] case, a reasonable officer would have understood that his conduct violated the right." Velez v. Eutzy, 152 F.4th 292, 303 (1st Cir. 2025) (citing Mlodzinski v. Lewis, 648 F.3d 24, 33 (1st Cir. 2011)).

As a general rule, a law will be clearly established for qualified immunity purposes only if (1) it is dictated by "controlling authority" involving similar facts, Wesby, 583 U.S. at 63, (2) it is based on a "robust consensus" of persuasive authority, id., or (3) it is based on a "general constitutional rule already identified in decisional law" that applies "with obvious clarity to the specific conduct in question," Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997)); see also Berge v. Sch. Comm. of Gloucester, 107 F.4th 33, 39 (1st Cir. 2024); Velez, 152 F.4th at 303.

1. Excessive Force Claims

Justice alleges that the officer defendants violated his rights through their use of excessive force. The First Circuit has held that the "usual standard for an excessive force claim brought by an involuntarily committed mental patient is whether the force used was 'objectively reasonable' under all circumstances." Davis v. Rennie, 264 F.3d 86, 108 (1st Cir. 2001). In Davis v. Rennie, the court found that a civilly committed person's "rights stem from" the Fourteenth Amendment's due process clause. Id. at 97.

Since the circuit's determination in Davis, the Supreme Court has weighed in on an adjacent issue, holding that "an objective standard is appropriate in the context of excessive force claims brought by pretrial detainees pursuant to the Fourteenth Amendment." Kingsley v. Hendrickson,

576 U.S. 389, 402 (2015). In so holding, the Court rejected the notion that excessive force claims brought by pretrial detainees should be subject to the more stringent subjective standard required by Eighth Amendment excessive force claims, as those who have not yet been convicted "cannot be punished at all." Id. at 400. The First Circuit has adopted this reasoning, acknowledging that Kingsley "extended the objective reasonableness standard for use of force from the arrest stage through the probable cause hearing" for claims brought both under the Fourth and the Fourteenth Amendments. Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 70 (1st Cir. 2016).

Although neither the Supreme Court nor the First Circuit has squarely addressed whether Kingsley extends to civil commitments, that decision does not undermine Davis's holding that excessive force claims brought by the civilly committed should be assessed under an objective reasonableness standard. Moreover, several other courts that have examined the issue since Kingsley have held that objective reasonableness standard applies to such claims. See Aruanno v. Maurice, 790 F. App'x 431, 434 (3rd Cir. 2019) (applying Kingsley to excessive-force claim brought by civilly committed plaintiff under the Fourteenth Amendment); Welsh v. Correct Care Recovery Sols., 845 F. App'x 311, 317 (5th Cir. 2021) (same); Monts v. Brown, 2023 WL 109731, at *1 (9th Cir. Jan. 5, 2023) (same). Against this backdrop, I am

persuaded that Justice's Fourteenth Amendment excessive force claims should be assessed under Kingsley's objective reasonableness standard.

In determining whether an officer's use of force violated clearly established law, courts can draw on various sources. While "the protections offered by the Fourth, Eighth and Fourteenth Amendments differ in substantial ways, courts generally consider Fourth and Eighth Amendment excessive force cases instructive when determining what constitutes de minimis force, or force that is reasonable under the circumstances, for Fourteenth Amendment purposes as well." Lewis v. Huebner, 2020 WL 1244254, at *5 n.1 (S.D.N.Y. Mar. 16, 2020); see also Boyd v. McNamara, 74 F.4th 662, 667 n.3 (5th Cir. 2023) (holding that because the standard for excessive force is the same under the Fourth and Fourteenth Amendments, the court has "previously relied on Fourth Amendment excessive force cases to determine whether a right had been clearly established for purposes of a Fourteenth Amendment excessive force claim.").

It is worth noting, however, that a mentally-ill, civil committed person is entitled to greater protection from the use of force than inmates who have been committed of a crime. See Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982) ("Persons who have been involuntarily committed are entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."). It is therefore possible

that force as applied to a convicted criminal might not be excessive under the Eighth Amendment but would be excessive as applied to a mentally-ill, civilly committed individual. Nevertheless, to the extent that cases arising under the Eighth and Fourteenth Amendments clearly establish that excessive force was used, those precedents can also be used to establish a mentally-ill, civil committed individual's Fourteenth Amendment right to be free from excessive force in similar circumstances.

Here, Justice's excessive force claims arise primarily from the defendants' use of tasers, pepper spray, and four-point restraints against him. In analyzing those claims, I assume for purposes of analysis that clearly established law bars the use of tasers or pepper spray against a civilly committed person who is compliant and does not pose an immediate threat to himself or others. See Gray v. Cummings, 917 F.3d 1, 12 (1st Cir. 2019) (describing holding in Parker v. Gerrish, 547 F.3d 1, 10-11 (1st Cir. 2008) that the use of a taser against an unarmed suspect, who, in the course of an arrest "present[ed] no significant active resistance or threat at the time of the tasing") (citation modified); Segrain v. Duffy, 118 F.4th 45, 60 (1st Cir. 2024) (second application of pepper spray after inmate was disarmed satisfies the objective component of an Eighth Amendment excessive force claim). I also assume that general law establishes with "obvious clarity" that four-point restraints cannot lawfully be used against a civilly committed person who is

compliant and not a danger to himself or others. See Pelzer, 536 U.S. at 741 (obvious clarity standard); c.f. Williams v. Benjamin, 77 F.3d 756, 763 (4th Cir. 1996) ("Courts have . . . approved the limited use of four-point restraints, as a last resort, when other forms of prison discipline have failed.").

The difficulty here, however, is that Justice was not compliant and non-threatening when the officer defendants used force against him. To the contrary, during each of the alleged use of force incidents, Justice was repeatedly non-compliant and acted such that the officer defendants could have believed he posed a danger to both himself and others.

On February 18, 2018, Justice banged on his cell door for at least ten minutes, shouted threats to the officers, repeatedly refused to comply with verbal commands, and failed to respond to a "spark test" warning him that a taser would be used against him if he did not comply. These actions prompted medical personnel to issue a Personal Safety Emergency Intervention Order requiring that Justice be placed in four-point restraints. Doc. 161 at 12. It was in response to Justice's actions that the officer defendants used a taser to "temporarily incapacitate" Justice so that he could be handcuffed and then placed in four-point restraints. Doc. 160-20 at 3.

Likewise, Justice engaged in resistant, threatening, or self-harming behaviors on both April 10 and July 13, 2018. On April 10, 2018, Justice threatened to throw urine at an officer and shouted expletives at him before

the officer briefly deployed pepper spray into Justice's cell. And on July 13, 2018, Justice had completely obstructed the officers' view into his cell, climbed to a shelf in his room, and repeatedly refused to comply with the officers' orders to take down the obstruction and "cuff-up." These actions prompted two officers to briefly deploy pepper spray into his cell. When that use of pepper spray proved ineffective in securing Justice's compliance, the officers forcibly removed him from the shelf and temporarily applied handcuffs.

Finally, on January 22, 2019, Justice again stood on an elevated surface, refused to comply with officers' requests to get down and "cuff up," and repeatedly threatened to harm himself by jumping off the elevated surface. After repeated failed efforts to gain his compliance, the officers entered his cell and forcibly removed Justice from the surface, handcuffed him, and then placed him in four-point restraints.[7]

Given these circumstances, I cannot say that any of the officer defendants violated Justice's clearly established rights. First, in each of the use of force incidents, the officer defendants had reason to believe that the force they used was necessary both to protect Justice from harming himself

---

[7] Because the defendants do not seek summary judgment as to defendant Seabron, I need not discuss the circumstances surrounding Seabron's alleged use of the taser on two separate occasions on January 22, 2019.

and to ensure their own safety. Second, in three of the four incidents, the officer defendants gave Justice multiple warnings and opportunities to comply before using force. And, while officer Logan pepper sprayed Justice on April 10, 2018 without giving him advance warning, he did so in response to an imminent threat that Justice would throw urine on him. Finally, in each instance, no more force was used against Justice than what reasonable officers would believe was necessary under the circumstances.

In light of these facts, I conclude that the officer defendants did not violate clearly established law during the four use of force incidents. Justice cannot point to any controlling authority or any robust consensus of persuasive authority to support his position. See Wesby, 583 U.S. at 63. Nor does he show that any general legal principle applies with obvious clarity to the conduct at issue in this case. See Pelzer, 536 U.S. at 741. Accordingly, the officer defendants are entitled to qualified immunity, and I grant summary judgment to them as to Justice's claims of excessive force. [8]

[8] Justice advances several ancillary claims of excessive force on the four dates addressed in his complaint, including that the officer defendants used excessive force when attempting to restrain him by using physical force against him, incorrectly handcuffing him, and using pain compliance techniques. Doc. 29 at 10-11; Doc. 131 at 6-7. However, Justice makes these allegations in a conclusory way and provides no case law to support his argument that the officer defendants who used these techniques violated clearly established law. As such, I grant summary judgment as to these remaining allegations.

In conjunction with his claims of excessive force, Justice brings failure-to-intervene claims against two officer defendants, Kimball and Logan. Under circuit precedent, "[a]n officer may be held liable not only for his personal use of excessive force, but also for his failure to intervene in appropriate circumstances to protect an arrestee from the excessive use of force by his fellow officers." Miranda-Rivera, 813 F.3d at 73 (quoting Wilson v. Town of Mendon, 294 F.3d 1, 6 (1st Cir. 2002)). Such a duty arises "when [an officer] sees another officer using excessive force against an [individual] if the officer could realistically prevent that force and had sufficient time to do so." Davis, 264 F.3d at 113.

If, however, the officer who allegedly used excessive force did not violate clearly established law, then his fellow officers are also entitled to qualified immunity for failing to intervene. See Miller v. Jackson, 152 F.4th 258, 267 (1st Cir. 2025). Here, therefore, because the officer defendants are entitled to qualified immunity for their actions, so too are the officers who allegedly failed to intervene.[9]

---

[9] Justice alleges that Logan is also liable for failing to intervene to prevent Seabron from using excessive force against him twice on January 22, 2019. The undisputed evidence establishes, however, that Logan could not have prevented Seabron from using the taser on either occasion. When Seabron allegedly first used the taser, Logan was actively attempting to restrain Justice and broke his hand during that effort. And, when Seabron allegedly tased Justice a second time while Justice was in four-point

2. Unconstitutional Strip Search

Justice's final federal allegation against an officer defendant is that he was unlawfully strip searched by Deblois. A strip search of a civilly committed person is constitutional so long as it is reasonable. Bell v. Wolfish, 441 U.S. 520, 558-59 (1979) (pretrial detainees); Serna v. Goodno, 567 F.3d 944, 949-51 (applying Bell balancing test to strip searches of civilly committed persons). The constitutionality of a strip search "depends on whether the circumstances reasonably justify such an intrusive invasion of privacy." United States v. Cofield, 391 F.3d 334, 336 (1st Cir. 2004) (citing Bell, 441 U.S. at 559 (1979)). Courts must assess the reasonableness of such a search under a totality of the circumstances inquiry into the following factors: "(1) the scope of the particular intrusion, (2) the manner in which it is conducted, (3) the justification for initiating it, and (4) the place in which it is conducted." Id. (quoting Bell, 441 U.S. at 559) (citation modified).

Even construing the evidence in the light most favorable to Justice, I conclude that he was not strip searched on January 22, 2019. Deblois states in a sworn declaration that he did not "strip search" Justice on that day but instead suggests that Justice's clothes were "likely removed prior to getting

---

restraints, Logan had left the area to seek treatment for his broken hand. See Doc. 160-18 at 7. Accordingly, Logan is also entitled to qualified immunity for these claims.

placed in a safety smock or heavy clothes." Doc. 160-20 at 4. The defendants argue that Justice's clothes were removed by a staff member "for safety purposes" and that he was later put into heavy clothes pursuant to a standard protocol "to keep patients safe and to prevent them from using their own clothing for self-harm." Doc. 160-24 at 17, 38. Justice has not produced any evidence to contradict Deblois's sworn declaration. Accordingly, Deblois is entitled to qualified immunity from Justice's strip search claim.

**B. Supervisory Liability**

The defendants additionally argue that they are entitled to summary judgment from Justice's failure to train claims against defendants Ferrier, Hanks, Mattis, and Robinson because these supervisory defendants were not directly involved in any of the purportedly unconstitutional conduct and were not deliberately indifferent to the allegedly unconstitutional conduct of their subordinate officer defendants.

"Under § 1983, courts have treated claims for both failure to supervise and failure to train under the general category of supervisory liability." Bochart v. City of Lowell, 989 F. Supp. 2d 151, 155-56 (D.Mass. 2013). The First Circuit has cautioned that "[t]he liability criteria for 'failure to train' claims are exceptionally stringent." Justiniano v. Walker, 986 F.3d 11, 20 (1st Cir. 2021) (quoting Hayden v. Grayson, 134 F.3d 449, 456 (1st Cir. 1998)). "Generally, a supervisor cannot be held liable under § 1983 on a respondeat

superior theory—a 'supervisor's liability must be premised on [their] own acts or omissions' and does not attach automatically even if a subordinate is found liable." Wadsworth v. Nguyen, 129 F.4th 38, 63 (1st Cir. 2025) (citing Justiniano, 986 F.3d at 20).

There are two circumstances under which supervisors can be held liable: when they directly participate in the unconstitutional conduct, and when then their "conduct . . . amounts to condonation or tacit authorization." Camilo-Robles v. Zapata, 175 F.3d 41, 44 (1st Cir. 1999). Justice does not allege that the supervisory defendants directly participated in any of the use of force incidents. Accordingly, they can be held liable as supervisors only if "(1) the behavior of [the] subordinates results in a constitutional violation, and (2) the supervisor's action or inaction was affirmatively linked to that behavior in the sense that it could be characterized as supervisory encouragement, condonation or acquiescence, or gross negligence amounting to deliberate indifference." Wadsworth, 129 F.4th at 62-63 (citation modified). "Deliberate indifference requires a plaintiff to demonstrate or allege '(1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk.'" Justiniano, 986 F.3d at 20 (quoting Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998)).

To prove his supervisory liability claims, Justice must also establish a causal link between the supervisors' actions or inactions and the use of force by the officer defendants. See id. To satisfy this element, a plaintiff must prove "that the supervisor's conduct led inexorably to the constitutional violation." Guadelupe-Báez v. Pesquera, 819 F.3d 509, 515 (1st Cir. 2016) (citation modified). In failure-to-train claims, the plaintiff must show that the "lack of training caused [the subordinate officer] to take actions that were objectively unreasonable and constituted excessive force." Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 27 (1st Cir. 2005). Causation is a "difficult standard to meet," Justiniano, 986 F.3d at 20-21, but it can be satisfied "by showing inaction in the face of a 'known history of widespread abuse sufficient to alert a supervisor to ongoing violations.'" Id. at 21 (quoting Guadelupe-Báez, 819 F.3d at 515).

Justice has not provided any evidence from which a reasonable jury could find that that he has met any of these requirements with respect to any of the supervisory defendants. Even if the officer defendants violated Justice's constitutional rights, the record contains no evidence to support a claim that the supervisory defendants' actions were "affirmatively linked to th[ose] behavior[s] in the sense that [those actions] could be characterized as supervisory encouragement, condonation or acquiescence, or gross negligence amounting to deliberate indifference." Wadsworth, 129 F.4th at 62-63

(citation modified). Justice does not allege that the supervisory defendants had actual or constructive knowledge of a grave risk of harm to him, nor does he show that they failed to address any risk of which they did have knowledge. In fact, in his deposition, Justice repeatedly stated that he did not "know how" Hanks and Mattis had violated his rights and had "no idea how [Ferrier was] involved." Doc. 160-13 at 26-28. Justice's best argument regarding the supervisory defendants is that he filed a complaint that would have given Robinson notice of the officer defendants' purported violations. However, to the extent Justice testified that he "file[d] complaints" that would have given Robinson "knowledge of the things that were happening to me," Justice was unable to provide details regarding the content of those complaints and was "not sure" whether he filed any complaints regarding the incidents that gave rise to this litigation. Id. at 11-13, 29-30. Moreover, while Justice said that Robinson's replies to those complaints were "neutral," he does not allege that she failed to address any risk of harm of which she was made aware. Id. at 30. Given the lack of support for his supervisory liability claims, I conclude that the defendants are entitled to summary judgment on these claims as well.

### C. State Law Tort Claims

The defendants also seek summary judgment on Justice's state law assault, battery, and negligent supervision claims. They then ask the court to

decline to exercise supplemental jurisdiction over Justice's claims for negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress. I deny both requests.

The defendants devote only a single sentence in their brief to their contention that the officer defendants are entitled to summary judgment on Justice's assault and battery claims. Doc. 160-24 at 26 n.5. They speak with similar brevity when pressing for summary judgment on Justice's claim that the supervisory defendants are entitled to prevail on their negligent supervision claims. Id. at 22. The defendants do not present any developed argument in support of either contention, nor do they cite to or reason from New Hampshire case law to support their claims. As other courts have noted, an "entirely conclusory argument—made without citation to legal authority or the factual record in defendants' original brief—is not sufficient to support a summary judgment motion." ICONICS, Inc. v. Massaro, 192 F. Supp. 3d 254, 267 (D.Mass. 2016). Accordingly, I decline to address these arguments because they have not been sufficiently developed. See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999) ("The district court is free to disregard arguments that are not adequately developed.").

The defendants also argue that I should dismiss Justice's remaining state law claims for lack of supplemental jurisdiction. Although I have discretion to decline supplemental jurisdiction over state law claims under 28

U.S.C. § 1367, this would not be an appropriate case to do so. The First Circuit has held that when determining whether to decline supplemental jurisdiction over surviving state law claims, courts can consider "the interests of fairness, judicial economy, convenience, and comity," among other factors. Camelio v. American Fed'n, 137 F.3d 666, 672 (1st Cir. 1998). Here, where the case has been ongoing for over five years, discovery has concluded, dispositive motions have been filed, and federal claims remain as to one defendant, I do not believe it would be appropriate to decline supplemental jurisdiction and force Justice to refile his claims in state court. See Doe v. Holly, 2022 WL 1038012, at *4 n. 10 (D.Mass. Feb. 25, 2022) ("[T]he Court nonetheless exercises supplemental jurisdiction over the remaining state law claims given that the parties completed discovery and briefed summary judgment as to every claim."). Accordingly, I retain supplemental jurisdiction over Justice's state law claims.

## IV. CONCLUSION

For the foregoing reasons, I grant the defendants' motion for summary judgment with respect to Justice's § 1983 claims against the moving defendants (counts 1, 2, 3, 4, and 11) but deny their motion without prejudice with respect to Justice's state law claims (count 15(a)-(e) and 15(h)). Because

defendant Seabron did not join in the motion, Justice's claims against him are unaffected by this Memorandum and Order.[10]

SO ORDERED.

/s/Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

September 10, 2026

cc: William Soler Justice, pro se
Counsel of Record

[10] Justice raises additional arguments in his objection concerning the constitutionality of his placement in the SPU, the quality of care and conditions provided there, and its systemic failures. However, at a previous hearing, I made clear that Justice could not add new claims in his amended complaint and instead could only proceed on the claims I had previously approved. Oct. 28, 2024 Hearing. To the extent I allowed Justice to amend his complaint, it was only to allow him to add defendants who participated in the four use of force incidents. Id. In any event, to the extent Justice raises new arguments in his objection to the defendants' motion for summary judgment, it is well settled that a plaintiff may not "raise new and unadvertised theories of liability for the first time in opposition to a motion for summary judgment." Calvi v. Knox County, 470 F.3d 422, 431 (1st Cir. 2006). I therefore decline to address any of the arguments Justice makes for the first time in his objection to his motion for summary judgment.